# EXHIBIT B

# POSTPETITION CREDIT AGREEMENT

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**DATED AS OF July 31, 2015**

**AMONG**

**COYNE INTERNATIONAL ENTERPRISES CORP.,**
**as Borrower,**

**NXT CAPITAL, LLC,**
**as Agent, as a Lender and**
**as Sole Bookrunner and Sole Lead Arranger**

**AND**

**THE ADDITIONAL LENDERS**
**FROM TIME TO TIME PARTY HERETO.**

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS..................................................................................... 1

    Section 1.1    Certain Defined Terms............................................................. 1
    Section 1.2    Accounting Terms and Determinations. .................................. 1
    Section 1.3    Other Definitional Provisions and References. ....................... 2

ARTICLE 2 LOANS ............................................................................................... 2

    Section 2.1    [Reserved]. .............................................................................. 2
    Section 2.2    Revolving Loans. .................................................................... 2
    Section 2.3    [Reserved]. .............................................................................. 4
    Section 2.4    Mandatory Prepayments. ........................................................ 4
    Section 2.5    Interest, Fees, Calculations. ................................................... 6
    Section 2.6    Notes. ...................................................................................... 9
    Section 2.7    Provisions Regarding Payment............................................... 9

ARTICLE 3 REPRESENTATIONS AND WARRANTIES ................................. 10

    Section 3.1    Existence and Power............................................................... 10
    Section 3.2    Organizational Authority and Governmental Authorization; No
                Contravention. ........................................................................ 11
    Section 3.3    Binding Effect......................................................................... 11
    Section 3.4    Capitalization. ......................................................................... 11
    Section 3.5    Financial Information. ............................................................ 11
    Section 3.6    Litigation................................................................................ 11
    Section 3.7    Ownership of Property............................................................ 12
    Section 3.8    No Default............................................................................... 12
    Section 3.9    Labor Matters.......................................................................... 12
    Section 3.10   Investment Company. ............................................................. 12
    Section 3.11   Margin Regulations................................................................ 12
    Section 3.12   Compliance With Laws; Anti-Terrorism Laws. ..................... 13
    Section 3.13   Taxes....................................................................................... 13
    Section 3.14   Compliance with ERISA. ....................................................... 13
    Section 3.15   Brokers.................................................................................... 14
    Section 3.16   [Reserved]. .............................................................................. 14
    Section 3.17   Environmental Compliance. ................................................... 14
    Section 3.18   Intellectual Property............................................................... 15
    Section 3.19   Real Property Interests........................................................... 16
    Section 3.20   [Reserved]. .............................................................................. 16
    Section 3.21   Full Disclosure....................................................................... 16
    Section 3.22   Representations and Warranties Incorporated from Other Operative
                Documents. ............................................................................. 16

Section 3.23    Matters Relating to Lien and Property Rights. ........................................ 16
Section 3.24    Budget. ............................................................................................... 17
Section 3.25    Financing Order. .................................................................................. 17

ARTICLE 4 AFFIRMATIVE COVENANTS ................................................................. 17

Section 4.1     Financial Statements and Other Reports. ............................................. 17
Section 4.2     Payment and Performance of Obligations. ........................................... 21
Section 4.3     Maintenance of Existence. ................................................................... 21
Section 4.4     Maintenance of Property; Insurance. .................................................... 21
Section 4.5     Compliance with Laws. ........................................................................ 22
Section 4.6     Inspection of Property, Books and Records, Appraisals. ...................... 23
Section 4.7     Use of Proceeds. ................................................................................. 23
Section 4.8     Lenders' Meetings; Lender Advisors. ................................................... 24
Section 4.9     [Reserved]. .......................................................................................... 24
Section 4.10    Further Assurances. ............................................................................ 24
Section 4.11    Chief Executive Office; Senior Financial Officer. .................................. 25
Section 4.12    Investment Banker. ............................................................................. 25
Section 4.13    [Reserved]. .......................................................................................... 25
Section 4.14    Bankruptcy Transaction Milestones. .................................................... 25
Section 4.15    Post-Closing Deliveries. ...................................................................... 26

ARTICLE 5 NEGATIVE COVENANTS ........................................................................ 26

Section 5.1     Debt. ................................................................................................... 26
Section 5.2     Liens. ................................................................................................... 26
Section 5.3     Contingent Obligations. ...................................................................... 28
Section 5.4     Restricted Distributions. ...................................................................... 28
Section 5.5     Restrictive Agreements. ...................................................................... 29
Section 5.6     Payments and Modifications of Subordinated Debt. ............................ 29
Section 5.7     Consolidations, Mergers and Sales of Assets. ..................................... 29
Section 5.8     Purchase of Assets, Investments. ........................................................ 29
Section 5.9     Transactions with Affiliates. ................................................................. 30
Section 5.10    Modification of Organizational Documents. ......................................... 30
Section 5.11    Reserved. ............................................................................................ 30
Section 5.12    Fiscal Year. .......................................................................................... 30
Section 5.13    Conduct of Business. ........................................................................... 30
Section 5.14    [Reserved]. .......................................................................................... 30
Section 5.15    Limitation on Sale and Leaseback Transactions. ................................. 30
Section 5.16    Compliance with Anti-Terrorism Laws. ................................................. 31
Section 5.17    Financing Order; Administrative Expense Priority; Payments. .............. 31

ARTICLE 6 FINANCIAL COVENANTS ........................................................................ 32

Section 6.1     Minimum AWR. ................................................................................... 32

ARTICLE 7 CONDITIONS ...................................................................................... 32

    Section 7.1    Conditions to Closing. ...................................................... 32
    Section 7.2    Conditions to Each Loan. .................................................. 33

ARTICLE 8 EVENTS OF DEFAULT ...................................................................... 34

    Section 8.1    Events of Default. ............................................................. 34
    Section 8.2    Acceleration and Suspension or Termination of Revolving Loan
                 Commitment. .................................................................... 39
    Section 8.3    [Reserved]. ........................................................................ 39
    Section 8.4    Default Rate of Interest and Suspension of LIBOR Rate Options. .......... 39
    Section 8.5    Setoff Rights. ................................................................... 40
    Section 8.6    Application of Proceeds. ................................................... 40

ARTICLE 9 EXPENSES AND INDEMNITY ........................................................ 41

    Section 9.1    Expenses. .......................................................................... 41
    Section 9.2    Indemnity. ......................................................................... 42

ARTICLE 10 TAXES; YIELD PROTECTION ...................................................... 43

    Section 10.1    Taxes. ............................................................................... 43
    Section 10.2    Capital Adequacy. ............................................................ 45
    Section 10.3    Increased Costs. ................................................................ 46
    Section 10.4    Mitigation Obligations. ..................................................... 46
    Section 10.5    Conclusiveness of Statements; Survival. ............................. 47
    Section 10.6    Dodd-Frank. ..................................................................... 47

ARTICLE 11 AGENT ............................................................................................... 47

    Section 11.1    Appointment and Authorization. ....................................... 47
    Section 11.2    Agent and Affiliates. ........................................................ 48
    Section 11.3    Action by Agent; Action by Secured Parties. .................... 48
    Section 11.4    Consultation with Experts. ................................................ 49
    Section 11.5    Liability of Agent. ............................................................ 49
    Section 11.6    Indemnification. ................................................................ 49
    Section 11.7    Right to Request and Act on Instructions. ......................... 50
    Section 11.8    Credit Decision. ............................................................... 50
    Section 11.9    Collateral Matters. ........................................................... 50
    Section 11.10    Agency for Perfection. ..................................................... 51
    Section 11.11    Notice of Default. ............................................................. 51
    Section 11.12    Successor Agent. .............................................................. 51
    Section 11.13    Disbursements of Revolving Loans; Payment and Sharing of
                 Payment. .......................................................................... 52
    Section 11.14    Right to Perform, Preserve and Protect. ............................ 55
    Section 11.15    Additional Titled Agents. ................................................. 56
    Section 11.16    Third Party Beneficiaries. ................................................. 56

ARTICLE 12 MISCELLANEOUS ....................................................................... 56

Section 12.1     Survival. ......................................................................... 56
Section 12.2     No Waivers; Remedies Cumulative. ........................................ 57
Section 12.3     Notices. .......................................................................... 57
Section 12.4     Severability. .................................................................... 58
Section 12.5     Amendments and Waivers. ................................................... 58
Section 12.6     Assignments; Participations; Replacement of Lenders. ............... 59
Section 12.7     Headings. ........................................................................ 63
Section 12.8     Confidentiality. ................................................................ 63
Section 12.9     Waiver of Consequential and Other Damages. ........................... 64
Section 12.10    Marshaling; Payments Set Aside. .......................................... 64
Section 12.11    GOVERNING LAW; SUBMISSION TO JURISDICTION. ............... 64
Section 12.12    WAIVER OF JURY TRIAL. ................................................. 65
Section 12.13    Publication; Advertisement. ................................................ 65
Section 12.14    Counterparts; Signatures; Integration. .................................... 66
Section 12.15    No Strict Construction. ...................................................... 66
Section 12.16    USA PATRIOT Act Notification. .......................................... 66
Section 12.17    [Reserved] ....................................................................... 66
Section 12.18    Acknowledgements. ........................................................... 66

# ANNEXES, EXHIBITS AND SCHEDULES

## ANNEXES

Annex A          -          Definitions
Annex B          -          Commitment Annex
Annex C          -          Closing Checklist

## EXHIBITS

Exhibit A          -          Assignment Agreement
Exhibit E          -          Notice of Borrowing
Exhibit F          -          Payment Notification
Exhibit G-2        -          Revolving Loan Note

## SCHEDULES

Schedule 3.1       -          Existence, Organizational Identification Numbers, Foreign
                              Qualification, Prior Names
Schedule 3.4       -          Capitalization
Schedule 3.6       -          Litigation
Schedule 3.9       -          Labor Matters
Schedule 3.14      -          ERISA
Schedule 3.15      -          Brokers
Schedule 3.17      -          Environmental Compliance
Schedule 3.18      -          Intellectual Property
Schedule 3.19      -          Real Estate
Schedule 4.14      -          Bankruptcy Transaction Milestones
Schedule 5.1       -          Debt
Schedule 5.2       -          Liens
Schedule 5.3       -          Contingent Obligations
Schedule 5.8       -          Investments
Schedule 5.9       -          Affiliate Transactions
Schedule 5.13      -          Business Description

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of July 31, 2015 is among **Coyne International Enterprises Corp.**, a New York corporation ("**Borrower**"), the financial institutions or other entities from time to time parties hereto, each as a "**Lender**," and **NXT Capital, LLC**, a Delaware limited liability company, individually as a Lender, as Agent, Sole Bookrunner and Sole Lead Arranger.

### RECITALS:

WHEREAS, on July 31, 2015 (the "**Filing Date**"), Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of New York (the "**Bankruptcy Court**");

WHEREAS, Borrower is continuing to operate its business and manage its properties as debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower desires that Lenders extend certain working capital facilities to Borrower to enable the Borrower to operate in chapter 11 pending the sale of its business, pay transaction fees and expenses incurred in connection with the consummation of the transactions consummated hereby, to repay certain debt of Borrower on the date hereof, and for other purposes expressly set forth herein; and

WHEREAS, Borrower is willing to secure all of the Obligations by granting to Agent, for the benefit of the Secured Parties, a first priority perfected Lien upon substantially all of its personal and real property, and, subject to the terms hereof, the outstanding Capital Stock of each of its first-tier Foreign Subsidiaries; and

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrower, Lenders and Agent agree as follows:

### ARTICLE 1
### DEFINITIONS

Section 1.1    Certain Defined Terms.

Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms on Annex A to this Agreement.

Section 1.2    Accounting Terms and Determinations.

Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including without limitation determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP consistently applied. If at any time any change in GAAP would

affect the computation of any financial ratio or financial requirement set forth in any Financing Document, and Borrower or Required Lenders shall so request, Agent, Lenders and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) Borrower shall provide to Agent and Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (Codification of Accounting Standards 825-10) to value any Debt or other liabilities of any Borrower at "fair value", as defined therein.

Section 1.3        <u>Other Definitional Provisions and References</u>.

References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits" or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided.  Any term defined herein may be used in the singular or plural.  "Include", "includes" and "including" shall be deemed to be followed by "without limitation".  Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person.  References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively.  Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.  Time is of the essence for each performance obligation of Borrower under this Agreement and each Financing Document.  All amounts used for purposes of financial calculations required to be made herein shall be without duplication.  References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations.  References to any statute or act, without additional reference, shall be deemed to refer to Federal statutes and acts of the United States.  References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto.

**ARTICLE 2**
**LOANS**

Section 2.1        [Reserved].

Section 2.2        <u>Revolving Loans</u>.

(a)        <u>Commitments</u>.  On the terms and subject to the conditions set forth herein, each Lender severally agrees to make Loans to Borrower from time to time as set forth herein (each a "**Revolving Loan**", and collectively, "**Revolving Loans**") equal to such

Lender's Revolving Loan Commitment Percentage of Revolving Loans requested by Borrower hereunder, provided that after giving effect thereto, the Revolving Loan Outstandings at any time shall not exceed, for any week, the principal amount of the Revolving Loans projected to be outstanding during such week as set forth in the Budget for such week.  Within the foregoing limits, Borrower may borrow under this Section 2.2, may prepay or repay Revolving Loans from time to time and may reborrow Revolving Loans pursuant to this Section 2.2.  Anything to the contrary in this Section 2.2(a) notwithstanding, Agent shall have the right (but not the obligation) to establish and increase or decrease or eliminate Reserves, including, without limitation, Reserves to address the results of any audit or appraisal performed by or on behalf of Agent from time to time after the Closing Date, Reserves for any accrued amounts in excess of the amount set forth therefor in the Budget against the Revolving Loan Commitments.  Each request for a borrowing shall be in the minimum amount of $50,000.

       (b)     <u>Reserved</u>.

       (c)     <u>Advancing Revolving Loans</u>.

           (i)     <u>Notice of Borrowing</u>.  Borrower shall deliver to Agent a Notice of Borrowing with respect to each proposed borrowing of a Revolving Loan (other than Revolving Loans made pursuant to paragraph (ii) below), such Notice of Borrowing to be delivered no later than noon (Chicago time) (A) on the day of such proposed borrowing, in the case of Base Rate Loans in an aggregate principal amount equal to or less than $250,000, (B) on the Business Day prior to such proposed borrowing, in the case of Base Rate Loans in an aggregate principal amount greater than $250,000 and (C) on the third (3rd) Business Day prior to such proposed borrowing, in the case of all LIBOR Loans.  Once given, except as provided in Section 2.5(g)(ii), a Notice of Borrowing shall be irrevocable and Borrower shall be bound thereby.

           (ii)     <u>Authority on Notice</u>.  Borrower hereby authorizes Lenders and Agent to make Revolving Loans based on telephonic notices made by any Person which Agent, in good faith, believes to be acting on behalf of Borrower.  Borrower agrees to deliver to Agent a Notice of Borrowing in respect of each Revolving Loan requested by telephone no later than one Business Day following such request.  If the Notice of Borrowing differs in any respect from the action taken by Agent and Lenders, the records of Agent and Lenders shall govern absent demonstrable error. Borrower further hereby authorizes Lenders and Agent to make Revolving Loans based on otherwise timely (as set forth in Section 2.2(c)(i)) electronic notices made by any Person which Agent, in good faith, believes to be acting on behalf of Borrower, but only after Agent shall have established procedures acceptable to Agent for accepting electronic Notices of Borrowing, as indicated by Agent's written confirmation thereof.

(iii)    Authority to Advance Revolving Loans.  Borrower and each Revolving Lender hereby authorizes Agent to make Revolving Loans (which shall be Base Rate Loans) on behalf of Revolving Lenders, in Agent's sole discretion, to pay interest, fees, expenses and other charges payable by Borrower from time to time under this Agreement or any other Financing Document, so long as, in each case, after giving effect to any such Revolving Loans pursuant to this clause (B), the Revolving Loan Outstandings do not exceed the Revolving Loan Limit; provided, that Agent shall have no obligation at any time to make any Revolving Loan pursuant to the provisions of the preceding clause (B).  Agent shall have the right to make Revolving Loans pursuant to the provisions of this paragraph regardless of whether the conditions precedent set forth in Section 7.2 are then satisfied, including the existence of any Default or Event of Default either before or after giving effect to the making of such Revolving Loans.

(d)    Mandatory Revolving Loan Repayments.

(i)    Repayment Upon Termination Date.  The Revolving Loan Commitment shall terminate upon the earlier to occur of (A) the Commitment Expiry Date and (B) any date on which Agent or Required Lenders elect to terminate the Revolving Loan Commitment pursuant to Section 8.2 (such earlier date being the "**Termination Date**").  On the Commitment Expiry Date, there shall become due and payable, and Borrower shall repay the entire outstanding principal amount of each Revolving Loan, together with accrued and unpaid Obligations pertaining thereto.

(ii)    Repayment of Overadvances.  If at any time the Revolving Loan Outstandings exceed the Revolving Loan Limit, then, on the next succeeding Business Day, Borrower shall repay the Revolving Loans, in an aggregate amount equal to such excess.

(e)    [Reserved].

Section 2.3    [Reserved].

Section 2.4    Mandatory Prepayments.

There shall become due and payable and Borrower shall prepay the Loans in the following amounts and at the following times:

(a)    [Reserved.]

(b)    Casualty and Other Insurance Proceeds.  On the date on which Borrower (or Agent as loss payee or assignee) receives any Major Casualty Proceeds an amount equal to one hundred percent (100%) of such Major Casualty Proceeds.

(c)    Debt and Equity Proceeds.  Upon receipt by Borrower of the proceeds from the incurrence of Debt or the proceeds from the issuance and sale of any Debt or

-4-

Capital Stock or the proceeds of additional paid in capital, Borrower shall prepay the Loans in an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such incurrence, such issuance and sale or such additional paid in capital.

(d)    <u>Asset Disposition Proceeds</u>.  Upon receipt by Borrower of the proceeds of any Asset Disposition, Borrower shall prepay the Loans in an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such Asset Disposition, subject to the terms of any order of the Bankruptcy Court authorizing such Disposition (provided further, that if such court order does not authorize such prepayment at such time and in such manner as is acceptable to Agent, an Event of Default will exist by reason of this Section 2.4(d)).

(e)    <u>Extraordinary Receipts</u>.  Upon receipt by Borrower of any Extraordinary Receipts, Borrower shall prepay the Loans in an amount equal to one hundred percent (100%) of such Extraordinary Receipts.

(f)    <u>General Provisions</u>.  Borrower shall deliver to Agent an appropriately completed Payment Notification at least two (2) Business Days prior to each mandatory prepayment pursuant to this Section 2.4, and Agent shall promptly notify each Lender of such notice.  Any prepayment of a LIBOR Loan on a day other than the last day of an Interest Period therefor shall include interest on the principal amount being repaid and shall be subject to Section 2.5(g).  All prepayments of a Loan shall be applied first to that portion of such Loan comprised of Base Rate Loans and then to that portion of such Loan comprised of LIBOR Loans, in direct order of Interest Period maturities.  If Borrower would incur costs pursuant to Section 2.5(g) as a result of any mandatory prepayment of any LIBOR Loan, Borrower may deposit cash in the amount of such mandatory prepayment with Agent for the benefit of the applicable Lenders.  Any cash collateral so deposited with Agent shall be used to prepay the LIBOR Loans as Interest Periods expire (or at the election of Agent, earlier if a Default or Event of Default is then continuing).  Amounts so deposited may be commingled with other assets of Agent and shall not accrue interest for the benefit of Borrower.  LIBOR Loans backed by cash collateral pursuant to the preceding sentences shall continue to accrue interest until such Loans have been paid using such cash collateral.  Subject to the foregoing, all mandatory prepayments pursuant to this Section 2.4 shall be applied as a repayment of the outstanding Revolving Loans with a concurrent, permanent dollar-for-dollar reduction in the Revolving Loan Commitments, pro rata among all Revolving Lenders in accordance with the applicable Revolving Loan Exposures.

(g)    <u>Disgorgement</u>.  In the event that the Lenders are required to repay or disgorge to Borrower or any representatives of Borrower's estate (as agents, with derivative standing or otherwise) all or any portion of the Existing Obligations authorized and directed to be repaid pursuant to the Financing Order, or any payment on account of the Existing Obligations made to any Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or any applicable state or provincial law, or any other similar provisions under any other state, federal or provincial statutory or common law (all such amounts being hereafter referred to as the "**Avoided**

**Payments**"), then, in such event, Borrower shall prepay the outstanding principal amount of the Revolving Loans in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments by Borrower or any representative of Borrower's estate, for application to the Revolving Loans in Agent's discretion.

Section 2.5        Interest, Fees, Calculations.

(a)        Interest.  From and following the Closing Date, depending upon the election of Borrower from time to time, subject to the terms hereof, to have portions of the Loans accrue interest determined by reference to the Base Rate or the LIBOR, the Loans and the other Obligations shall bear interest at the applicable rates set forth below:

(i)        If a Base Rate Loan, or any other Obligation other than a LIBOR Loan, then at the sum of the Base Rate plus the applicable Base Rate Margin.

(ii)        If a LIBOR Loan, then at the sum of the LIBOR plus the applicable LIBOR Margin.

(b)        Unused Line Fee.  From and following the Closing Date, Borrower shall pay Agent, for the benefit of Revolving Lenders, in accordance with its Pro Rata Shares, a fee in an amount equal to (i) the average daily amount of the Revolving Loan Commitment less the average daily balance of the sum of the Revolving Loan Outstandings during the preceding month, multiplied by (ii) one-half of one percent (.50%) per annum. Such fee is to be paid in arrears on the last day of each calendar month and on the Termination Date.

(c)        [Reserved].

(d)        Agent's Fees.  Borrower shall pay to Agent fees in such amounts and at such times as set forth in that certain letter agreement dated the Closing Date between Agent and Borrower, as amended from time to time.

(e)        DIP Commitment Fee.  Borrower shall pay to Agent, for the ratable account of the Lenders, a commitment fee as set forth in the Interim Order and Final Order.

(f)        Computation of Interest and Related Fees.  All interest and fees under each Financing Document shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  The date of funding of a Base Rate Loan and the first day of an Interest Period with respect to a LIBOR Loan shall be included in the calculation of interest. The date of payment of a Base Rate Loan and the last day of an Interest Period with respect to a LIBOR Loan shall be excluded from the calculation of interest.  If a Loan is repaid on the same day that it is made, one (1) day's interest shall be charged.  Interest on all Base Rate Loans is payable in arrears on the last day of each calendar month and on the maturity of such Loans, whether by acceleration or otherwise.  Interest on LIBOR Loans shall be payable on the last day of the applicable Interest Period, unless the Interest Period is greater than three (3) months, in which case interest will also be payable on the last day of each three (3)

month interval.  In addition, interest on LIBOR Loans is due on the maturity of such Loans, whether by acceleration or otherwise.

(g)    LIBOR Provisions.

(i)    LIBOR Election.  All Loans made on the Closing Date shall be Base Rate Loans and shall remain so until three (3) Business Days after the Closing Date.  Thereafter, subject to the provisions of Section 8.4, Borrower may request that Revolving Loans permitted to be made hereunder be LIBOR Loans, that outstanding portions of Revolving Loans be converted to LIBOR Loans and that all or any portion of a LIBOR Loan be continued as a LIBOR Loan upon expiration of the applicable Interest Period.  Any such request will be made by submitting a Notice of Borrowing to Agent on the third (3rd) Business Day prior to such proposed borrowing, conversion or continuation.  Once given, and except as provided in paragraph (ii) below, a Notice of Borrowing shall be irrevocable and Borrower shall be bound thereby.  Upon the expiration of an Interest Period, in the absence of a new Notice of Borrowing submitted to Agent not less than three (3) Business Days prior to the end of such Interest Period, the LIBOR Loan then maturing shall be automatically converted to a Base Rate Loan.  There may be no more than six (6) LIBOR Loans outstanding at any one time.  Each request for a LIBOR Loan, whether by original issuance, conversion or continuation, shall be in a minimum amount of $250,000 and, if in excess of such amount, in an integral multiple of $50,000.  Loans which are not requested as LIBOR Loans in accordance with this paragraph (i) shall be Base Rate Loans.  Agent shall notify Lenders of each Notice of Borrowing received by Agent not less than two (2) Business Days prior to the first day of the Interest Period of the LIBOR Loan requested thereby.

(ii)    Inability to Determine LIBOR.  In the event, prior to commencement of any Interest Period relating to a LIBOR Loan, Agent shall determine or be notified by Required Lenders that adequate and reasonable methods do not exist for ascertaining LIBOR, Agent shall promptly provide notice of such determination to Borrower and Lenders (which shall be conclusive and binding on Borrower and Lenders).  In such event (A) any request for a LIBOR Loan or for a conversion to or continuation of a LIBOR Loan shall be automatically withdrawn and shall be deemed a request for a Base Rate Loan, (B) each LIBOR Loan will automatically, on the last day of the then current Interest Period relating thereto, become a Base Rate Loan and (C) the obligations of Lenders to make LIBOR Loans shall be suspended until Agent or Required Lenders determine that the circumstances giving rise to such suspension no longer exist, in which event Agent shall so notify Borrower and Lenders.

(iii)    Illegality.  Notwithstanding any other provisions hereof, if any Law shall make it unlawful for any Lender to make, fund or maintain LIBOR Loans, such Lender shall promptly give notice of such circumstances to Agent, Borrower and the other Lenders.  In such an event, (A) the commitment of such Lender to make

-7-

LIBOR Loans, continue LIBOR Loans or convert Base Rate Loans to LIBOR Loans shall be immediately suspended and (B) such Lender's outstanding LIBOR Loans shall be converted automatically to Base Rate Loans on the last day of the Interest Period thereof or at such earlier time as may be required by Law.

(iv)    LIBOR Breakage Fee.    Upon (A) any default by Borrower in making any borrowing of, conversion into or continuation of any LIBOR Loan following Borrower's delivery to Agent of any applicable Notice of Borrowing or (B) any payment of a LIBOR Loan on any day that is not the last day of the Interest Period applicable thereto (regardless of the source of such prepayment and whether voluntary, by acceleration or otherwise, but excluding deposits of cash collateral in respect of LIBOR Loans made pursuant to Section 2.4(f)), Borrower shall promptly pay Agent, for the benefit of all Lenders that funded or were prepared to fund any such LIBOR Loan, an amount equal to the amount of any losses, expenses and liabilities (including, without limitation, any loss (including interest paid) in connection with the re-employment of such funds) that any Lender may sustain as a result of such default or such payment. For purposes of calculating amounts payable to a Lender under this paragraph, each Lender shall be deemed to have actually funded its relevant LIBOR Loan through the purchase of a deposit bearing interest at LIBOR in an amount equal to the amount of that LIBOR Loan and having a maturity and repricing characteristics comparable to the relevant Interest Period; provided, however, that each Lender may fund each of its LIBOR Loans in any manner it sees fit, and the foregoing assumption shall be utilized only for the calculation of amounts payable under this subsection.

(h)    Maximum Lawful Rate.    In no event shall the interest charged with respect to any Loan or any other Obligation exceed the maximum amount permitted under the laws of the State of New York or of any other applicable jurisdiction. Notwithstanding anything to the contrary herein or elsewhere, if at any time the rate of interest payable hereunder or under any Note or other Financing Document (the "**Stated Rate**") would exceed the highest rate of interest permitted under any applicable Law to be charged (the "**Maximum Lawful Rate**"), then for so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable shall be equal to the Maximum Lawful Rate; provided, that if at any time thereafter the Stated Rate is less than the Maximum Lawful Rate, Borrower shall, to the extent permitted by Law, continue to pay interest at the Maximum Lawful Rate until such time as the total interest received is equal to the total interest which would have been received had the Stated Rate been (but for the operation of this provision) the interest rate payable. Thereafter, the interest rate payable shall be the Stated Rate unless and until the Stated Rate again would exceed the Maximum Lawful Rate, in which event this provision shall again apply. In no event shall the total interest received by any Lender exceed the amount which it could lawfully have received had the interest been calculated for the full term hereof at the Maximum Lawful Rate. If, notwithstanding the prior sentence, any Lender has received interest hereunder in excess of the Maximum Lawful Rate, such excess amount shall be applied to the reduction of the principal balance of the Loans or to other

amounts (other than interest) payable hereunder, and if no such principal or other amounts are then outstanding, such excess or part thereof remaining shall be paid to Borrower.  In computing interest payable with reference to the Maximum Lawful Rate applicable to any Lender, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made.

Section 2.6    Notes.

The portion of the Revolving Loans made by each Lender shall be evidenced, if so requested by such Lender, by a promissory note, substantially in the form of Exhibit G-2 hereto, executed by Borrower (a "**Revolving Loan Note**") in an original principal amount equal to such Lender's Pro Rata Share of  the Revolving Loan Commitment.

Section 2.7    Provisions Regarding Payment.

(a)    General.  All payments to be made by  Borrower under any Financing Document, including payments of principal and interest made hereunder and pursuant to any other Financing Document, and all fees, expenses, indemnities and reimbursements, shall be made without setoff or counterclaim.  If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension (it being understood and agreed that, solely for purposes of calculating financial covenants and computations contained herein and determining compliance therewith, if payment is made, in full, on any such extended due date, such payment shall be deemed to have been paid on the original due date without giving effect to any extension thereto).  Any payments received in the Payment Account before noon (Chicago time) on any date shall be deemed received by Agent on such date, and any payments received in the Payment Account after noon (Chicago time) on any date shall be deemed received by Agent on the next succeeding Business Day.  In the absence of receipt by Agent of an appropriately completed Payment Notification at least two (2) Business Days prior to any prepayment, Borrower and each Lender hereby authorize and direct Agent, subject to the provisions of Section 8.6 hereof, to apply such prepayment against then outstanding Revolving Loans; provided, that (i) if Agent receives an appropriately completed Payment Notification within two (2) Business Days after making any such payment, Agent may (and shall be fully authorized by Borrower and each Lender) to apply such amounts received in accordance with the terms of such Payment Notification and to make any corresponding reversals in respect thereof and (ii) if Agent at any time thereafter determines that payments received by Agent were in respect of a mandatory prepayment event, Agent may, in its sole discretion, apply such payments in accordance with the provisions of Section 2.4, and shall be fully authorized by Borrower and each Lender to make any corresponding reversals in respect thereof.  The foregoing provisions regarding payments to be made to Lenders and other comparable provisions contained in this Agreement or in any other Financing Document shall be subject to the right of Agent to set

off against payments due to a Defaulted Lender any funding shortfall of such Defaulted Lender, all as Agent may elect from time to time.

(b)    Loan Account.  Agent shall maintain a loan account on its books to record Loans and other extensions of credit made by Lenders hereunder or under any other Financing Document, and all payments thereon made by Borrower.  All entries in such loan account shall be made in accordance with Agent's customary practices as in effect from time to time.  The balance in such loan account, as recorded on Agent's most recent printout or other written statement, shall be, absent demonstrable error, evidence of the amounts due and owing to Agent and Lenders by Borrower; provided that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay all amounts owing hereunder or under any other Financing Document.  Unless Borrower notifies Agent of any objection to any such printout or statement (specifically describing the basis for such objection) within thirty (30) days after the date of receipt thereof, it shall be deemed final, binding and conclusive upon Borrower in all respects as to all matters reflected therein.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES**

To induce Agent and Lenders to enter into this Agreement and to make the Loans and other credit accommodations contemplated hereby, Borrower represents and warrants to Agent and each Lender that the following are, and after giving effect to the consummation of the transactions contemplated by the Operative Documents will be, true, correct and complete:

Section 3.1    Existence and Power.

Borrower (a) is a corporation duly organized, validly existing and in good standing under the laws of New York, and (b) subject to the approval of the Bankruptcy Court, has all powers and all governmental licenses, authorizations, registrations, permits, consents and approvals required under all applicable Laws and required in order to carry on its business as now conducted (collectively, "**Permits**"), except where the failure to have such Permits could not reasonably be expected to have a Material Adverse Effect. Borrower is qualified to do business as a foreign entity in each jurisdiction in which it is required to be so qualified, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.1, Borrower has not had, over the five (5) year period preceding the Closing Date, any name other than its current name or was incorporated or organized under the laws of any jurisdiction other than its current jurisdiction of incorporation or organization.  As of the Closing Date, no Subsidiary exists.

Section 3.2      Organizational Authority and Governmental Authorization; No Contravention.

Subject to the approval of the Bankruptcy Court pursuant to the Financing Order, the execution, delivery and performance by Borrower of the Operative Documents to which it is a party are within its powers, have been duly authorized by all necessary action pursuant to its Organizational Documents, except for actions required to perfect Liens granted to Agent under the Financing Documents, require no further action by or in respect of, or filing with, any Governmental Authority and do not violate, conflict with or cause a breach or a default under or a right of termination under (i) any Law or any of its Organizational Documents or (ii) any contract, agreement, lease or other instrument binding upon it or its properties, except for such violations, conflicts, breaches or defaults or rights of termination as could not, with respect to this clause (ii), reasonably be expected to have a Material Adverse Effect.

Section 3.3      Binding Effect.

Subject to the approval of the Bankruptcy Court pursuant to the Financing Order, each of the Operative Documents to which Borrower is a party constitutes a valid and binding agreement or instrument of Borrower, enforceable against it in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

Section 3.4      Capitalization.

The authorized Capital Stock of Borrower and holders of such Capital Stock are as set forth in the Existing Credit Agreement.

Section 3.5      Financial Information.

(a)      [Reserved.]

(b)      [Reserved.]

(c)      [Reserved.]

(d)      No Material Adverse Change.  Since December 31, 2014, there has been no material adverse change in the business, operations, properties or condition (financial or otherwise) of Borrower, other than the commencement Case or as otherwise previously disclosed to Agent.

Section 3.6      Litigation.

Other than the commencement of the Case and except as set forth on Schedule 3.6, as of the Closing Date there is no Litigation pending against, or to Borrower's

knowledge threatened against it. There is no Litigation pending in which an adverse decision could reasonably be expected to have a Material Adverse Effect.

Section 3.7    Ownership of Property.

Borrower is the lawful owner of, has good and marketable title to and is in lawful possession of, or has valid leasehold interests in, all properties and other assets (real or personal, tangible, intangible or mixed) purported or reported to be owned or leased (as the case may be) by it, except (i) for any such properties which are immaterial to the operations of Borrower's business and/or (ii) as may have been disposed of in the Ordinary Course of Business or otherwise in compliance with the terms hereof.

Section 3.8    No Default.

No Default or Event of Default has occurred and is continuing.  Other than any breaches or defaults arising solely as a result of the commencement of the Case, Borrower is not in breach or default under or with respect to any contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect.

Section 3.9    Labor Matters.

There are no strikes or other labor disputes pending or, to Borrower's knowledge, threatened against it.  Hours worked and payments made to the employees of Borrower have not been in violation, in any material respect, of the Fair Labor Standards Act or any other applicable Law dealing with such matters.  All payments due from Borrower or for which any claim may be made against it on account of wages and employee and retiree health and welfare insurance and other benefits have been paid or accrued as a liability on their books, as the case may be.  The consummation of the transactions contemplated by the Financing Documents and the other Operative Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which it is a party or by which it is bound.  All collective bargaining agreements to which any Borrower is a party and all pending strikes and material labor disputes are set forth on Schedule 3.9.

Section 3.10    Investment Company.

Borrower is not an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," all within the meaning of the Investment Company Act of 1940.

Section 3.11    Margin Regulations.

None of the proceeds from the Loans have been or will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry any

Margin Stock or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation T, U or X of the Federal Reserve Board.

Section 3.12    Compliance With Laws; Anti-Terrorism Laws.

(a)    Laws Generally.  Except as disclosed pursuant to the schedules to this Agreement, Borrower is in compliance with the requirements of all applicable Laws.

(b)    Anti-Terrorism Laws.   Neither Borrower nor any of its Affiliates is (i) in violation of any Anti-Terrorism Law, (ii) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, (iii) a Blocked Person, or is controlled by a Blocked Person, (iv) acting for or on behalf of a Blocked Person, (v) associated with a Blocked Person or (vi) providing material financial or technical support or other services to or in support of acts of terrorism of a Blocked Person.  Borrower and to Borrower's knowledge, none of its Affiliates or the agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

Section 3.13    Taxes.

Each Federal, state, local and foreign tax return, report and statement required to be filed by or on behalf of Borrower, in respect of which any tax in excess of $50,000 is payable, has been filed with the appropriate Governmental Authorities in each jurisdiction in which such return, report and statement is required to be filed and, except to the extent subject to a Permitted Contest, all Taxes (including sales, employment and real property taxes) and other charges shown to be due and payable in respect thereof or otherwise due from Borrower have been timely paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for nonpayment thereof.

Section 3.14    Compliance with ERISA.

(a)    ERISA Plans.  Schedule 3.14 lists all ERISA Plans and Multiemployer Plans.  Each ERISA Plan (and the related trusts and funding agreements) complies in form and in operation with, has been administered in compliance with, and the terms of each ERISA Plan satisfies, the applicable requirements of ERISA and the Code in all material respects.  Each ERISA Plan which is intended to be qualified under Section 401(a) of the Code is so qualified, and the United States Internal Revenue Service has issued a favorable determination letter with respect to each such ERISA Plan which may be relied on currently. Borrower has not incurred liability for any material excise tax under any of Sections 4971 through 5000 of the Code.

-13-

(b)    Pension Plans and Multiemployer Plans.   During the thirty-six (36) month period prior to making of any Loan, (i) no steps have been taken to terminate any Pension Plan and (ii) no failure to make contributions with respect to any Pension Plan sufficient to give rise to a Lien under the Code has occurred.  All amounts required by Code Sections 412 and 430 to be funded by Borrower with respect to a Pension Plan have been made in compliance therewith.  No condition exists or event or transaction has occurred with respect to any Pension Plan which could result in the incurrence by Borrower of any liabilities, fines and penalties exceeding $250,000, except (a) as previously disclosed to Agent or (b) under Section 1113 of the Bankruptcy Code.  Borrower has not incurred liabilities exceeding $250,000 to the PBGC (other than for current premiums) with respect to any Pension Plan.  All contributions (if any) have been made on a timely basis to any Multiemployer Plan that are required to be made by Borrower under the terms of the plan or of any collective bargaining agreement or by applicable Law; except as permitted by an order of the Bankruptcy Court, Borrower has not withdrawn or partially withdrawn from any Multiemployer Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, could result in a withdrawal or partial withdrawal from any such plan, and, except as previously disclosed to Agent, Borrower has not received any notice that any Multiemployer Plan is in reorganization or termination, that increased contributions may be required to avoid a reduction in plan benefits  or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 or Section 431 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent.

Section 3.15    Brokers.

Except for (a) Investment Bank, (b) as set forth on Schedule 3.15, and (c) fees payable to Agent and/or Lenders, no broker, finder or other intermediary has brought about the obtaining, making or closing of the transactions contemplated by the Operative Documents, and Borrower does not and will not have any obligation to any Person in respect of any finder's or brokerage fees in connection herewith or therewith.

Section 3.16    [Reserved].

Section 3.17    Environmental Compliance.

(a)    Hazardous Materials.   Except as set forth on Schedule 3.17, no Hazardous Materials (i) are located on any properties now or previously owned, leased or operated by Borrower in violation of any Environmental Law or (ii) have been released into the environment, or deposited, discharged, placed or disposed of at, on, under or near any of such properties in a manner that would require the taking of any action under any Environmental Law and have given rise to, or could reasonably be expected to give rise to, remediation costs and expenses on the part of Borrower in excess of $250,000.  No portion of any such property is being used, or has been used at any previous time, for the disposal, storage, treatment, processing or other handling of Hazardous Materials in material violation

-14-

of any Environmental Law nor is any such property affected by any Hazardous Materials Contamination.  All oral or written notifications of a release of Hazardous Materials required to be filed by or on behalf of Borrower under any applicable Environmental Law have been filed or are in the process of being timely filed by or on behalf of Borrower.

(b)  Notices Regarding Environmental Compliance.  Except as set forth on Schedule 3.17, no notice, notification, demand, request for information, citation, summons, complaint or order has been issued, no complaint has been filed, no penalty has been assessed and no investigation or review is pending, or to Borrower's knowledge, threatened by any Governmental Authority or other Person with respect to any (i) alleged violation by Borrower of any Environmental Law, (ii) alleged failure by Borrower to have any Permits required in connection with the conduct of its business or to comply with the terms and conditions thereof, (iii) any generation, treatment, storage, recycling, transportation or disposal of any Hazardous Materials or (iv) release of Hazardous Materials.

(c)  Properties Requiring Remediation.  Except as set forth on Schedule 3.17, no property now owned or leased by Borrower and, to Borrower's knowledge, no such property previously owned or leased by Borrower, has, directly or indirectly, transported or arranged for the transportation of any Hazardous Materials, is listed or, to Borrower's knowledge, proposed for listing, on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any state list or is the subject of Federal, state or local enforcement actions or other investigations which may lead to claims against Borrower for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, but not limited to, claims under CERCLA or RCRA.

(d)  Underground Storage Tanks.  Except as set forth on Schedule 3.17, there are no underground storage tanks located on any property owned or leased by Borrower that are not properly registered or permitted under applicable Environmental Laws or that are leaking or disposing of Hazardous Materials.

(e)  Environmental Liens.  Except as set forth on Schedule 3.17, there are no Liens under or pursuant to any applicable Environmental Laws on any real property or other assets owned or leased by Borrower, and no actions by any Governmental Authority have been taken or, to Borrower's knowledge, are in process which could subject any of such properties or assets to such Liens.

Section 3.18    Intellectual Property.

Borrower owns, is licensed to use, or otherwise has the right to use, all Intellectual Property that is material to its business or operations.  All such Intellectual Property existing as of the Closing Date and registered with any United States or foreign Governmental Authority is set forth on Schedule 3.18.

-15-

Section 3.19    <u>Real Property Interests</u>.

Except as set forth on Schedule 3.19, Borrower has no ownership, leasehold or other interest in real property.  Schedule 3.19 sets forth the address of each such parcel.

Section 3.20    <u>[Reserved]</u>.

Section 3.21    <u>Full Disclosure.</u>

None of the information (financial or otherwise, but exclusive of financial forecasts and projections) set forth in this Agreement, the Security Documents or the Schedules hereto or thereto contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which such statements were made.  All financial forecasts and projections delivered to Agent and Lenders have been prepared on the basis of the assumptions stated therein.  Such forecasts and projections represent Borrower's best estimate of future financial performance and such assumptions are believed by Borrower to be fair and reasonable in light of current business conditions; provided that Borrower can give no assurance that such forecasts and projections will be attained.

Section 3.22    <u>Representations and Warranties Incorporated from Other Operative Documents</u>.

As of the Closing Date, each of the representations and warranties made in the Operative Documents by Borrower and to Borrower's knowledge, any other Person, is true and correct in all material respects, and such representations and warranties made by Borrower therein are hereby incorporated herein by reference with the same effect as though set forth in their entirety herein, as qualified therein, except to the extent that such representation or warranty relates to a specific date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date.

Section 3.23    <u>Matters Relating to Lien and Property Rights</u>.

The entry of the Financing Order is effective to create in favor of Agent, for the benefit of Lenders, as security for the Obligations, (i) a valid first priority (other than with respect to the Permitted Priority Liens, the Carveout and Prepetition Senior Liens) Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and (ii) an allowed administrative expense in the Case having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens, the Carveout and Prepetition Senior Liens (the "**Superpriority Claims**").  Except for the Financing Order, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for either (x) the pledge or grant by Borrower of the Liens purported to be created in favor of Agent pursuant to this

-16-

Agreement or any of the Financing Documents or (y) the exercise by Agent of any rights or remedies in respect of any Collateral (whether specifically granted or created pursuant to this Agreement, any of the Financing Documents or created or provided for by applicable law), except as may be required in connection with the disposition of any pledged Collateral by laws generally affecting the offering and sale of securities.

Section 3.24    Budget.

The Budget was prepared by the Senior Financial Officer and represents the good faith belief of such Person at such time as to the probable course of Borrower's business and financial affairs, over the periods shown therein, subject to the assumptions stated therein.

Section 3.25    Financing Order.

The Financing Order is in full force and effect, is not subject to a pending appeal or motion for leave to appeal or other proceeding to set aside such order and has not been reversed, modified, amended, stayed or vacated absent Agent's written consent.

## ARTICLE 4
## AFFIRMATIVE COVENANTS

Borrower agrees that so long as any Credit Exposure exists:

Section 4.1    Financial Statements and Other Reports.

To maintain a system of accounting sufficient to permit preparation of financial statements in accordance with GAAP and to provide the information required to be delivered to Agent and Lenders hereunder, and cause Borrower to deliver to Agent all of the following deliveries, and, with respect to each Lender, the deliveries required by Section 4.1(a) through (e):

(a)    Monthly Financial Statements.  As soon as practicable and in any event within thirty (30) days after the end of each month (including the last month of Borrower's Fiscal Year) a consolidated balance sheet of Borrower as at the end of such month and the related consolidated statements of operations and cash flows for such month, and for the portion of the Fiscal Year then ended together with a statement of revenues for such month (broken down by week, by plant and by revenue type) and, in comparative form, the figures for the corresponding periods of the previous Fiscal Year and the figures for such month and for such portion of the Fiscal Year then ended set forth in the annual plans, forecasts and projections delivered pursuant to Section 4.1(e), all in reasonable detail and in the case of such financial statements (but not comparisons) certified by a Responsible Officer of Borrower as fairly presenting in all material respects the financial condition and results of operations of Borrower  and as having been prepared in accordance with GAAP applied on a basis consistent with the audited financial statements of Borrower, subject to changes

resulting from audit and normal year-end adjustments and the absence of footnote disclosures.

(b)     Annual Financial Statements.  As soon as available and in any event within ninety (90) days after the end of each Fiscal Year, a consolidated balance sheet of Borrower as of the end of such Fiscal Year and the related statements of operations, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year and the figures for such Fiscal Year set forth in the annual plans, forecasts and projections delivered pursuant to Section 4.1(e), certified (solely with respect to such financial statements, but not comparisons) as fairly presenting in all material respects the financial condition and results of operations of Borrower and as having been prepared in accordance with GAAP, without qualification (including with respect to the scope of audit), emphasis or exception by Dannible & McKee LLP or independent public accountants of nationally recognized standing reasonably acceptable to Agent, except that such accountants may express a going concern qualification.

(c)     Certificates.  Upon written request from Agent to Borrower, together with each delivery of financial statements pursuant to Sections 4.1(a) and 4.1(b), solely in respect of any such financial statements delivered in respect of the end of any Fiscal Quarter, a management report (A) describing the operations and financial condition of Borrower for the fiscal period covered by such financial statements and the portion of the current Fiscal Year then elapsed (or for the Fiscal Year then ended in the case of year-end financials) and (B) discussing the reasons for any significant variations as between the fiscal period covered and the portion of the Fiscal Year then elapsed, as between such periods and the same periods during the immediately preceding Fiscal Year, and as between such periods and the same periods included in the annual plans, forecasts and projections delivered pursuant to Section 4.1(e), all such information to be presented in reasonable detail and to be certified by a Responsible Officer of Borrower to the effect that such information fairly presents, in all material respects, the results of operations and financial condition of Borrower as at the dates and for the periods indicated.

(d)     [Reserved].

(e)     Projections.  Upon written request from Agent to Borrower, within thirty (30) days after the conclusion of each Fiscal Year, Borrower's annual operating plans, financial forecasts and cash flow projections, each for the following Fiscal Year presented on a monthly basis, all of which shall be for Borrower and its Consolidated Subsidiaries and shall be in a format reasonably consistent with plans, forecasts and projections theretofore provided to Lenders, and promptly following the preparation thereof, updates to any of the foregoing from time to time prepared by management of Borrower.

(f)     Accountant's Letters.  Promptly upon receipt thereof, copies of all reports submitted to Borrower by independent public accountants in connection with each annual, interim or special audit of the financial statements of any such Person made by such

accountants, including the comment letter submitted by such accountants to management in connection with any audit.

(g)    [Reserved]

(h)    [Reserved].

(i)    <u>Notices of Material Events</u>.  Promptly upon any officer of Borrower obtaining knowledge (i) of the existence of any Event of Default or Default, or becoming aware that the holder of any Debt of Borrower in excess of $250,000 has given any notice or taken any other action with respect to a claimed default thereunder, (ii) of any change in Borrower's or Subsidiary's certified accountant or any resignation, or decision not to stand for re-election, by any member of Borrower's board of directors (or comparable body), (iii) that any Person has given any notice to Borrower of, or taken any other action with respect to a claimed breach or default under, any contract, agreement, lease or other instrument to which Borrower is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect, (iv) of the institution of any Litigation seeking equitable relief or involving an alleged liability of Borrower or Subsidiary equal to or greater than $250,000 or any adverse determination in any Litigation involving equitable relief or a potential liability of Borrower equal to or greater than $250,000 or (v) any loss, damage or destruction of any Collateral having a fair market value in excess of $250,000, whether or not covered by insurance, a certificate of a Responsible Officer of Borrower specifying the nature and period of existence of any such condition or event, or specifying the notice given or action taken by such holder or Person and the nature of such claimed default (including any Event of Default or Default), event or condition, and what action Borrower has taken, is taking or proposes to take with respect thereto.

(j)    <u>ERISA Notices</u>.  Promptly upon any officer of Borrower obtaining knowledge of (i) except pursuant to a motion under Section 1113 of the Bankruptcy Code, the institution of any steps by Borrower to terminate any Pension Plan, (ii) the failure of Borrower to make a required contribution on a timely basis to any Pension Plan or to any Multiemployer Plan, (iii) the taking of any action with respect to a Pension Plan which could result in the requirement that Borrower furnish a bond or other security to the PBGC or such Pension Plan, (iv) the occurrence of a reportable event under Section 4043 of ERISA (for which a reporting requirement is not waived) with respect to any Pension Plan, (v) except pursuant to a motion under Section 1113 of the Bankruptcy Code, the occurrence of any event with respect to any ERISA Plan, Pension Plan or Multiemployer Plan which could result in the incurrence by Borrower of any material liability, fine or penalty (including any claim or demand for withdrawal liability or partial withdrawal from any Multiemployer Plan), (vi) except pursuant to a motion under Section 1113 of the Bankruptcy Code, any material increase in the liability or contingent liability of Borrower with respect to any post-retirement welfare plan benefit or (vii) the receipt by Borrower of any notice that any Multiemployer Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of an excise tax, that any such plan is or

has been funded at a rate less than that required under Section 412 or Section 431 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent, a certificate of a Responsible Officer of Borrower specifying the nature and period of existence of any such condition or event, or specifying the notice given or action taken by such holder or Person, and what action Borrower has taken, is taking or proposed to take with respect thereto.

(k)    <u>Environmental Notices</u>.    Promptly upon any officer of Borrower obtaining knowledge of any of the following which could reasonably be expected to result in the payment by Borrower of an amount in excess of $250,000 or which could otherwise reasonably be expected to have a Material Adverse Effect, (i) any complaint, order, citation, notice or other written communication from any Person delivered to Borrower with respect to any Environmental Law, (ii) the existence or alleged existence of a violation of any applicable Environmental Law, (iii) any release of any Hazardous Materials into the environment, (iv) the commencement of any cleanup of any Hazardous Materials, (v) any pending legislative or threatened proceeding for the termination, suspension or non-renewal of any material Permit required under any applicable Environmental Law, or (vi) any property of Borrower that is or will be subject to a Lien imposed pursuant to any Environmental Law, a certificate of a Responsible Officer of Borrower specifying the nature and period of existence of any such condition or event, or specifying the notice given or action taken by such holder or Person, and what action Borrower has taken, is taking or proposes to take with respect thereto.

(l)    <u>New Intellectual Property, Real Property and Swap Contracts</u>.  Promptly upon any officer of Borrower obtaining knowledge that Borrower has either (i) registered or applied to register any Intellectual Property with any Governmental Authority, (ii) acquired any interest in real property (including leasehold interests in real property) or (iii) entered into any Swap Agreement, a certificate of a Responsible Officer of Borrower describing such Intellectual Property, such real property and/or such Swap Agreement in such detail as Agent shall reasonably require.

(m)    <u>Governmental Reports and Notices</u>.    Promptly upon receipt or filing thereof, copies of any reports or notices related to any matter which could reasonably be expected to have a Material Adverse Effect which are received by Borrower from, or filed by Borrower with, any Governmental Authority.

(n)    <u>Borrower Information</u>.    With reasonable promptness, such other information and data with respect to Borrower as from time to time may be reasonably requested by Agent or any Lender.

(o)    <u>[Reserved]</u>.

(p)    <u>Weekly AWR</u>.    No later than Tuesday of each week, a detailed report of the AWR for the immediately preceding two weeks ended each Friday, on a plant by plant basis, each in form and substance satisfactory to Agent.

(q)     Budget.   Promptly and in any event at least three (3) Business Days prior to the beginning of each week, an updated Budget for the succeeding thirteen-week period.

(r)     Variance Report.   Promptly and in any event within three Business Days following the end of each week, a Variance Report, in form and substance satisfactory to Agent.

(s)     Other Information.   Promptly upon their becoming available, copies of (i) all press releases and other statements made available generally by Borrower to the public concerning material developments in the business of Borrower or any of its Subsidiaries, and (ii) copies of all pleadings, motions, application and judicial information filed by or on behalf of Borrower with the Bankruptcy Court or provided by or to the U.S. Trustee or the Committee, at the time such document is filed or delivered, as applicable.

Section 4.2     Payment and Performance of Obligations.

Borrower (i) will pay and discharge, at or before maturity, all of its obligations and liabilities, including tax liabilities, in accordance with the Budget and Section 5.17(a), and (ii) will not breach or permit to exist any default under, the terms of any lease, commitment, contract, instrument or obligation to which it is a party, or by which its properties or assets are bound, except for such breaches or defaults which could not reasonably be expected to have a Material Adverse Effect.

Section 4.3     Maintenance of Existence.

Borrower will preserve, renew and keep in full force and effect, and will cause each Subsidiary to preserve, renew and keep in full force and effect, its existence and all rights, privileges and franchises necessary or desirable in the normal conduct of business, except any Subsidiaries of Borrower may dissolve or merge into Borrower or another Subsidiary if not otherwise prohibited by the terms of this Agreement.

Section 4.4     Maintenance of Property; Insurance.

(a)     Maintenance of Property.   Borrower will keep, and will cause each Subsidiary to keep, all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.

(b)     Required Insurance Coverage.   Borrower will maintain (i) casualty insurance on all real and personal property on an all risks basis (including the perils of flood and quake), covering the repair and replacement cost of all such property and coverage for business interruption and public liability insurance (including products/completed operations liability coverage) in each case of the kinds customarily carried or maintained by Persons of established reputation engaged in similar businesses and in amounts reasonably acceptable to Agent (but not less than the amounts in place as of the Closing Date) and (ii) such other insurance coverage in such amounts and with respect to such risks as Agent may reasonably

-21-

request.  All such insurance shall be provided by insurers having an A.M. Best policyholders rating reasonably acceptable to Agent.

(c)     Evidence of Insurance Coverage.  Borrower will cause Agent to be named as an additional insured, assignee and loss payee (which shall include, as applicable, identification as mortgagee), as applicable, on each insurance policy required to be maintained by a Credit Party pursuant to this Section 4.4 pursuant to endorsements in form and substance reasonably acceptable to Agent.  Borrower will deliver to Agent and Lenders (i) on the Closing Date (and prior to each anniversary thereof), a current certificate from Borrower's insurance broker dated such date showing the amount of coverage as of such date, and that such policies include effective waivers (whether under the terms of any such policy or otherwise) by the insurer of all claims for insurance premiums against all loss payees and additional insureds and all rights of subrogation against all loss payees and additional insureds, and that if all or any part of such policy is canceled, terminated or expires, the insurer will forthwith give notice thereof to each additional insured, assignee and loss payee and that no cancellation, reduction in amount or material change in coverage thereof shall be effective until at least thirty (30) days after receipt by each additional insured, assignee and loss payee of written notice thereof, (ii) on an annual basis, and upon the request of any Lender through Agent from time to time full information as to the insurance carried, (iii) within five (5) days of receipt of notice from any insurer, a copy of any notice of cancellation, nonrenewal or material change in coverage from that existing on the date of this Agreement and (iv) forthwith, notice of any cancellation or nonrenewal of coverage by Borrower.

(d)     Reserved.

(e)     Right to Purchase Insurance.  In the event Borrower fails to provide Agent with evidence of the insurance coverage required by this Agreement, Agent may purchase insurance at Borrower's expense to protect Agent's interests in the Collateral.  This insurance may, but need not, protect Borrower's interests.  The coverage purchased by Agent may not pay any claim made by Borrower or any claim that is made against Borrower in connection with the Collateral.  Borrower may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that Borrower have obtained insurance as required by this Agreement.  If Agent purchases insurance for the Collateral, Borrower will be responsible for the costs of that insurance to the fullest extent provided by Law including interest and other charges imposed by Agent in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to the Obligations.

Section 4.5     Compliance with Laws.

Borrower will comply, in all material respects, with the requirements of all applicable Laws.  Without limiting the foregoing, if any release or disposal of Hazardous Materials shall have occurred on any real property owned or operated by Borrower, Borrower, will cause the prompt containment and removal of such Hazardous Materials and

-22-

the remediation of such real property or other assets as is necessary to comply in all material respects with all Environmental Laws.  Without limiting the foregoing, Borrower will (i) ensure that no Affiliate of Borrower is or becomes a Blocked Person, (ii) not conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person and (iii)  comply with all applicable Bank Secrecy Act and other Anti-Terrorism Laws.

Section 4.6        Inspection of Property, Books and Records, Appraisals.

Borrower will keep proper books of record and account in accordance, in all material respects, with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities; and Borrower will permit Agent, using such third party analyst as it shall select (at the sole cost of the Borrower), to conduct a review of such books of record and account to confirm compliance herewith. Borrower will permit, on reasonable prior notice, at the sole cost of Borrower, representatives of Agent to visit and inspect any of its properties, to examine and make abstracts or copies from any of its books and records, to conduct collateral audits, physical inspections and analyses of its assets and to discuss its affairs, finances and accounts with its officers, employees and independent public accountants. Borrower shall be obligated to pay the costs each inspection.  In addition to the foregoing, from time to time, Borrower shall obtain and deliver to Agent, at the sole cost of the Borrower, appraisal reports in form and substance and from appraisers satisfactory to Agent stating the then current market values of all or any portion of the real estate and personal property owned by Borrower and each route owned by Borrower.

Section 4.7        Use of Proceeds.

The proceeds of Revolving Loans shall be used by Borrower in accordance with the terms of the Financing Order and the Budget and in accordance with the terms described herein, (i) to repay a portion of the Existing Obligations, (ii) to provide payments of "adequate protection" (as set forth in Section 361 of the Bankruptcy Code) in favor of the Existing Lenders and (iii) for working capital and general corporate purposes of Borrower (including, without limitation, to pay for administrative expenses incurred during the Case to the extent set forth in the Budget), in each case as permitted by, and consistent in all respects with, the Budget and the Financing Order, including, without limitation, to repay, upon the entry of the Final Order, the Existing Obligations in an amount equal to the Existing Obligations outstanding as of such date less $10,000,000.  Without limiting the generality of the foregoing, Borrower will not use the proceeds of any loan made hereunder or any proceeds of Collateral to be applied to (i) repay the Subordinated Debt, or and (ii) affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent enforceability or priority of the Liens, claims or rights in favor of Agent, any Lender, Existing Agent or any Existing Lender, except as any of the foregoing may be permitted under the Financing Order.

Section 4.8    Lenders' Meetings; Lender Advisors.

As reasonably requested by Agent or Required Lenders, Borrower will conduct a meeting of Agent and Lenders to discuss the most recently reported financial results and the financial condition of Borrower, at which there shall be present a Responsible Officer and such other officers of the Borrower as may be reasonably requested to attend by Agent or Required Lenders, such request or requests to be made at a reasonable time prior to the scheduled date of such meeting.   Such meetings shall be held at a time and place convenient to Lenders and to Borrower.  In accordance with Section 9.1 of the Agreement, Borrower acknowledges and agrees that Borrower will reimburse Agent for all reasonable costs and expenses incurred or paid by Agent in connection with the enforcement of the Agreement or any Financing Documents (including such fees and expenses incurred after and in connection with enforcement of any judgment or order in respect of the Obligations) and including, without limitation, all reasonable fees, costs and expenses of any consultant or other advisor retained by Agent, including, without limitation, Andrews Advisory Group, LLC (the "**Lender Advisor**"), and acknowledges and agrees that such fees, costs and expenses constitute Obligations.  Further, Borrower will fully cooperate with any reasonable request of Lender Advisor or any other consultant or advisor retained by Agent, will consult with Lender Advisor in connection with the preparation of Borrower' financial statements, projections and budgets, and will provide Lender Advisor and any other consultant or advisor with access to (a) Borrower's financial and other information as may be reasonably requested from time to time, and (b) Borrower' management, advisors, auditor and other representatives as may be reasonably requested from time to time; provided, however, that Borrower acknowledges that Lender Advisor shall have no decision-making authority or day-to-day control with respect to the business and operations of the Credit Parties.

Section 4.9    [Reserved].

Section 4.10    Further Assurances.

(a)    General.  Borrower will at its own cost and expense, promptly and duly take, execute, acknowledge and deliver all such further acts, documents and assurances as may from time to time be necessary or as Agent or Required Lenders may from time to time reasonably request in order to carry out the intent and purposes of the Financing Documents and the transactions contemplated thereby, including all such actions to establish, create, preserve, protect and perfect a first priority Lien (subject only to Permitted Liens) in favor of Agent for the benefit the Secured Parties on the Collateral (including Collateral acquired after the date hereof).  Without limiting the foregoing, absent written agreement of Agent to the contrary, Borrower will obtain control agreements with respect to deposit accounts (excluding deposit accounts established after notice to Agent containing no more than $250,000 (for all such accounts in the aggregate) at any time and deposit accounts established exclusively for payroll), securities accounts and commodities accounts, and will use commercially reasonable efforts to obtain Lien waivers and collateral access agreements from landlords, bailees and mortgagees of facilities at which any Collateral with a value in excess of $250,000 is stored or located, in each case in form and substance reasonably

satisfactory to Agent.  Borrower will cause the contents of each deposit account referred to in the immediately preceding sentence for which the Borrower are not required to obtain control agreements to be swept to a deposit account subject to a control agreement in favor of Agent no less frequently than two times per week.

(b)    New Subsidiaries.    Without limiting the generality of the foregoing, Borrower shall not acquire or form any new Subsidiary after the date hereof.

Section 4.11    Chief Executive Office; Senior Financial Officer.

Borrower will continue to retain Mark Samson or another senior executive satisfactory to Agent ("**Chief Executive Officer**") and Jennifer Collins or another senior financial officer satisfactory to Agent (the "**Senior Financial Officer**"), each on terms and conditions acceptable to Agent.  Borrower hereby authorizes the Chief Executive Officer and Senior Financial Officer and Lender Advisor to meet with Agent and Lender Advisor (in person and telephonically) and provide to Agent and Lender Advisor such information and reports with respect to Borrower and its financial condition, businesses, assets, liabilities and prospects, as Agent or Lender Advisor may request from time to time.  Borrower will cause Chief Executive Officer and Senior Financial Officer to be made available to prospective purchasers, prospective refinancing lenders, Agent, the Lenders and Lender Advisor during reasonable business hours and upon reasonable request.

Section 4.12    Investment Banker.

Borrower has retained SSG Advisors, LLC, and will continue to retain SSG Advisors, LLC or another investment banker acceptable to Agent (the "**Investment Banker**"; together with Chief Executive Officer and Senior Financial Officer, the "**Advisors**" and each an "**Advisor**"), on terms and conditions acceptable to Agent, for the purpose of considering, investigating and commencing steps to consummate strategic alternatives, including, without limitation, a sale of the business of Borrower as a going concern or in one or more transactions.  Borrower (i) will cooperate with all reasonable requests of Investment Banker concerning the process for which it was hired, (ii) authorize Investment Banker to provide Agent such reports as it may request in writing from time to time (such request to be delivered to Borrower and Investment Banker), and (iii) authorize Investment Banker to communicate directly with Agent and any advisors retained by Agent so long as Investment Banker provides prior notice of such communication to Borrower and an opportunity for Borrower or Consultant to participate in such communications.

Section 4.13    [Reserved].

Section 4.14    Bankruptcy Transaction Milestones.

Borrower shall cause the performance and delivery of the items set forth on Schedule 4.14 on or before the dates specified therein with respect to such items (the "**Milestones**").

Section 4.15        Post-Closing Deliveries.

(a)        On or before the date that is the earlier to occur of 75 days from the Closing Date and the closing date of the sale of the real property located at 1051 S. Clinton Street, Syracuse, NY 13202 (the "**Syracuse Location**") (or such later date as may be agreed to by Agent in its sole discretion), Borrower shall deliver an extension to the lease with respect to the Syracuse Location.

# ARTICLE 5
# NEGATIVE COVENANTS

Borrower agree that so long as any Credit Exposure exists:

Section 5.1        Debt.

Borrower will not directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Debt, except for:

(a)        Debt constituting Obligations;

(b)        the Existing Obligations, including any Debt reinstated by the Bankruptcy Court and constituting Reinstated Existing Obligations;

(c)        Debt outstanding on the date of this Agreement and set forth on Schedule 5.1 (including, without limitation, Debt that was incurred or assumed for the purpose of financing all or any part of the cost of acquiring any fixed assets (including through Capital Leases));

(d)        [Reserved];

(e)        [Reserved];

(f)        [Reserved];

(g)        [Reserved]; and

(h)        Debt owing to insurance carriers and incurred to finance insurance premiums of Borrower in the Ordinary Course of Business in a principal amount not to exceed at any time the amount of insurance premiums to be paid by such Credit Party.

Section 5.2        Liens.

Borrower will not, directly or indirectly, create, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it, except:

(a)        Liens securing the Obligations;

(b)        Liens existing on the date of this Agreement and set forth on Schedule 5.2;

(c)        [Reserved];

(d)        Liens for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or the subject of a Permitted Contest;

(e)        Liens securing appeal bonds and judgments, with respect to judgments that do not otherwise result in or cause an Event of Default under Section 8.1(i); provided that the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are the subject of a Permitted Contest;

(f)        Easements, rights of way, restrictions, minor defects or irregularities in title and other similar Liens not interfering in any material respect with the ordinary conduct of the business of Borrower;

(g)        Any interest or title of a lessor or sublessor under any lease permitted by this Agreement;

(h)        Liens arising from precautionary uniform commercial code financing statements filed under any lease permitted by this Agreement;

(i)        Licenses, sublicenses, leases or subleases granted to third parties in the Ordinary Course of Business not interfering with the business of the Borrower;

(j)        Liens in favor of collecting banks arising under Section 4-210 of the UCC;

(k)        Liens (including the right of setoff) in favor of a bank or other depository institution arising as a matter of law encumbering deposits;

(l)        Liens arising out of consignment or similar arrangements for the sale of goods entered into by Borrower in the Ordinary Course of Business;

(m)        Liens on cash collateral, in an amount not to exceed $200,000 in the aggregate for Borrower securing Contingent Obligations described in Section 5.3(h);

(n)        Liens on insurance premiums securing Debt incurred by Borrower pursuant to Section 5.1(i);

(o)        Liens on the Collateral securing the Subordinated Debt;

(p)        Liens on the Collateral securing the Existing Obligations; and

(q)      Liens in favor of customs and revenue authorities arising as a matter of Law which secure payment of customs duties in connection with the importation of goods in the Ordinary Course of Business.

Notwithstanding anything to the contrary in this Agreement or other Financing Documents, Borrower shall not, and shall not permit any of its Subsidiaries to, create, incur, assume, or suffer to exist, directly or indirectly, any Lien with priority over the Liens created by the Financing Documents, except the Permitted Priority Liens and, if consented to in writing by the Agent, the Liens securing the Existing Obligations.

Section 5.3      Contingent Obligations.

Borrower shall not, directly or indirectly, create, assume, incur or suffer to exist any Contingent Obligations, except for:

(a)      Contingent Obligations arising in respect of the Obligations and Existing Obligations;

(b)      Contingent Obligations resulting from endorsements for collection or deposit in the Ordinary Course of Business;

(c)      [reserved];

(d)      Contingent Obligations outstanding on the date of this Agreement and set forth on Schedule 5.3;

(e)      Contingent Obligations arising under Guarantees issued by Borrower in the Ordinary Course of Business;

(f)      Contingent Obligations arising under indemnity agreements with title insurers to cause such title insurers to issue to Agent mortgagee title insurance policies;

(g)      Contingent Obligations arising under letters of credit, bankers acceptances and similar instruments incurred in the Ordinary Course of Business not to exceed $50,000 in the aggregate at any time outstanding for Borrower; and

(h)      Contingent Obligations arising with respect to customary indemnification obligations in favor of purchasers in connection with dispositions permitted under Section 5.7.

Section 5.4      Restricted Distributions.

Borrower will not, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Distribution.

-28-

Section 5.5        Restrictive Agreements.

Borrower will not, directly or indirectly (i) enter into or assume any agreement (other than the Financing Documents, other than the Subordinated Debt Documents and other than Capital Leases and purchase money debt documents which contain prohibitions only upon the property leased or purchased thereunder) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired or (ii) create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind (except as provided by the Subordinated Debt Documents) on the ability of any such Person to pay or make Restricted Distributions, to pay any Debt owed by such Person, to make loans or advances or to transfer any of its property or assets.

Section 5.6        Payments and Modifications of Subordinated Debt.

Borrower will not, directly or indirectly (i) declare, pay, make or set aside any amount for payment in respect of Subordinated Debt, (ii) amend or otherwise modify the terms of any Subordinated Debt, except for amendments or modifications made in full compliance with the Subordination Agreement, or (iii) take, with respect to any Debt hereafter incurred or assumed that, by its terms, or by separate agreement, is subordinated to the Obligations, any action of the type described in clause (i) or (ii) above in violation of the applicable subordination agreement.

Section 5.7        Consolidations, Mergers and Sales of Assets.

Borrower will not, directly or indirectly, consolidate or merge with or into any other Person. Borrower will not consummate any Asset Disposition outside the ordinary course of its business except pursuant to the Milestones.

Section 5.8        Purchase of Assets, Investments.

Borrower will not, directly or indirectly:

(a)        acquire or enter into any agreement to acquire all or substantially all of the assets or Capital Stock of any Person or acquire all or substantially all of the assets of any operating division of any Person;

(b)        create, acquire or enter into any agreement to create or acquire any Subsidiary;

(c)        engage or enter into any agreement to engage in any joint venture or partnership with any other Person; or

(d)        acquire or own or enter into any agreement to acquire or own any Investment in any Person other than:

(i)        Investments existing on the date of this Agreement and set forth on Schedule 5.8;

(ii)       cash and Cash Equivalents;

(iii)      [Reserved];

(iv)      [Reserved]; and

(v)       [Reserved].

Section 5.9        Transactions with Affiliates.

Except (i) as expressly permitted by this Agreement, (ii) as otherwise disclosed on Schedule 5.9, and (iii) for transactions arising in the Ordinary Course of Business that are disclosed to Agent in advance of being entered into (provided that no such notice is required for transactions consisting of compensation and reimbursement of expenses of officers or other immaterial transactions) and which contain terms that are no less favorable to Borrower than those which might be obtained from a third party not an Affiliate of Borrower, Borrower will not, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate.

Section 5.10        Modification of Organizational Documents.

Borrower will not, directly or indirectly, amend or otherwise modify its Organizational Documents, except for such amendments or other modifications required by Law or which are not adverse to the interests of Agent or any Lender and which, in each instance, are fully disclosed to Agent.

Section 5.11        Reserved.

Section 5.12        Fiscal Year.

Borrower will not change its Fiscal Year.

Section 5.13        Conduct of Business.

Borrower will not, directly or indirectly, engage in any line of business other than those businesses engaged in on the Closing Date.

Section 5.14        [Reserved].

Section 5.15        Limitation on Sale and Leaseback Transactions.

Borrower will not, directly or indirectly, enter into any arrangement with any Person whereby in a substantially contemporaneous transaction Borrower sells or transfers

-30-

all or substantially all of its right, title and interest in an asset and, in connection therewith, acquires or leases back the right to use such asset.

Section 5.16    Compliance with Anti-Terrorism Laws.

(a)    Borrower will not, directly or indirectly, knowingly enter into any agreements or documents with any Person listed on the OFAC Lists.  Borrower shall immediately notify Agent if Borrower has knowledge that any such Person or any of its Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement is or becomes a Blocked Person or (i) is convicted on, (ii) pleads nolo contendere to, (iii) is indicted on or (iv) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering.  Borrower will not, directly or indirectly, (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

Section 5.17    Financing Order; Administrative Expense Priority; Payments.

Borrower will not:

(a)    seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Financing Order, except for modifications and amendments joined in or agreed to in writing by Agent; and, measured as of each Friday after the Filing Date, Borrower will not permit the actual expenditures for the immediately preceding 4-week period, through and including the week ending as of such Friday, to exceed the "Permitted Variance" as defined in the Financing Order;

(b)    seek the use of "Cash Collateral" (as defined in the Financing Order) in a manner inconsistent with the terms of the Financing Order without the prior written consent of Agent;

(c)    suffer to exist at any time a priority for any administrative expense or unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503((b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code) or any super priority claim which is equal or superior to the priority of the Agent or the Lenders in respect of the Obligations or the Existing Agent or the Existing Lenders in respect of the Existing Obligations, except for the amounts having a priority over the Obligations to the extent set forth in the definition of Carveout;

(d)      suffer to exist at any time any Lien on any properties, assets or rights except for Permitted Priority Liens, the Carveout and the Liens securing the Existing Obligations;

(e)      prior to the date on which the Obligations have been indefeasibly paid in full in cash, the Revolving Loan Commitments have been terminated and this Agreement has been terminated, pay any administrative expenses, except administrative expenses incurred in the Ordinary Course of Business of Borrower, and set forth in the Budget, in each case subject to the extent and having the order of priority set forth in the definition of Carveout; and

(f)      notwithstanding the foregoing, the Borrower shall be permitted to pay as the same may become due and payable (i) administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the Ordinary Course of Business and to the extent otherwise authorized under the Financing Order and this Agreement and (ii) compensation and reimbursement of expenses to professionals allowed and payable under Sections 330 and 331 of the Bankruptcy Code to the extent permitted by the Financing Order.

## ARTICLE 6
## FINANCIAL COVENANTS

Borrower agree that so long as any Credit Exposure exists:

Section 6.1      Minimum AWR.

Borrower will not permit AWR for any facility, measured as of each Tuesday from and after the Filing Date, for the immediately preceding two (2) week period ended each Friday to be less than 90% of the amount set forth for such period and such facility in the AWR Projections delivered by Borrower to Agent on July 10, 2015.

## ARTICLE 7
## CONDITIONS

Section 7.1      Conditions to Closing.

The obligation of each Lender to make Loans on the Closing Date, of Agent or any Lender on the Closing Date shall be subject to the receipt by Agent of each agreement, document and instrument set forth on the Closing Checklist, each in form and substance reasonably satisfactory to Agent, and to the satisfaction of the following conditions precedent, each to the satisfaction of Agent and Lenders in their sole discretion:

(a)      the payment of all fees, expenses and other amounts due and payable on the Closing Date under each Financing Document;

(b)     the absence, since December 31, 2015, of any material adverse change in the business, operations, properties or condition (financial or otherwise) of Borrower, or any event or condition which could reasonably be expected to result in such a material adverse change other than the Case (other than such events as have been disclosed to Agent);

(c)     the Case shall have been commenced in the Bankruptcy Court and all "first day orders" and all related pleadings to be entered at or promptly following the commencement of the Case have been provided in advance to Agent, each in form and substance reasonably satisfactory to Agent;

(d)     the Bankruptcy Court shall have entered the Interim Order within five (5) Business Days after the commencement of the Case, entered on notice to such parties as may be satisfactory to Agent;

(e)     Borrower shall have filed with the Bankruptcy Court one or more motions seeking approval of the sale of all or substantially all of the assets of Borrower pursuant to one or more sales and seeking approval of bidding procedures, in each case, in form and substance satisfactory to Agent;

(f)     receipt by Agent of the AWR Projections; and

(g)     receipt by Agent of such other documents, instruments and/or agreements as Agent may reasonably request.

Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Financing Document, each additional Operative Document and each other document, agreement and/or instrument required to be approved by Agent, Required Lenders or Lenders, as applicable, on the Closing Date.

Section 7.2     Conditions to Each Loan.

The obligation of Lenders to make a Loan to Borrower (other than Revolving Loans made pursuant to Section 2.3(b)), of Agent or any Lender is subject to the satisfaction of the following additional conditions:

(a)     in the case of a Revolving Loan, receipt by Agent of a Notice of Borrowing (or telephonic or electronic notice, as permitted by Section 2.2) in accordance with Section 2.2;

(b)     the fact that, immediately after such borrowing and after application of the proceeds thereof or after such issuance, the Revolving Loan Outstandings will not exceed the Revolving Loan Limit and the Revolving Loan Outstandings will not exceed the principal amount of Revolving Loans projected to be outstanding during such week as set forth in the Budget for such week;

(c)     the fact that, if any Default or Event of Default shall have occurred and is continuing or would occur as the result of such borrowing or issuance, neither Agent nor Required Revolving Lenders shall have elected not to make, or not to permit the making of, any additional Revolving Loan;

(d)     the fact that, if any representation or warranty of Borrower contained in the Financing Documents shall not be true, correct and complete in any material respect (without duplication of any materiality provision contained therein) on and as of the date of such borrowing or issuance (or any earlier date with respect to which any such representation or warranty relates), neither Agent nor Required Revolving Lenders shall have elected not to make, or not to permit the making of, any additional Revolving Loan;

(e)     with respect to any Loan made after 30 days from the Closing Date, the Bankruptcy Court shall have entered the Final Order, which Final Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Agent;

(f)     the fact that, as of such date, all motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the Obligations, and the approval thereof shall be in form and substance satisfactory to Agent; and

(g)     receipt by Agent of an Officer's Certificate, in form and substance reasonably acceptable to Agent, executed by the Senior Financial Officer or Chief Executive Officer, demonstrating to the satisfaction of Agent that, as of such date and after giving effect to the proposed borrowing and based upon good faith determinations and projections consistent with the projections required to be delivered pursuant to Section 4.1(e) and the Budget, Borrower is in compliance with the Budget and all other operating and financial covenants set forth in this Agreement as of each applicable date;

Each giving of a Notice of Borrower hereunder and each acceptance by Borrower of the proceeds of any Loan made hereunder shall, except as set forth in the Notice of Borrowing, be deemed to be a representation and warranty by Borrower on the date of such notice or acceptance as to the facts specified in Sections 7.2(b), 7.2(c) and 7.2(d).

## ARTICLE 8
## EVENTS OF DEFAULT

Section 8.1     <u>Events of Default</u>.

The occurrence of any of the following conditions and/or events, whether voluntary or involuntary, by operation of Law or otherwise, shall constitute an "**Event of Default**":

(a)     Borrower shall fail to pay when due any principal, interest, fee or other amount under any Financing Document or all or any of any portion of the Existing

Obligations as and when due and payable in accordance with the Financing Order and the Existing Financing Documents;

(b)      Borrower shall fail to observe or perform any covenant contained in Section 4.1(a), (b), (c)(i) or (iii), (d), (i)(i), (o), (p), (q) or (r) and in the case of each other covenant contained in Section 4.1, such failure is not remedied or waived within ten (10) days),  Section 4.4(b),  Section 4.6,  Section 4.7,  Section 4.11,  Section 4.12,  Section 4.13, Section 1.14, Section 4.15, Article 5, or Article 6;

(c)      Borrower shall fail to observe or perform any covenant contained in this Agreement or in any other Financing Document (other than occurrences described in other provisions of this Section 8.1 for which a different grace or cure period is specified or for which no grace or cure period is specified) and such failure is not remedied or waived within thirty (30) days after the earlier of (i) receipt by Borrower of notice from Agent or Required Lenders of such failure or (ii) actual knowledge of Borrower of such failure;

(d)      any representation, warranty, certification or statement made by Borrower in any Financing Document or in any certificate, financial statement or other document delivered pursuant to any Financing Document is incorrect in any respect (or in any material respect if such representation, warranty, certification or statement is not by its terms already qualified as to materiality) when made (or deemed made);

(e)      [reserved];

(f)      [reserved];

(g)      [reserved];

(h)      except pursuant to an order of the Bankruptcy Court in form and substance reasonably satisfactory to Agent, (i) institution of any steps by any Person to terminate a Pension Plan if as a result of such termination Borrower could reasonably be expected to be required to make a contribution to such Pension Plan, or could reasonably be expected to incur a liability or obligation to such Pension Plan, in either case excess of $25,000, (ii) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under ERISA or the Code securing an obligation in excess of $25,000, or (iii) there shall occur any withdrawal or partial withdrawal from a Multiemployer Plan and the withdrawal liability (without unaccrued interest) to Multiemployer Plans as a result of such withdrawal (including any outstanding withdrawal liability that Borrower has incurred on the date of such withdrawal) exceeds $25,000;

(i)      if, after the Filing Date, one or more judgments, orders, decrees or arbitration awards for the payment of money (not paid or fully covered by insurance or as to which the relevant insurance company has denied coverage) aggregating in excess of $25,000 shall be rendered against any one or more of the Borrower and either (i) enforcement proceedings shall have been commenced by any creditor upon any such

-35-

judgments or orders or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of any such judgments, or orders, decrees or awards, by reason of a pending appeal, bond or otherwise, shall not be in effect;

(j)      any change in Borrower's board of directors;

(k)      any Lien created by any of the Security Documents shall at any time fail to constitute a valid and perfected Lien on a material portion of the Collateral purported to be secured thereby, subject to no prior or equal Lien except Permitted Priority Liens and, if consented to in writing by Agent, the Liens securing the Existing Obligations, or Borrower or Subsidiary shall so assert;

(l)      Borrower shall be prohibited or otherwise materially restrained from conducting the business theretofore conducted by it by virtue of any casualty, any labor strike, any determination, ruling, decision, decree or order of Governmental Authority of competent jurisdiction or any other event and such casualty, labor strike, determination, ruling, decision, decree, order or other event remains unstayed and in effect for any period of ten (10) days, or any material portion of Borrower's assets is attached, seized, subject to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person and the same is not discharged before the earlier of thirty (30) days after the date that it first arises or five (5) Business Days prior to the date on which such property or asset is subject to forfeiture by Borrower;

(m)      any of the Financing Documents (or any material provision thereof) shall for any reason fail to constitute the valid and binding agreement of any party thereto;

(n)      Borrower makes any payment on account of any Debt existing as of the Filing Date, except for payments of the Existing Obligations or any payments expressly authorized by the Financing Order and this Agreement or pursuant to any other order of the Bankruptcy Court consented to in writing by Agent;

(o)      the Final Order is not entered within twenty-one (21) days (or such other period as Agent may agree to in writing) following entry of the Interim Order; or any Financing Order is stayed, revised, revoked, remanded, rescinded, amended, reversed, vacated, or modified in any manner not acceptable to Agent;

(p)      an order with respect to the Case shall be entered by the Bankruptcy Court (i) appointing a trustee under Section 1104, or an examiner with enlarged powers relating to the operation of the business of the Borrower under Section 1106(b) of the Bankruptcy Code or (ii) terminating Borrower's exclusive rights to file and solicit acceptances for a chapter 11 plan;

(q)      an order with respect to the Case shall be entered by the Bankruptcy Court approving any claim arising under Sections 105, 506(c) or 552(b) of the Bankruptcy

-36-

Code against Agent, any Lender or the Collateral; or the extent of the Liens on Collateral are otherwise limited by such Section of the Bankruptcy Code

(r)     (i) any Person other than the Borrower shall commence any action in the Case adverse to Agent or any Lender or any of their rights and remedies under the Financing Documents, the Financing Order or any other order of the Bankruptcy Court and the same shall remain unopposed by Borrower for more than 5 Business Days;

(s)     (i) Borrower shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of Agent and the Lenders, claims or rights against Borrower or any of their Subsidiaries or to subject any Collateral to assessment pursuant to 506(c) or 552(b) of the Bankruptcy Code, (ii) any Lien or security interest created by this Agreement or the Financing Order shall, for any reason, ceases to be valid or (iii) any action is commenced by Borrower which contests the validity, perfection or enforceability of any of the Liens and security interests of Agent and the Lenders created by this Agreement or the Financing Order;

(t)     an order with respect to the Case shall be entered by the Bankruptcy Court converting the Case to a case under chapter 7 of the Bankruptcy Code;

(u)     any plan of reorganization is filed (by Borrower or any other Person if Borrower's exclusive right to file a plan has been shortened or terminated) that, or an order shall be entered by the Bankruptcy Court confirming a reorganization plan in the Case which, does not (i) contain a provision for termination of this Agreement and the Existing Credit Agreement, the cash collateralization of all contingent obligations hereunder, the indefeasible payment in full in cash of all Obligations and all Existing Obligations and the termination of the Revolving Loan Commitments ("**Paid in Full**") in a manner satisfactory to the Agent on or before the effective date, or substantial consummation, of such plan and (ii) provide for the continuation of the Liens and security interests granted to Agent and priorities until such plan effective date all Obligations and Existing Obligations are Paid in Full;

(v)     an order shall be entered by the Bankruptcy Court dismissing the Case which does not contain a provision for termination of the obligations of Agent and Lenders under this Agreement and the Existing Credit Agreement and the Obligations and Existing Obligations are not Paid in Full on or before such dismissal;

(w)     an order with respect to the Case shall be entered without the express prior written consent of Agent, (i) to revoke, vacate, reverse, stay, modify, supplement or amend this Agreement and the transactions contemplated hereby, any Financing Document or the Financing Order, or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to Borrower's equal or superior to the priority of the Agent and the Lenders in respect of the Obligations and the Existing Obligations, except for the amounts having a priority over the Obligations to the extent set forth in the definition of Carveout;

(x)     an order shall be entered by the Bankruptcy Court granting relief from the automatic stay to any creditor(s) of Borrower with respect to any claim in an amount equal to or exceeding $25,000 in the aggregate; provided, however, that it shall not be an Event of Default if relief from the automatic stay is granted (i) solely for the purpose of allowing such creditor to determine the liquidated amount of its claim against any such Person or (ii) to permit the commencement of or prosecution of a proceeding to collect solely against an insurance company;

(y)     a motion shall be filed seeking authority, or an order shall be entered in the Case, that (i) permits Borrower to incur Debt secured by any claim under Bankruptcy Code Section 364(c)(1) or by a Lien pari passu with or superior to the Lien granted under the Financing Documents and the Existing Financing Documents and Bankruptcy Code Sections 364(c)(2) or (d), unless (A) all of the Obligations and Existing Obligations have been Paid in Full at the time of the entry of any such order, or (B) the Obligations and the Existing Obligations are Paid in Full with such debt, or (ii) permits Borrower the right to use Collateral other than in accordance with the terms of the Financing Order, unless all of the Obligations and Existing Obligations shall have been Paid in Full;

(z)     the proceeds of any sale or other Disposition of Collateral are not directly remitted to Agent at the closing thereof for applicable to the Obligations and the Existing Obligations in accordance with the terms of this Agreement and the Financing Order;

(aa)     any motions to sell Collateral or approve procedures regarding the same, any plan or disclosure statement or supplements or amendments thereto, or any orders approving or amending any of the foregoing, are not in form and substance reasonably acceptable to Agent;

(bb)     the automatic stay terminates or expires unless all of the Obligations and Existing Obligations shall have been Paid in Full;

(cc)     Borrower challenges the extent, validity or priority of the Obligations or the Existing Obligations or the application of any payments or collections received by Agent, Lenders, Existing Agent, Existing Lenders to the Obligations or Existing Obligations as provided for herein or in the Financing Order; or Borrower challenges the validity, extent, perfection or priority of any Liens granted in the Collateral to secure the Obligations or the Existing Obligations;

(dd)     If the Investment Banker ceases to be investment banker for the Borrower and the Borrower have not appointed a replacement Investment Banker reasonably acceptable to Agent within ten Business Days thereafter;

(ee)     If the Chief Executive Officer or Senior Financial Officer is terminated or disqualified for any reason, and Company has not appointed a replacement Chief

Executive Officer and Senior Financial Officer, as applicable, reasonably acceptable to Agent within ten (10) Business Days thereafter;

(ff)    payment of or granting adequate protection with respect to any Debt that was existing prior to the Filing Date (other than as provided herein or as approved by Agent and the Bankruptcy Court); or

(gg)    Borrower shall fail to maintain sufficient projected borrowing capacity under this Agreement to pay all accrued administrative obligations and other administrative claims when due, and sufficient additional borrowing capacity to enable such other unpaid administrative obligations and administrative claims that are required to be paid in full when due.

Section 8.2    Acceleration and Suspension or Termination of Revolving Loan Commitment.

Upon the occurrence and during the continuance of an Event of Default, Agent may, and shall, if so requested by Required Lenders, (i) by notice to Borrower suspend or terminate the Revolving Loan Commitment and the obligations of Agent and Lenders with respect thereto, in whole or in part (and, if in part, such reduction shall be pro rata among Lenders having a Revolving Loan Commitment Percentage), (ii) by notice to Borrower declare all or any portion of the Obligations to be, and such Obligations shall thereupon become, immediately due and payable, with accrued interest thereon, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower and Borrower will pay the same, (iii) enforce any and all Liens and security interests created pursuant to the Financing Documents and/or (iv) subject to the applicable terms, if any, of the Financing Order, exercise any or all rights and remedies available at law or in equity pursuant to any other Financing Document.

Section 8.3    [Reserved].

Section 8.4    Default Rate of Interest and Suspension of LIBOR Rate Options.

With respect to any or all of the following, at the election of Agent or Required Lenders (but in the case of clause (iii) below, Agent or Required Revolving Lenders), after the occurrence of an Event of Default and for so long as it continues, (i) the Loans shall bear interest at rates that are two percent (2.0%) in excess of the rates otherwise payable under this Agreement, (ii) Obligations (other than the Loans and those arising under Swap Contracts) shall bear interest at the Base Rate plus the Base Rate Margin applicable to Revolving Loans plus two percent (2.0%), (iii) as the Interest Periods for LIBOR Loans then in effect expire, such Loans shall be converted into Base Rate Loans and (iv) the LIBOR election will not be available to Borrower.  Any election made pursuant to clause (i) or (ii) above may be made retroactive to the date of the occurrence of the applicable Event of Default.

Section 8.5        Setoff Rights.

During the continuance of any Event of Default, each Lender is hereby authorized by Borrower at any time or from time to time, with reasonably prompt subsequent notice to Borrower (any prior or contemporaneous notice to Borrower being hereby expressly waived) to set off and to appropriate and to apply any and all (i) balances held by such Lender or any of such Lender's Affiliates at any of its offices for the account of Borrower (regardless of whether such balances are then due to Borrower), and (ii) other property at any time held or owing by such Lender to or for the credit or for the account of Borrower, against and on account of any of the Obligations; except that no Lender shall exercise any such right without the prior written consent of Agent.  Any Lender exercising a right to set off shall purchase for cash (and the other Lenders shall sell) interests in each of such other Lender's Pro Rata Share of the Obligations as would be necessary to cause all Lenders to share the amount so set off with each other Lender in accordance with its Pro Rata Share of the Obligations.  Borrower agree that any Lender or any of such Lender's Affiliates may, to the fullest extent permitted by law, exercise its right to set off with respect to the Obligations as provided in this Section 8.5.

Section 8.6        Application of Proceeds.

(a)        As to Borrower.  Notwithstanding anything to the contrary contained in this Agreement, Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by Agent from or on behalf of Borrower or any guarantor of all or any part of the Obligations, and, as between Borrower on the one hand and Agent and Lenders on the other, Agent shall have the continuing and exclusive right to apply any and all payments received against the Obligations in such manner as Agent may deem advisable notwithstanding any previous application by Agent.

(b)        After Event of Default.  Agent may apply (and upon direction of Required Lenders shall apply) any and all payments received by Agent in respect of the Obligations, and any and all proceeds of Collateral received by Agent, to the Obligations in such order as Agent (or Required Lenders) may from time to time elect.

(c)        [Reserved].

(d)        Residuary.  Any balance remaining after giving effect to the applications set forth in this Section 8.6 shall be delivered to Borrower or to whoever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct. In carrying out any of the applications set forth in this Section 8.6, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (ii) each of the Persons entitled to receive a payment or cash collateral in any particular category shall receive an amount equal to its pro rata share of amounts available to be applied pursuant thereto for such category.

# ARTICLE 9
## EXPENSES AND INDEMNITY

Section 9.1        Expenses.

Borrower hereby agrees to promptly pay (i) all reasonable out-of-pocket costs and expenses of Agent (including without limitation the reasonable and documented fees, costs and expenses of counsel to, and independent appraisers and consultants retained by Agent) in connection with loan proposals and commitments, in connection with the examination, review, due diligence investigation, documentation, negotiation, closing and syndication of the transactions contemplated by the Financing Documents, in connection with the creation, perfection and maintenance of Liens pursuant to the Financing Documents, in connection with the performance by Agent of its rights and remedies under the Financing Documents and in connection with the continued administration of the Financing Documents including (A) any amendments, modifications, consents and waivers to and/or under any and all Financing Documents or Existing Financing Documents and (B) any periodic public record searches conducted by or at the request of Agent (including, without limitation, title investigations and public records searches), pending litigation and tax lien searches and searches of applicable corporate, limited liability, partnership and related records concerning the continued existence, organization and good standing of certain Persons), (ii) without limitation of the preceding clause (i), all costs and expenses of Agent, Lenders and its Affiliates  (and of any participant of any Lender to the extent consented to by Agent) in connection with (A) protecting, storing, insuring, handling, maintaining, auditing, examining, valuing or selling any Collateral, (B) any litigation, dispute, suit or proceeding relating to any Financing Document or Existing Financing Document, and (C) any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the Financing Documents or Existing Financing Document (it being agreed that such costs and expenses may include the reasonable costs and expenses of the Advisors, Lender Advisor and any other workout consultants, investment bankers, financial consultants, appraisers, valuation firms and other advisors), including any such costs and expenses incurred in connection with any action to lift the automatic stay of Section 362 of the Bankruptcy Code, or any other action or participation by Agent, any Lender, Existing Agent or any Existing Lender in the Case, including any contested matters or adversary proceedings, to the extent related to any of the foregoing, (iii) without limitation of the preceding clause (i), all costs and expenses of Agent in connection with Agent's reservation of funds in anticipation of the funding of the initial Loans to be made hereunder, provided that Borrower has requested or consented to such reservation of funds, and (iv) all reasonable and documented fees, costs and expenses of counsel incurred by Lenders in connection with any litigation, dispute, suit or proceeding relating to any Financing Document (including, without limitation, any litigation over the reasonableness or allowance of any interest, fees, costs, charges or other Obligations incurred under any Financing Document) or in connection with any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all Financing Documents (including such fees and expenses incurred after and in connection with enforcement of any judgment or order in respect of the Obligations).  In addition, all

fees and expenses of each Advisor will be the sole responsibility of Borrower and in no event will Agent or Lenders have any liability or responsibility for the payment of any such fees or expenses, nor will Agent or Lenders have any obligation or liability to Borrower or any other person by reason of any acts or omissions of any Advisor or the retention of any Advisor.

Section 9.2    Indemnity.

Borrower hereby agrees to indemnify, pay and hold harmless Agent and Lenders and the officers, directors, employees, trustees, agents, investment advisors, collateral managers, servicers, Lender Advisor and counsel of Agent and Lenders (collectively called the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable and documented fees and disbursements of counsel for such Indemnitee) in connection with any investigative, remedial, administrative or judicial matter or proceeding, whether or not such Indemnitee shall be designated a party thereto and including any such proceeding initiated by or on behalf of Borrower, and the reasonable expenses of investigation by engineers, environmental consultants and similar technical personnel and any commission, fee or compensation claimed by any broker asserting any right to payment for the transactions contemplated hereby, which may be imposed on, incurred by or asserted against such Indemnitee as a result of or in connection with the transactions contemplated hereby or by the other Operative Documents (including (i)(A) as a direct or indirect result of the presence on or under, or escape, seepage, leakage, spillage, discharge, emission or release from, any property now or previously owned, leased or operated by Borrower of any Hazardous Materials or any Hazardous Materials Contamination, (B) arising out of or relating to the offsite disposal of any materials generated or present on any such property or (C) arising out of or resulting from the environmental condition of any such property or the applicability of any governmental requirements relating to Hazardous Materials, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of Borrower, (ii) proposed and actual extensions of credit under this Agreement and (iii) any matter arising from or relating to any action or omission of any of the Indemnitees in connection with the Existing Financing Documents or the exercise of any rights or remedies thereunder or related thereto) and the use or intended use of the proceeds of the Loans, except that Borrower shall have no obligation hereunder to an Indemnitee with respect to any liability resulting from the gross negligence, bad faith or willful misconduct of, or breach of this Agreement by, such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.    To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, Borrower shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all such indemnified liabilities incurred by the Indemnitees or any of them.

## ARTICLE 10
## TAXES; YIELD PROTECTION

Section 10.1    <u>Taxes</u>.

(a)    <u>Gross Up for Taxes</u>.  All payments of principal and interest on the Loans and all other amounts payable hereunder or under any Financing Document shall be made free and clear of and without deduction for any present or future income, excise, stamp, documentary, property or franchise taxes and other taxes, fees, duties, levies, assessments, withholdings or other charges of any nature whatsoever (including interest and penalties thereon) imposed by any taxing authority, excluding (A) taxes imposed on or measured by Agent's or any Lender's net income by the jurisdiction under which Agent or such Lender is organized or has a present or former connection (other than a connection resulting from entering into any of the Financing Documents, receiving any payment thereunder, or taking any action thereunder), (B) any United States federal withholding taxes to the extent imposed on the amounts payable to such Lender or Agent at the time such Lender or Agent becomes a party to this Agreement, unless in the case of an assignee, the applicable assigning person would have been entitled to receive additional amounts with respect to such taxes at the time of such assignment, (C) any United States federal withholding taxes or deductions imposed under Sections 1471 and 1472 of the Code, or (D) any United States federal withholding taxes that would not have been imposed but for such Lender's failure to comply with Sections 10.1(d) or (e)  (all non-excluded items being called "**Taxes**").  If any withholding or deduction from any payment to be made by Borrower hereunder is required in respect of any Taxes pursuant to any applicable Law, then Borrower will  (i) pay directly to the relevant authority the full amount required to be so withheld or deducted, (ii) promptly forward to Agent an official receipt or other documentation satisfactory to Agent evidencing such payment to such authority, and (iii) pay to Agent for the account of Agent, Lenders and other applicable Person such additional amount or amounts as is necessary to ensure that the net amount actually received by Agent, each Lender and each other Person will equal the full amount it would have received had no such withholding or deduction been required.  If any Taxes are directly asserted against Agent, any Lender or any other Person with respect to any payment made hereunder, Agent, such Lender or such other Person may pay such Taxes and Borrower will promptly pay such additional amounts (including any penalty, interest or expense) as is necessary in order that the net amount received by such Person after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such Person would have received had such Taxes not been asserted so long as such amounts have accrued on or after the day which is two hundred seventy (270) days prior to the date on which Agent, such Lender or such other Person first made demand therefor; provided that if the event giving rise to such amount has retroactive effect, such two hundred seventy (270) day period shall be extended to include the period of retroactive effect.

(b)    <u>Other Taxes</u>.  Borrower agrees to pay any present or future stamp, value added or documentary taxes or any other excise or property taxes, charges, or similar levies ("**Other Taxes**") that arise from any payment made hereunder or from the execution,

-43-

delivery, performance, recordation, or filing of, or otherwise with respect to this Agreement or any other Financing Document.

(c)     Interest and Penalties.  If Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to Agent, for the account of Agent and the respective Lenders and other Persons, the required receipts or other required documentary evidence, Borrower shall indemnify Agent and Lenders for any taxes, interest, penalties, fees and expenses that may become payable by Agent or any Lender as a result of any such failure.

(d)     Foreign Lenders.  Each Foreign Lender that is a party hereto on the Closing Date or purports to become an assignee of an interest pursuant to Section 12.6(a) after the Closing Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) shall execute and deliver to Borrower and Agent one or more (as Borrower or Agent may reasonably request) United States Internal Revenue Service Forms W-8ECI, W-8BEN, W-8IMY (as applicable) and other applicable forms, certificates or documents prescribed by the United States Internal Revenue Service or reasonably requested by Agent certifying as to such Lender's entitlement to a complete exemption from withholding or deduction of Taxes.  Any Foreign Lender that is relying on the portfolio interest exception of Section 871(h) or Section 881(c) of the Code, shall also provide Agent and Borrower with IRS Form W-8BEN, a certificate (the "**Portfolio Interest Certificate**") representing to Agent and Borrower that such Foreign Lender is not a "bank" for purposes of Section 881(c) of the Code, is not a ten percent (10%) holder of Borrower described in Section 871(h)(3)(B) of the Code, is not a controlled foreign corporation receiving interest from a related person (within the meaning of Sections 881(c)(3)(C) and 864(d)(4) of the Code) and is not a conduit entity participating in a conduit financing arrangement as defined in Treasury Regulation Section 1.881-3.  Each Lender shall provide new forms (or successor forms) or certificates upon the expiration or obsolescence of any previously delivered forms and to promptly notify Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction.  Borrower shall not be required to pay additional amounts to any Lender pursuant to this Section 10.1 with respect to United States federal withholding taxes to the extent that the obligation to pay such additional amounts would not have arisen but for the failure of such Lender to comply with this paragraph other than as a result of a change in Law.   If a payment made to a Lender under this Agreement or any would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or the Agent as may be necessary for Borrower or the Agent to comply with their obligations under FATCA, to determine that such Lender has complied with such Lender's obligations under FATCA, or to determine the amount to deduct and withhold from such payment.

-44-

(e)     United States Lenders.  Any Lender other than a Foreign Lender or a Lender that constitutes an "exempt recipient" within the meaning of Treasury Regulation Section 1.6049-4(c) that is a party hereto on the Closing Date or purports to become an assignee of an interest pursuant to Section 12.6(a) after the Closing Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) shall execute and deliver to Borrower and Agent one or more (as Borrower or Agent may reasonably request) United States Internal Revenue Service Form W-9, certifying to such Lender's U.S. Taxpayer Identification Number and exemption from United States federal backup withholding taxes. Each Lender shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and to promptly notify Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction. Borrower shall not be required to pay any additional amount to any Lender pursuant to this Section 10.1 with respect to United States federal withholding taxes to the extent the obligation to pay such additional amounts would not have arisen but for the failure of the Lender to comply with this paragraph.

(f)     If the Internal Revenue Service or any other Governmental Authority of the United States or any other jurisdiction asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender due to a failure on the part of the Lender to comply with the provisions of this Section 10.1, such Lender shall indemnify and hold Agent harmless for all amounts paid, directly or indirectly, by Agent, as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent under this Section 10.1, together with all costs and expenses (including attorneys fees and expenses).  The obligation of the Lenders under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

Section 10.2     Capital Adequacy.

If any Lender shall reasonably determine that the adoption or taking effect of, or any change in, any applicable Law regarding capital adequacy, in each instance, after the Closing Date, or any change after the Closing Date in the interpretation, administration or application thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation, administration or application thereof, or the compliance by any Lender or any Person controlling such Lender with any request, guideline or directive regarding capital adequacy (whether or not having the force of Law) of any such Governmental Authority, central bank or comparable agency adopted or otherwise taking effect after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or such controlling Person's capital as a consequence of such Lender's obligations hereunder to a level below that which such Lender or such controlling Person could have achieved but for such adoption, taking effect, change, interpretation, administration, application or compliance (taking into consideration such Lender's or such controlling Person's policies with respect to capital adequacy) then from time to time, upon demand by such Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a

copy of which shall be furnished to Agent), Borrower shall promptly pay to such Lender such additional amount as will compensate such Lender or such controlling Person for such reduction, so long as such amounts have accrued on or after the day which is two hundred seventy (270) days prior to the date on which such Lender first made demand therefor; provided that if the event giving rise to such amount has retroactive effect, such two hundred seventy (270) day period shall be extended to include the period of retroactive effect.

Section 10.3    Increased Costs.

If any Lender shall reasonably determine that the adoption or taking effect of, or any change in, any applicable Law, in each instance, after the Closing Date or any change after the Closing Date in the interpretation, administration or application of any Law by any Governmental Authority, central bank or comparable agency charged with the interpretation, administration or application thereof, or the compliance by any Lender or any Person controlling such Lender with any request, guideline or directive (whether or not having the force of Law) of any such authority, central bank or comparable agency:  (A) shall impose, modify or deem applicable any reserve (including any reserve imposed by the Board of Governors of the Federal Reserve System, or any successor thereto), special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by any Lender, or (B) shall impose on any Lender any other condition affecting its LIBOR Loans, any of its Notes (if any) or its obligation to make LIBOR Loans; and the result of anything described in clauses (A) and (B) above is to increase the cost to (or to impose a cost on) such Lender of making or maintaining any LIBOR Loan, or to reduce the amount of any sum received or receivable by such Lender under this Agreement or under any of its Notes (if any) with respect thereto, then upon demand by such Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a copy of which shall be furnished to Agent), Borrower shall promptly pay directly to such Lender such additional amount as will compensate such Lender or controlling Person for such increased cost or such reduction, so long as such amounts have accrued on or after the day which is two hundred seventy (270) days prior to the date on which such Lender first made demand therefor; provided that if the event giving rise to such amount has retroactive effect, such two hundred seventy (270) day period shall be extended to include the period of retroactive effect.

Section 10.4    Mitigation Obligations.

If any Lender requests compensation under either Section 10.2 or Section 10.3, or requires Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 10.1, then, upon the written request of Borrower, such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder (subject to the provisions of Section 12.6) to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or materially reduce amounts payable pursuant to any such Section, as the case

-46-

may be, in the future, (ii) would not subject such Lender to any unreimbursed cost or expense and (iii) would not otherwise be disadvantageous to such Lender (as determined in its sole discretion). Without limitation of the provisions of Section 9.1, Borrower hereby agrees to pay all costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 10.5    Conclusiveness of Statements; Survival.

Determinations and statements of any Lender pursuant to Sections 10.1, 10.2 and 10.3 shall be conclusive and binding absent demonstrable error. Lenders may use reasonable averaging and attribution methods in determining compensation under Sections 10.1, 10.2 and 10.3, and the provisions of such Sections shall survive repayment of the Loans and termination of this Agreement.

Section 10.6    Dodd-Frank.

Notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines and directives thereunder or issued in connection therewith shall be deemed, for all purposes of this Agreement, to be adopted after the date of this Agreement, regardless of the date actually enacted, adopted or issued.

## ARTICLE 11
## AGENT

Section 11.1    Appointment and Authorization.

(a)    General.    Each Lender hereby irrevocably appoints and authorizes Agent to enter into each of the Financing Documents to which it is a party (other than this Agreement) on its behalf and to take such actions as Agent on its behalf and to exercise such powers under the Financing Documents as are delegated to Agent by the terms thereof, together with all such powers as are reasonably incidental thereto. Subject to the terms of Section 12.5, Section 11.16 and to the terms of the other Financing Documents, Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Financing Documents on behalf of Lenders. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and the other Secured Parties and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with Borrower. Agent may perform any of its duties hereunder, or under the Financing Documents, by or through its own agents or employees.

(b)    Specific Rights Regarding Collateral.    Without limiting the generality of the powers of Agent, as set forth above, Agent is hereby authorized to act as collateral agent for each Lender and each other Secured Party pursuant to each of the Financing Documents. In such capacity, Agent has the right to exercise all rights and remedies available under the Financing Documents, the UCC and other applicable law. The powers of

-47-

the Agent shall include, in the event of any sale or other disposition of all or any portion of the Collateral (whether such sale or other disposition  is under the UCC, including pursuant to Sections 9-610 or 9-620 thereof, under the Bankruptcy Code, including pursuant to Sections 363, 365 or 1129 thereof, or under other applicable Law, including any sale by judicial action), with the consent of the Required Lenders, to (i) form on behalf of the Secured Parties an entity to be the acquirer of such Collateral and to offset (credit bid) any of the Obligations against the purchase price payable by Agent (or such acquisition entity) at such sale or other disposition. (ii) consent to assumption of all or any portion of the Obligations secured by the Collateral purchased by any other Person, and (iii) in connection with either (i) or (ii) above, otherwise consent to a reduction of the Obligations as consideration in connection with such sale or other disposition. Agent shall have the authority to take such other actions (either directly or through one or more acquisition vehicles) as it may deem necessary or desirable, and as may be approved by Required Lenders, to consummate a sale of the type described in the immediately preceding sentences. Agent shall have the authority, with the consent of Required Lenders, to accept non-cash consideration in connection with the sale or other disposition of the Collateral, whether the purchaser is Agent, an entity formed by Agent as described above or any other Person.

Section 11.2    Agent and Affiliates.

Agent shall have the same rights and powers under the Financing Documents as any other Lender and may exercise or refrain from exercising the same as though it were not Agent, and Agent and its Affiliates may lend money to, invest in and generally engage in any kind of business with Borrower as if it were not Agent hereunder.

Section 11.3    Action by Agent; Action by Secured Parties.

(a)    Agent.  Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender or any other Person. Nothing in this Agreement or any of the Financing Documents is intended to or shall be construed to impose upon Agent any obligations in respect of this Agreement or any of the Financing Documents except as expressly set forth herein or therein.  Actions taken by Agent hereunder, under the other Financing Documents or upon the instructions of Required Lenders or such other portion of the Lenders (as required hereunder), shall be binding upon each Lender and each of the other Secured Parties.

(b)    Secured Parties.  Anything in this Agreement or any other Financing Document to the contrary notwithstanding, each Secured Party hereby agrees with each other Secured Party and with Agent that no Secured Party shall take any action to protect or enforce its rights against Borrower arising out of this Agreement or any other Financing Document (including exercising any rights of set-off) without first obtaining the prior written consent of the Agent, it being the intent of Lenders and the other Secured Parties that any such action to protect or enforce rights against Borrower under this Agreement and the other Financing Documents shall be taken in concert and at the direction or with the consent of Agent.

-48-

Section 11.4    <u>Consultation with Experts</u>.

Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

Section 11.5    <u>Liability of Agent</u>.

Neither Agent nor any of its directors, officers, agents or employees shall be liable to any Secured Party or any other Person for any action taken or not taken by it in connection with the Financing Documents, except that Agent shall be liable with respect to its specific duties set forth hereunder, but only to the extent of its own gross negligence, bad faith or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction.   Neither Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into or verify (i) any statement, warranty or representation made in connection with any Financing Document or any borrowing hereunder, (ii) the performance or observance of any of the covenants or agreements specified in any Financing Document, (iii) the satisfaction of any condition specified in any Financing Document, (iv) the validity, effectiveness, sufficiency or genuineness of any Financing Document, any Lien purported to be created or perfected thereby or any other instrument or writing furnished in connection therewith, (v) the existence or non-existence of any Default or Event of Default; or (vi) the financial condition of Borrower.   Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, telex, facsimile or electronic transmission or similar writing) believed by it to be genuine or to be signed by the proper party or parties.   Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Secured Party to whom payment was due but not made, shall be to recover from other Secured Parties any payment in excess of the amount to which it is determined to be entitled (and such other Secured Parties hereby agree to return to such Secured Party any such erroneous payments received by them).

Section 11.6    <u>Indemnification</u>.

Lenders shall, on a ratable basis, indemnify Agent (to the extent not reimbursed by Borrower) upon demand against any cost, expense (including counsel fees and disbursements), withholding tax liability, claim, demand, action, loss or liability (except such as result from Agent's gross negligence, bad faith or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that Agent may suffer or incur in connection with the Financing Documents or any action taken or omitted by Agent hereunder or thereunder.   If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Required Lenders until such additional indemnity is furnished.

Section 11.7     Right to Request and Act on Instructions.

Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Financing Documents Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Financing Documents until it shall have received such instructions from Required Lenders or all or such other portion of Lenders as shall be prescribed by this Agreement.  Without limiting the foregoing, no Secured Party shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or any of the other Financing Documents in accordance with the instructions of Required Lenders and or Required Revolving Lenders (or all or such other portion of Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required Lenders or Required Revolving Lenders (or such other applicable portion of Lenders), Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable Law or exposes Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 11.6.

Section 11.8     Credit Decision.

Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Financing Documents.

Section 11.9     Collateral Matters.

Secured Parties irrevocably authorize Agent, at its option and in its discretion, to (i) release any Lien granted to or held by Agent under any Security Document (A) upon the termination of all Credit Exposure, or (B) constituting property sold or disposed of as part of or in connection with any disposition permitted under any Financing Document (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the sale or other disposition of property being made in full compliance with the provisions of the Financing Documents), and (ii) release or subordinate any Lien granted to or held by Agent under any Security Document constituting property described in Section 5.2(c) (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the identification of any property described in Section 5.2(c).  Upon request by Agent at any time, Secured Parties will confirm Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Section 11.9.

Section 11.10   <u>Agency for Perfection</u>.

Agent and each Secured Party hereby appoint each other Secured Party as agent for the purpose of perfecting Agent's security interest in assets which, in accordance with the UCC in any applicable jurisdiction, can be perfected by possession or control. Should any Secured Party (other than Agent) obtain possession or control of any such assets, such Secured Party shall notify Agent thereof, and, promptly upon Agent's request therefor, shall deliver such assets to Agent or in accordance with Agent's instructions or transfer control to Agent in accordance with Agent's instructions.  Without limiting the provisions of Section 11.3(b), each Secured Party agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Obligations unless instructed to do so by Agent (or consented to by Agent, as provided in Section 8.5), it being understood and agreed that such rights and remedies may be exercised only by Agent.

Section 11.11   <u>Notice of Default</u>.

Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to Agent for the account of Lenders, unless Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  Agent will notify each Lender of its receipt of any such notice.  Agent shall take such action with respect to such Default or Event of Default as may be requested by Required Lenders, or Required Revolving Lenders (or all or such other portion of Lenders as shall be prescribed by this Agreement) in accordance with the terms hereof.  Unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interests of Lenders.

Section 11.12   <u>Successor Agent</u>.

Agent may at any time give notice of its resignation to Lenders and Borrower.  Upon receipt of any such notice of resignation, Required Lenders shall have the right, in consultation with Borrower, to appoint a successor Agent.  Upon the acceptance of a successor's appointment as Agent hereunder and notice of such acceptance to the resigning Agent, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the resigning (or resigned) Agent, the resigning Agent's resignation shall become immediately effective and the resigning Agent shall be discharged from all of its duties and obligations hereunder and under the other Financing Documents (if such resignation was not already effective and such duties and obligations not already discharged, as provided below in this paragraph).  The fees payable by Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  If no such successor shall have been so appointed by Required Lenders and shall have accepted such appointment within thirty (30) days after the resigning

Agent gives notice of its resignation, then the resigning Agent, from and following the expiration of such thirty (30) day period, shall have the exclusive right, upon one (1) Business Days' notice to Borrower and Lenders, to make its resignation effective immediately. From and following the effectiveness of its resignation, (i) the resigning Agent shall be discharged from its duties and obligations hereunder and under the other Financing Documents and (ii) all payments, communications and determinations provided to be made by, to or through Agent shall instead be made by or to each Lender directly, until such time as Required Lenders appoint a successor Agent as provided for above in this paragraph. The provisions of this Agreement shall continue in effect for the benefit of any resigning Agent and its sub-agents after the effectiveness of its resignation hereunder and under the other Financing Documents in respect of any actions taken or omitted to be taken by any of them while the resigning Agent was acting or was continuing to act as Agent.

Section 11.13    Disbursements of Revolving Loans; Payment and Sharing of Payment.

(a)    Revolving Loan Advances, Payments and Settlements; Interest and Fee Payments.

(i)    Agent shall have the right, on behalf of Revolving Lenders, to disburse funds to Borrower for all Revolving Loans requested or deemed requested by Borrower pursuant to the terms of this Agreement; provided, that Agent, except as expressly provided in Section 2.2(c)(iii), shall not advance any Revolving Loan pursuant to this clause (i) if, (x) to the knowledge of Agent, the Revolving Loan Outstandings exceed the Revolving Loan Limit, either before or after giving effect to the making of any proposed Revolving Loan, or (y) Agent or Required Revolving Lenders have elected, pursuant to Section 7.2, not to make, or permit the making of, additional Revolving Loans. Agent shall be conclusively entitled to assume, for purposes of the preceding sentence, that each Revolving Lender will fund its Pro Rata Share of all Revolving Loans requested by Borrower. Each Revolving Lender shall reimburse Agent on demand, in accordance with the provisions of the immediately following paragraph, for all funds disbursed on its behalf by Agent pursuant to the first sentence of this clause (i), or if Agent so requests, each Revolving Lender will remit to Agent its Pro Rata Share of any Revolving Loan before Agent disburses the same to Borrower. If Agent elects to require that each Revolving Lender make funds available to Agent, prior to a disbursement by Agent to Borrower, Agent shall advise each Revolving Lender by telephone, facsimile or e-mail of the amount of such Revolving Lender's Pro Rata Share of the Revolving Loan requested by Borrower no later than 1:00 p.m. (Chicago time) on the date of funding of such Revolving Loan, and each such Revolving Lender shall pay Agent on such date such Revolving Lender's Pro Rata Share of such requested Revolving Loan, in same day funds, by wire transfer to the Payment Account, or such other account as may be identified by Agent to Revolving Lenders from time to time. If any Lender fails to pay the amount of its Pro Rata Share within one (1) Business Day after Agent's demand, Agent shall promptly notify Borrower, and Borrower shall immediately repay such amount to

Agent, together with accrued interest thereon from and including the date such amount is made available to Borrower to but excluding the date of payment at the rate of interest then applicable to Revolving Loans which are Base Rate Loans. Nothing in this Section 11.13 or elsewhere in this Agreement or the other Financing Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that Agent or Borrower may have against any Lender as a result of any default by such Lender hereunder.

        (ii)      On a Business Day of each week as selected from time to time by Agent, or more frequently (including daily), if Agent so elects (each such day being a "**Settlement Date**"), Agent will advise each Revolving Lender by telephone, facsimile or e-mail of the amount of each such Revolving Lender's percentage interest of the Revolving Loan balance (after giving effect to all advances and collections of Revolving Loans subsequent to the immediately preceding Settlement Date) as of the close of business of the Business Day immediately preceding the Settlement Date. In the event that payments are necessary to adjust the amount of such Revolving Lender's actual percentage interest of the Revolving Loan balance to such Lender's required percentage interest of the Revolving Loan balance as of any Settlement Date, the party from which such payment is due shall pay to the other, without setoff or discount, to the Payment Account in the case of Agent, and in accordance with instructions delivered by a Revolving Lender to Agent in the case of a Lender, the full amount necessary to make such adjustment. Payments to be made to Agent pursuant to the preceding sentence shall be made on the Settlement Date if the applicable Lender receives the applicable advice pursuant to the first sentence of this clause (ii) by noon (Chicago time) on the Settlement Date, or on the next Business Day if the advice is received after noon (Chicago time). Any obligation arising pursuant to the preceding sentences shall be absolute and unconditional and shall not be affected by any circumstance whatsoever. In the event settlement shall not have occurred by the date and time specified above, interest shall accrue on the unsettled amount at the Federal Funds Rate, for the first three (3) days following the scheduled date of settlement, and thereafter at the Base Rate plus the Base Rate Margin applicable to Revolving Loans. With respect to any payment described in this paragraph and which is owing to a Defaulted Lender, Agent shall be entitled to set off the funding short-fall of the Defaulted Lender against the payment due to such Lender.

        (iii)     On each Settlement Date, Agent shall advise each Revolving Lender by telephone, facsimile or e-mail of the amount of interest and fees paid for the benefit of Revolving Lenders, subsequent to the immediately preceding Settlement Date, and such Revolving Lender's Revolving Loan Exposure with respect thereto, and shall make payment to such Revolving Lender not later than noon (Chicago time) on the Business Day following the Settlement Date of such amounts in accordance with wire instructions delivered by such Revolving Lender to Agent, as the same may be modified from time to time by written notice to Agent; provided,

that, in the case such Revolving Lender is a Defaulted Lender, Agent shall be entitled to set off the funding short-fall against that Defaulted Lender's respective share of all payments received from Borrower or the Collateral.

(iv)    On the Closing Date, Agent, on behalf of Lenders, may elect to advance to Borrower the full amount of the initial Loans to be made on the Closing Date prior to receiving funds from Lenders, in reliance upon each Lender's commitment to make its Pro Rata Share of such Loans to Borrower in a timely manner on such date. If Agent elects to advance the initial Loans to Borrower in such manner, Agent shall be entitled to receive all interest that accrues on the Closing Date on each Lender's Pro Rata Share of such Loans unless Agent receives such Lender's Pro Rata Share of such Loans by 3:00 p.m. (Chicago time) on the Closing Date.

(v)    The provisions of this Section 11.13(a) shall be deemed to be binding upon Agent and Lenders notwithstanding the occurrence of any Default or Event of Default, or any insolvency or bankruptcy proceeding pertaining to Borrower.

(b)    [Reserved.]

(c)    Return of Payments.

(i)    If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)    If Agent determines at any time that any amount received by Agent under this Agreement must be returned to Borrower or paid to any other Person pursuant to any insolvency Law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Financing Document, Agent will not be required to distribute any portion thereof to any Lender. In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(d)    Defaulted Lenders. The failure of any Defaulted Lender to make any Revolving Loan or any payment required by it hereunder shall not relieve any other Lender of its obligations to make such Revolving Loan or payment, but neither any other Lender nor Agent shall be responsible for the failure of any Defaulted Lender to make a Revolving Loan or make any other payment required hereunder. Notwithstanding anything set forth herein to the contrary, a Defaulted Lender shall not have any voting or consent rights under or with respect to any Financing Document or constitute a "Lender" (or be included in the calculation of "Required Lenders" or "Required Revolving Lenders" hereunder) for any

voting or consent rights under or with respect to any Financing Document, provided that, no amendment, waiver or other modification that would (i) increase such Defaulted Lender's Revolving Loan Commitment Amount, (ii) reduce the principal of, rate of interest on or any fees owing to such Defaulted Lender or forgive any such principal, interest or fees, or (iii) postpone the date fixed for, or waive, any payment of principal (other than any payment under Section 2.4), interest or fees owing to such Defaulted Lender or postpone the date of termination of the commitment of any such Defaulted Lender hereunder, shall be effective, in each case, without the prior written consent of such Defaulted Lender.

(e)      <u>Sharing of Payments</u>.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of Section 10.2 or Section 10.3) in excess of its pro rata share of payments entitled pursuant to the other provisions of this Section 11.13, such Lender shall purchase from the other Lenders such participations in extensions of credit made by such other Lenders (without recourse, representation or warranty) as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; provided, however, that if all or any portion of the excess payment or other recovery is thereafter required to be returned or otherwise recovered from such purchasing Lender, such portion of such purchase shall be rescinded and each Lender which has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such return or recovery, without interest.  Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this clause (e) may, to the fullest extent permitted by Law, exercise all its rights of payment (including pursuant to Section 8.5) with respect to such participation as fully as if such Lender were the direct creditor of Borrower in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar Law, any Lender receives a secured claim in lieu of a setoff to which this clause (e) applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of Lenders entitled under this clause (e) to share in the benefits of any recovery on such secured claim.

Section 11.14      <u>Right to Perform, Preserve and Protect</u>.

If Borrower fails to perform any obligation hereunder or under any other Financing Document, Agent itself may, but shall not be obligated to, cause such obligation to be performed at Borrower' expense.  During the existence of an Event of Default, Agent is further authorized by Borrower and Secured Parties to make expenditures from time to time which Agent, in its reasonable business judgment, deems necessary or desirable to (i) preserve or protect the business conducted by Borrower, the Collateral, or any portion thereof and/or (ii) enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations.  Borrower hereby agrees to reimburse Agent on demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section 11.14.  Each Lender hereby agrees to indemnify Agent upon demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section 11.14, in accordance with the provisions of Section 11.6.

Section 11.15    <u>Additional Titled Agents</u>.

Except for rights and powers, if any, expressly reserved under this Agreement to any bookrunner, arranger or to any titled agent named on the cover page of this Agreement, other than Agent (collectively, the "**Additional Titled Agents**"), and except for obligations, liabilities, duties and responsibilities, if any, expressly assumed under this Agreement by any Additional Titled Agent, no Additional Titled Agent, in such capacity, has any rights, powers, liabilities, duties or responsibilities hereunder or under any of the other Financing Documents.  Without limiting the foregoing, no Additional Titled Agent shall have nor be deemed to have a fiduciary relationship with any Secured Party.  At any time that any Lender serving (or whose Affiliate is serving) as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loans and in the Revolving Loan Commitment, such Person shall be deemed to have concurrently resigned as such Additional Titled Agent.

Section 11.16    <u>Third Party Beneficiaries</u>.

The provisions of this Article 11 are solely for the benefit of Agent, Lenders, and as set forth in the remainder of this Section, the other Secured Parties. Borrower shall have no rights as a third party beneficiary of any of the provisions of this Article 11.  The provisions of this Article 11 and the other Financing Documents relating to Collateral shall benefit each Secured Party if, by accepting such benefits, such Secured Party agrees to be bound by the provisions of this Article 11 and all other provisions of the Financing Documents running to the benefit of Agent from any Lender, as if each other Secured Party was a Lender hereunder.  In furtherance of the foregoing, and as a condition to its acceptance of the benefits set forth above, each other Secured Party agrees that Agent and each of the Lenders and other Secured Parties shall be entitled to act in its sole discretion without regard to the interests of the Secured Party seeking the benefit hereof, without any duty or liability to such Secured Party and without having any duty to notify or seek the consent of such Secured Party prior to taking any action or omitting to take any action.

# ARTICLE 12
# MISCELLANEOUS

Section 12.1    <u>Survival</u>.

All agreements, representations and warranties made herein and in every other Financing Document shall survive the execution and delivery of this Agreement and the other Financing Documents.  The provisions of Articles 9, 10, 11 and 12 shall survive the payment of the Obligations (both with respect to any Lender and all Lenders collectively) and any termination of this Agreement.

Section 12.2    No Waivers; Remedies Cumulative.

No failure or delay by Agent or any Lender in exercising any right, power or privilege under any Financing Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein and therein provided shall be cumulative and not exclusive of any rights or remedies provided by Law. Any reference in any Financing Document to the "continuing" nature of any Event of Default shall not be construed as establishing or otherwise indicating that Borrower has the independent right to cure any such Event of Default, but is rather presented merely for convenience should such Event of Default be waived in accordance with the terms of the applicable Financing Documents.

Section 12.3    Notices.

(a)    All notices, requests and other communications to any party hereunder shall be in writing (including prepaid overnight courier, facsimile transmission, e-mail, electronic submissions or similar writing, but in no event by text message) and shall be given to such party at its address, facsimile number or e-mail address set forth on the signature pages hereof (or, in the case of any such Lender who becomes a Lender after the date hereof, in an Assignment Agreement or in a notice delivered to Borrower and Agent by the assignee Lender forthwith upon such assignment) or by electronic submissions, as provided below, or at such other address, facsimile number or e-mail address as such party may hereafter specify for the purpose by notice to Agent and Borrower; provided, that notices, requests or other communications shall be permitted by e-mail or other electronic submissions (but in no event by text message) only in accordance with the provisions of Section 12.3(b). Each such notice, request or other communication shall be effective (i) if given by facsimile, when such notice is transmitted to the facsimile number specified by this Section and the sender receives a confirmation of transmission from the sending facsimile machine, (ii) if given by e-mail or other electronic submissions, as set forth in Section 12.3(c) or (iii) if given by mail, prepaid overnight courier or any other means, when received at the applicable address specified by this Section.

(b)    Notices and other communications to the parties hereto may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites, but in no event by text message) provided, that (i) the foregoing shall not apply to notices sent directly to any party hereto if such party has notified Agent in writing that it has elected not to receive notices by electronic communication (which election may be limited to particular notices) and (ii) no Notices of Borrowing, Notices of LC Credit Event or any notices regarding request for advances hereunder shall be permitted to be delivered or furnished by Borrower by electronic communication unless made in accordance with specific procedures approved from time to time in writing by Agent.

(c)    Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt

of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor, provided, that if any such notice or other communication is not sent or posted during normal business hours, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

Section 12.4    <u>Severability</u>.

In case any provision of or obligation under this Agreement or any other Financing Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Section 12.5    <u>Amendments and Waivers</u>.

(a)    <u>General Provisions</u>.    No provision of this Agreement or any other Financing Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrower and Required Lenders (or by Agent with the prior written approval of Required Lenders), and, if (i) any amendment, waiver or other modification would either increase a Lender's Revolving Loan Commitment Amount, by such Lender, and (ii) the rights or duties of Agent are affected thereby, by Agent; provided that no such amendment, waiver or other modification shall, unless signed or otherwise approved in writing by all Lenders directly affected thereby (or by Agent with the prior written approval of each such Lender), (A) reduce the principal of, rate of interest on or any fees with respect to any Loan or forgive any principal, interest or fees, (B) postpone the date fixed for, or waive, any payment (other than a payment pursuant to Section 2.4) of principal of any Loan or of interest on any Loan or any fees hereunder or postpone the date of termination of the commitment of any Lender hereunder, (C) change the definition of the term Required Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder, (D) release all or substantially all of the Collateral, except, in each case with respect to this clause (D), as otherwise may be provided in this Agreement or the other Financing Documents (including in connection with any disposition permitted hereunder), (E) amend, waive or otherwise modify this Section 12.5(a) or the definitions of the terms used in this Section 12.5(a) insofar as the definitions affect the substance of this Section 12.5(a), or (F) consent to the assignment, delegation or other transfer by Borrower of any of its rights and obligations under any Financing Document or release Borrower from its payment obligations under any Financing Document, except, in each case with respect to this clause (F), pursuant to a merger or consolidation permitted pursuant to this Agreement.  It is hereby understood and agreed that all Lenders shall be deemed directly affected by an amendment, waiver or other modification of the type described in the preceding clauses (C), (D), (E) and (F) of the

preceding sentence.  Any waiver of any provision of this Agreement or any other Financing Document shall be effective only in the specific instance and for the specific purpose for which it is given.  No delay on the part of Agent or any Lender in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by any of them of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy.  Notwithstanding anything to the contrary set forth in this Section 12.5(a), Required Revolving Lenders are authorized, in their sole and absolute discretion, and without the consent of Required Lenders, to waive (x) any and all conditions to the funding of Revolving Loans set forth in Section 7.2 and/or (y) any Event of Default solely for the purpose of satisfying one or more conditions to the funding of Revolving Loans set forth in Section 7.2.

(b)     Required Revolving Lender Consent Rights.  Without limitation of the provisions of the preceding Section 12.5(a), no amendment, waiver or other modification to this Agreement shall, unless signed or otherwise approved by Required Revolving Lenders (or by Agent with the prior written approval of Required Revolving Lenders), (i) amend, waive or otherwise modify Section 2.2(a) or the definitions of the terms used in Section 2.2(a) insofar as the definitions affect the substance of such Section, (ii) change the definition of the term Required Revolving Lenders or the percentage of Lenders which shall be required for Required Revolving Lenders to take any action hereunder or (iii) amend, waive or otherwise modify this Section 12.5(b) or the definitions of the terms used in this Section 12.5(b) insofar as the definitions affect the substance of this Section 12.5(b).

(c)     Exceptions to Voting Requirements.  Notwithstanding anything contained in this Section 12.5 or any other provision of any Financing Document, (i) each Lender is entitled to vote as such Lender sees fit on any bankruptcy or insolvency reorganization plan that affects the Loans, (ii) each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code supersede the unanimous consent provisions set forth herein, and (iii) any fee letter entered into between Borrower and Agent may be amended, or rights or privileges thereunder waiver, in a writing executed only by the parties thereto.

Section 12.6     Assignments; Participations; Replacement of Lenders.

(a)     Assignments.

(i)     Any Lender may at any time assign to one or more Eligible Assignees all or any portion of such Lender's Loans and interest in the Revolving Loan Commitment, together with all related obligations of such Lender hereunder. Except as Agent may otherwise agree, the amount of any such assignment (determined as of the date of the applicable Assignment Agreement or, if a "Trade Date" is specified in such Assignment Agreement, as of such Trade Date) shall be in a minimum aggregate amount equal to $3,000,000 or, if less, the assignor's entire interests in the Revolving Loan Commitment and outstanding Loans; provided, that, in connection with simultaneous assignments to two or more Affiliated Persons,

including related Approved Funds, such Affiliated Persons and Approved Funds shall be treated as one assignee for purposes of determining compliance with the minimum assignment size referred to above.  Borrower and Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Eligible Assignee until Agent shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the applicable parties thereto, such other information regarding such Eligible Assignee as Agent reasonably shall require and a processing fee of $3,500; provided, no such fee shall be required in connection with an assignment by a Lender to an Affiliate of such Lender or an assignment to another Lender, and only one processing fee shall be payable in connection with simultaneous assignments to two or more related Affiliated Persons, including Approved Funds.

(ii)    From and after the date on which the conditions described above have been met and recordation in the register described in paragraph (iii) below, (A) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder and (B) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights and obligations hereunder (other than those that survive termination pursuant to Section 12.1).  Upon the request of the Eligible Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, Borrower shall execute and deliver to Agent for delivery to the Eligible Assignee (and, as applicable, the assigning Lender) Notes in the aggregate principal amount of the Eligible Assignee's percentage interest in the Revolving Loan Commitment (and, as applicable, Notes in the principal amount of that portion of the Revolving Loan Commitment retained by the assigning Lender).  Upon receipt by the assigning Lender of such Note, the assigning Lender shall return to Borrower any prior Note held by it.

(iii)    Agent, acting solely for this purpose as a non-fiduciary agent of Borrower, shall maintain at its offices located in Chicago, Illinois or another office in the United States a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount and interest of the Loans owing to, such Lender pursuant to the terms hereof.  The entries in such register shall be conclusive, and Borrower, Agent and Lenders may treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  Such register shall be available for inspection by Borrower and any Lender (provided that each Lender's right of inspection shall be limited to information about such Lender), at any reasonable time upon reasonable prior notice to Agent.  Any assignment may be effected only upon the registration thereof as provided in this paragraph (iii).

(iv)    Notwithstanding the foregoing provisions of this Section 12.6(a) or any other provision of this Agreement, any Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or grant to secure obligations to a Federal Reserve Bank; provided that no such pledge or grant shall release such Lender from any of its obligations hereunder or substitute any such pledgee or grantee for such Lender as a party hereto.

(v)    Notwithstanding the foregoing provisions of this Section 12.6(a) or any other provision of this Agreement, Agent has the right, but not the obligation, to effectuate assignments of Loans and Revolving Loan Commitments via an electronic settlement system acceptable to Agent as designated in writing from time to time to Lenders by Agent (the "**Settlement Service**").  At any time when  Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section 12.6(a).  Each assigning Lender and proposed Eligible Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loans and Revolving Loan Commitments pursuant to the Settlement Service.  With the prior written approval of each of Agent and Borrower, as applicable, Agent's and Borrower's approval of such Eligible Assignee shall be deemed to have been automatically granted with respect to any transfer effected through the Settlement Service.  Assignments and assumptions of the Loans and Revolving Loan Commitments shall be effected by the provisions otherwise set forth herein until Agent notifies Lenders of the Settlement Service as set forth herein.

(b)    Participations.  Any Lender may at any time, without the consent of, or notice to, Borrower or Agent, sell to one or more Persons participating interests in its Loans, commitments or other interests hereunder (any such Person, a "**Participant**"), provided, that the prior written consent of Agent shall be required for a sale of a participating interest to Investor, Borrower, any holder of Subordinated Debt or any Affiliate of any of the foregoing Persons.  In the event of a sale by a Lender of a participating interest to a Participant, (i) such Lender's obligations hereunder shall remain unchanged for all purposes, (ii) Borrower and Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder and (iii) all amounts payable by Borrower shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender.  Notwithstanding the foregoing, however, Borrower agrees that each Participant shall be entitled to the benefits of Section 10.1 as if it were a Lender (provided that such Participant complies with the requirements of Section 10.1(d) and (e) as if it were a Lender; provided further, that no Participant shall receive any greater compensation pursuant to Section 10.1 than would have been paid to the participating Lender if no participation had been sold).  No Participant shall have any direct or indirect voting rights hereunder except with respect to any event described in Section 12.5 expressly requiring the unanimous vote

of all Lenders or, as applicable, all affected Lenders.  Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement; provided that such right of setoff shall be subject to the obligation of each Participant to share with Lenders, as provided in Section 8.5.  In the event that a Lender sells a participation, the Lender, as a non-fiduciary agent on behalf of the Borrower, shall maintain (or cause to be maintained) in the United States a register (the "**Participant Register**") on which it enters the name of all participants in the Obligations held by it (and the principal amount (and interest thereon) of the portion of such Obligations that is subject to such participations).  Any participation or transfer thereof may be effected only by the registration of such participation on the Participant Register.

(c)    Replacement of Lenders.  Within thirty (30) days after (i) receipt by Agent of notice and demand from any Lender for payment of additional costs as provided in Section 10.2 or Section 10.3, which demand shall not have been revoked, (ii) Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 10.1, (iii) any Lender is a Defaulted Lender, and the circumstances causing such status shall not have been cured or waived; or (iv) any failure by any Lender to consent to a requested amendment, waiver or modification to any Financing Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender, or each Lender affected thereby, is required with respect thereto (each relevant Lender in the foregoing clauses (i) through (iv) being an "**Affected Lender**") each of Borrower and Agent may, at its option, notify such Affected Lender and, in the case of Borrower's election, the Agent, of such Person's intention to obtain, at Borrower's expense, a replacement Lender ("**Replacement Lender**") for such Lender, which Replacement Lender shall be an Eligible Assignee and, in the event the Replacement Lender is to replace an Affected Lender described in the preceding clause (iv), such Replacement Lender consents to the requested amendment, waiver or modification making the replaced Lender an Affected Lender.  In the event Borrower or Agent, as applicable, obtain a Replacement Lender within ninety (90) days following notice of its intention to do so, the Affected Lender shall sell, at par, and assign all of its Loans and funding commitments hereunder to such Replacement Lender in accordance with the procedures set forth in Section 12.6(a); provided, that (A) Borrower shall have, as applicable, (x) paid to such Lender (other than a Defaulted Lender) prepayment fees owing to such Lender pursuant to Section 2.5(e) (calculated as if the Loans being assigned by such Lender were instead prepaid to such Lender (and assuming that all other Obligations are being prepaid), and without giving effect to any amendment or modification to such Section not approved by such Lender and giving rise to such Lender being an Affected Lender) and (y) reimbursed such Lender for its increased costs and additional payments for which it is entitled to reimbursement under any of Section 10.1, Section 10.2 or Section 10.3, as applicable, of this Agreement through the date of such sale and assignment and (B) Borrower shall pay to Agent the $3,500 processing fee in respect of such assignment.  In the event that a replaced Lender does not execute an Assignment Agreement pursuant to Section 12.6(a) within five (5) Business Days after receipt by such replaced Lender of notice of replacement

pursuant to this Section 12.6(c) and presentation to such replaced Lender of an Assignment Agreement evidencing an assignment pursuant to this Section 12.6(c), such replaced Lender shall be deemed to have consented to the terms of such Assignment Agreement, and any such Assignment Agreement executed by Agent, the Replacement Lender and, to the extent required pursuant to Section 12.6(a), Borrower, shall be effective for purposes of this Section 12.6(c) and Section 12.6(a).   Upon any such assignment and payment and the registration thereof pursuant to Section 12.6(a)(iii), such replaced Lender shall no longer constitute a "Lender" for purposes hereof, other than with respect to such rights and obligations that survive termination as set forth in Section 12.1.

(d)   No Borrower Assignments.   Borrower may not assign, delegate or otherwise transfer any of its rights or other obligations hereunder or under any other Financing Document without the prior written consent of Agent and each Lender.

Section 12.7   Headings.

Headings and captions used in the Financing Documents (including the Exhibits, Schedules and Annexes hereto and thereto) are included for convenience of reference only and shall not be given any substantive effect.

Section 12.8   Confidentiality.

Agent and each Lender shall hold all non-public information regarding the Borrower and its business identified as such by Borrower and obtained by Agent or any Lender pursuant to the requirements hereof in accordance with such Person's customary procedures for handling information of such nature, except that disclosure of such information may be made (i) to its agents, employees, Subsidiaries, Affiliates, attorneys, auditors, lenders, professional consultants, rating agencies, insurance industry associations and portfolio management services, (ii) to prospective transferees or purchasers of any interest in the Loans, provided that any such prospective transferee, purchaser or counterparty shall have agreed to be bound by the provisions of this Section 12.8, (iii) as required by Law, subpoena, judicial order or similar order, (iv) in connection with any litigation or in connection with the exercise of any right or remedy under any Financing Document, (v) as may be required in connection with the examination, audit or similar investigation of such Person, and (vi) to a Person that is a trustee, investment advisor, collateral manager, servicer, noteholder or secured party in a Securitization (as hereinafter defined) in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization.   For the purposes of this Section, "Securitization" shall mean a public or private offering by a Lender or any of its Affiliates or its successors and assigns, of Capital Stock which represent an interest in, or which are collateralized, in whole or in part, by the Loans.   Confidential information shall not include information that either (A) is in the public domain, or becomes part of the public domain after disclosure to such Person through no fault of such Person, or (B) is disclosed to such Person by a Person other than a Credit Party or Subsidiary, provided Agent does not have actual knowledge that such Person is prohibited from disclosing such information.   The obligations of Agent and

Lenders under this Section 12.8 shall supersede and replace the obligations of Agent and Lenders under any confidentiality agreement in respect of this financing executed and delivered by Agent or any Lender prior to the date hereof.

Section 12.9      Waiver of Consequential and Other Damages.

To the fullest extent permitted by applicable Law, no Credit Party shall assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Financing Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Financing Documents or the transactions contemplated hereby or thereby.

Section 12.10      Marshaling; Payments Set Aside.

Neither Agent nor any other Secured Party shall be under any obligation to marshal any assets in payment of any or all of the Obligations.  To the extent that Borrower or any other Credit Party makes any payment or Agent enforces its Liens or Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such enforcement or setoff is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefore, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

Section 12.11      GOVERNING LAW; SUBMISSION TO JURISDICTION.

**THIS AGREEMENT AND EACH OTHER FINANCING DOCUMENT, AND ALL MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.  BORROWER HEREBY CONSENTS TO THE JURISDICTION OF THE BANKRUPTCY COURT OR, AT THE AGENT'S ELECTION, ANY STATE OR FEDERAL COURT LOCATED WITHIN THE BOROUGH OF MANHATTAN, CITY OF NEW YORK, STATE OF NEW YORK AND IRREVOCABLY AGREES THAT, SUBJECT TO AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER FINANCING DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS.  BORROWER EXPRESSLY SUBMITS**

**AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH CREDIT PARTY BY CERTIFIED OR REGISTERED MAIL, ADDRESSED TO SUCH CREDIT PARTY AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.**

Section 12.12    <u>WAIVER OF JURY TRIAL</u>.

**BORROWER, AGENT AND EACH LENDER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE FINANCING DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER, AGENT AND EACH LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT THEY HAVE RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. BORROWER, AGENT AND EACH LENDER WARRANT AND REPRESENT THAT THEY HAVE HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

Section 12.13    <u>Publication; Advertisement</u>.

(a)    <u>Publication</u>.  Borrower will not, directly or indirectly publish, disclose or otherwise use in any public disclosure, advertising material, promotional material, press release or interview, any reference to the name, logo or any trademark of NXT or any of its Affiliates or any reference to this Agreement or the financing evidenced hereby, in any case except (i) as required by Law, subpoena or judicial or similar order, in which case  Borrower shall give Agent prior written notice of such publication or other disclosure or (ii) with NXT's prior written consent.

(b)    <u>Advertisement</u>.  Each Lender and Borrower hereby authorizes NXT to publish the name of such Lender and Borrower, the existence of the financing arrangements referenced under this Agreement, the primary purpose and/or structure of those arrangements, the amount of credit extended under each facility, the title and role of each party to this Agreement, and the total amount of the financing evidenced hereby in any "tombstone", comparable advertisement or press release which NXT elects to submit for publication, but only after providing Borrower with a reasonable opportunity to review and comment on the same.  In addition, each Lender and Borrower agrees that NXT may provide

-65-

lending industry trade organizations with information necessary and customary for inclusion in league table measurements after the Closing Date.

Section 12.14    Counterparts; Signatures; Integration.

This Agreement and the other Financing Documents may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Signatures by facsimile or other electronic communication to any Financing Document shall bind the parties to the same extent as would a manually executed counterpart.  This Agreement and the other Financing Documents constitute the entire agreement and understanding among the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

Section 12.15    No Strict Construction.

The parties hereto have participated jointly in the negotiation and drafting of this Agreement and each of the other Financing Documents.  In the event an ambiguity or question of intent or interpretation arises, this Agreement and each of the other Financing Documents shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement or any other Financing Document.

Section 12.16    USA PATRIOT Act Notification.

Agent (for itself and not on behalf of any Lender) and each Lender hereby notifies Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record certain information and documentation that identifies Borrower, which information includes the name and address of Borrower and such other information that will allow Agent or such Lender, as applicable, to identify Borrower in accordance with the USA PATRIOT Act.

Section 12.17    [Reserved]

Section 12.18    Acknowledgements.

Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Financing Documents to which it is a party;

(b)    no Secured Party has any fiduciary relationship with or duty to Borrower arising out of or in connection with this Agreement or any of the other Financing Documents, and the relationship between the Borrower, on the one hand, and the Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

-66-

(c)     no joint venture is created hereby or by the other Financing Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Borrower and the Secured Parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by its authorized officers as of the day and year first above written.

### BORROWER

**COYNE INTERNATIONAL ENTERPRISES CORP.**, a New York corporation


By: _____

Name: _____

Title: _____


Address:        _____

                _____

Facsimile:      (___) ___-____

Email:          _____

Taxpayer ID No.:    _____

**Borrower's Account Designation:**


Name of Bank:   _____

ABA No.:        _____

Account No.:    _____

Account Name:   _____

Reference:      _____

Signature Page to Credit Agreement

**AGENT**

**NXT CAPITAL, LLC**, as Agent and a Lender

By: _____

Name: _____

Title: _____

| | |
|---|---|
| Address: | 191 North Wacker Drive |
| | Suite 3000 |
| | Chicago, Illinois 60606 |
| | Attn:  Account Manager for |
| | Coyne transaction |
| Facsimile: | (312) 450-8100 |
| Email: | _____ |

**With a copy to:**

Goldberg Kohn Ltd.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
Attn:  Randall Klein
Facsimile:    (312) 863-7474
E-mail:       randall.klein@goldbergkohn.com

**Payment Account Designation:**

| | |
|---|---|
| Name of Bank: | Wells Fargo Bank, N.A. |
| ABA No.: | 121-000-248 |
| Account No.: | 4123107187 |
| Account Name: | NXT Capital, LLC-Business |
| | Group Account |
| Reference: | Coyne |

Signature Page to Credit Agreement

**<u>LENDERS</u>**

**NXT CAPITAL, LLC**, as Agent and a Lender


By: _____

Name: _____

Title: _____


Address:          191 North Wacker Drive
                  Suite 1200
                  Chicago, Illinois 60606
                  Attn:  Account Manager for
                  Coyne transaction
Facsimile:        (312) 451-8100
Email:            Dean.jeffe@nxtcapital.com

## Annex A

## Definitions

"**Acceleration Event**" means the occurrence of an Event of Default (i) in respect of which Agent (whether at the request of Required Lenders or otherwise) has declared all or any portion of the Obligations to be immediately due and payable pursuant to Section 8.2 and/or (ii) pursuant to Section 8.1(a), and in respect of which Agent (whether at the request of Required Lenders or otherwise) has suspended or terminated the Revolving Loan Commitment pursuant to Section 8.2.

"**Account Debtor**" means "account debtor", as defined in Article 9 of the UCC.

"**Additional Titled Agents**" has the meaning set forth in Section 11.15.

"**Affected Lender**" has the meaning set forth in Section 12.6(c).

"**Affiliate**" means with respect to any Person (i) any Person that directly or indirectly controls such Person, (ii) any Person which is controlled by or is under common control with such controlling Person and (iii) each of such Person's (other than, with respect to any Lender, any Lender's) officers or directors (or Persons functioning in substantially similar roles) and the spouses, parents, descendants and siblings of such officers, directors or other Persons.  As used in this definition, the term "**control**" of a Person means the possession, directly or indirectly, of the power to vote ten percent (10%) or more of any class of voting Capital Stock of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting Capital Stock, by contract or otherwise.

"**Agent**" means NXT in its capacity as administrative and collateral agent for itself and for the other Secured Parties hereunder and under the other Financing Documents, as such capacity is established in, and subject to the provisions of, Article 11, and the successors of NXT in such capacity.

"**Agreement**" means this Credit Agreement, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Anti-Terrorism Laws**" means any Laws relating to terrorism or money laundering, including Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by OFAC.

"**Approved Fund**" means any (i) investment company, fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business or (ii) any Person (other than a natural person) which temporarily warehouses loans for any Lender or any entity described in the preceding clause (i) and that,

with respect to each of the preceding clauses (i) and (ii), is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.

"**Asset Disposition**" means any sale, lease, license, transfer, assignment or other consensual disposition by Borrower of any asset, but excluding (i) dispositions of Inventory or used, obsolete, worn-out or surplus equipment, all in the Ordinary Course of Business, (ii) dispositions of Cash Equivalents, (iii) sales, transfers and other dispositions of accounts receivable in connection with the compromise, settlement or collection thereof in the Ordinary Course of Business, (iv) the lease, assignment, license, sub-license or sub-lease of any real or personal property in the Ordinary Course of Business to the extent the same does not materially interfere with the business of Borrower and (v) any disposition of property or assets or issuance of Capital Stock by a Domestic Subsidiary of Borrower to Borrower or to another Domestic Subsidiary of Borrower.

"**Assignment Agreement**" means an agreement substantially in the form of Exhibit A hereto, or in the event Agent institutes a Settlement Service pursuant to Section 12.6(a), such other agreement as may be prescribed by such Settlement Service.

"**Avoidance Actions**" means any and all claims and causes of action of any Borrower's estate arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with any proceeds therefrom.

"**Avoided Payments**" has the meaning set forth in Section 2.4(g).

"**AWR**" means, with respect to any period, the total average weekly rental revenue (on a billed basis) attributable to the operations of the applicable facility of Borrower, excluding one-time sales, and calculated in the same manner by Borrower for purposes of determining the baseline AWR for each facility as set forth in Section 6.1.

"**AWR Projections**" means the projections prepared by Borrower in good faith setting forth the AWR for each week on a plant by plant basis and the minimum AWR covenant for such week.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy".

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Base Rate**" means a variable per annum rate, as of any date of determination, equal to the greatest of (i) the Federal Funds Rate <u>plus</u> one-half of one percent (0.50%) per annum, (ii) the rate of interest which is published as the "Prime Rate" posted on the Money Rates page of the Market Data section of The Wall Street Journal (or, if more than one rate is published as the Prime Rate, then the highest of such rates) and (iii) the sum of LIBOR (calculated for a one (1) month Interest Period determined two Business Days before the date

of determination) plus the excess of the then applicable LIBOR Margin for Revolving Loans over the then applicable Base Rate Margin for Revolving Loans.  Any change in the Base Rate due to a change in any of the foregoing will become effective as of the date of such change.  If The Wall Street Journal no longer publishes the Prime Rate, or Agent determines in good faith that the rate so published no longer accurately reflects an accurate determination of the prevailing Prime Rate, Agent may select a reasonably comparable source to use as the basis for the Base Rate.

"**Base Rate Loans**" means Loans which accrue interest by reference to the Base Rate, in accordance with the terms of this Agreement.

"**Base Rate Margin**" means 7% per annum.

"**Blocked Person**" means any Person:  (i) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (ii) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (iii) with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (iv) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; or (v) that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list.

"**Borrower**" has the meaning set forth in the Preamble to this Agreement.

"**Borrower's Account**" means, with respect to Borrower, the account specified on the signature pages hereof below Borrower's name into which Loans for the benefit of Borrower shall, absent other instructions, be made, or such other account as Borrower may specify by notice to Agent.

"**Budget**" means the thirteen (13) week consolidated weekly operating budget of Borrower setting forth the Projected Information for the periods described therein, a copy of the initial one of which is attached as Exhibit B to the Financing Order, as amended, modified or supplemented from time to time with Agent's written consent; such thirteen-week Budget to be updated (in substantially the same format as the prior thirteen-week Budget) weekly by Borrower, submitted to Agent and, upon acceptance in writing by Agent in its sole discretion, the prior approved Budget, as updated, shall constitute the then approved Budget.

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in Chicago and New York City are authorized or required by Law to close and, in the case of a Business Day which relates to a LIBOR Loan, a day on which dealings are carried on in the London interbank eurodollar market.

"**Capital Lease**" of any Person means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

"**Capital Stock**" means any and all shares, units, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person other than a corporation and any and all warrants, rights or options to purchase any of the foregoing, in each case whether voting or non-voting.

"**Carveout**" has the meaning set forth in the Interim Order or the Final Order, as applicable.

"**Carveout Expense Reserve**" means, as of any date of determination, a reserve established on account of the Carveout and Other Statutory Liabilities.

"**Case**" means the case of Borrower under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court and any superseding chapter 7 case.

"**Cash Equivalents**" means (i) direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof with a maturity date of no more than six (6) months from the date of acquisition, (ii) commercial paper with a duration of not more than three (3) months rated at least A-1 by Standard & Poor's Ratings Service and P-1 by Moody's Investors Services, Inc., which is issued by a Person (other than Borrower or an Affiliate of Borrower) organized under the laws of any state of the United States or of the District of Columbia, (iii) time deposits, certificates of deposit and banker's acceptances with a duration of not more than six (6) months issued by any office located in the United States of any bank or trust company which is organized under the laws of the United States or any state thereof, or is licensed to conduct a banking business in the United States, and has capital, surplus and undivided profits of at least $500,000,000 and which issues (or the parent of which issues) certificates of deposit or commercial paper with a rating described in clause (ii) above, (iv) repurchase agreements and reverse repurchase agreements with a duration of not more than 30 days with respect to securities described in clause (i) above entered into with an office of a bank or trust company meeting the criteria specified in clause (iii) above, (v) any money market or mutual fund provided that substantially all of the assets of such fund consist of the foregoing types of investments, and provided that such fund has assets in excess of $5,000,000,000 and is rated AAA by Standard & Poor's Ratings Service and Aaa by Moody's Investors Services, Inc., or (vi) other short-term liquid investments approved in writing by Agent.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"**Closing Checklist**" means Annex C to this Agreement.

"**Closing Date**" means the date of this Agreement.

"**Code**" means the Internal Revenue Code of 1986.

"**Collateral**" means all property, now existing or hereafter acquired, mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Agent, for the benefit of the Secured Parties, pursuant to the Security Documents and excluding the real property located in Syracuse, New York.  Without limitation of the foregoing, solely to the extent permitted pursuant to the terms of the Interim Order and Final Order, the Collateral shall include Avoidance Actions and proceeds of Avoidance Actions.

"**Committee**" means, collectively, the official committee of unsecured creditors or any other committee formed, appointed or approved in the Case.

"**Commitment Annex**" means Annex B to this Agreement.

"**Commitment Expiry Date**" means the earliest to occur of (i) the 91st day after the Filing Date (or such later date as agreed to in writing by Agent); (ii) the earlier of (a) the date the Revolving Loan Commitments are permanently reduced to zero pursuant to the terms hereof and the Financing Order and (b) the date that all Obligations and Existing Obligations have been Paid in Full; (iii) the date of the termination of the Revolving Loan Commitments pursuant to Section 8.2, (iv) the date which is twenty-one (21) days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (v) the date upon which the automatic stay expires, (vi) the date of the closing of a sale of all or substantially all of the Borrower' assets pursuant to Section 363 of the Bankruptcy Code and (vii) the date of entry of an order confirming a plan in the Case.

"**Contingent Obligation**" means, with respect to any Person, any direct or indirect liability of such Person:  (i) with respect to any debt, lease, dividend or other obligation of another Person if the purpose or intent of such Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreement relating thereto will be complied with, or that any holder of such liability will be protected, in whole or in part, against loss with respect thereto, (ii) with respect to any undrawn portion of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for the reimbursement of any drawing, (iii) under any Swap Contract, to the extent not yet due and payable, (iv) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (v) for any obligations of another Person pursuant to any agreement to purchase, repurchase  or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to preserve the solvency, financial condition or level of income of another Person.  The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or supported or for which the applicable Person is otherwise contingently liable and, if not a fixed and determinable amount, the maximum amount so guaranteed or supported or for which such Person is otherwise contingently liable.

"**Controlled Group**" means all members of a group of corporations and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with Borrower, are treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"**Credit Exposure**" means any period of time during which the Revolving Loan Commitment is outstanding or any Loan or other Obligation remains unpaid; provided, that no Credit Exposure shall be deemed to exist solely due to the existence of contingent indemnification liability, absent the assertion of a claim, or the known existence of a claim reasonably likely to be asserted, with respect thereto.

"**Debt**" of a Person means at any date, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and which are not more than ninety (90) days past the due date, (iv) all Capital Leases of such Person, (v) all non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (vi) all Capital Stock of such Person subject to repurchase or redemption at any time on or prior to the final maturity date of the Loans, other than at the sole option of such Person, (vii) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (viii) "earnouts" and similar payment obligations of such Person, (ix) all principal outstanding under any synthetic lease, off-balance sheet loan or similar financing product, and (x) all Debt of others Guaranteed by such Person.  Without duplication of any of the foregoing, Debt of Borrower shall include any and all Loans.

"**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"**Defaulted Lender**" means, so long as such failure shall remain in existence and uncured, any Lender which shall have failed to make any Loan or other credit accommodation, disbursement, settlement, reimbursement or other payment required pursuant to the terms of any Financing Document.

"**Domestic Subsidiary**" means a Subsidiary organized, incorporated or otherwise formed under the laws of the United States or any state thereof.

"**Eligible Assignee**" means (i) a Lender, (ii) an Affiliate of a Lender (other than a Defaulted Lender), (iii) an Approved Fund (other than an Approved Fund associated with a Defaulted Lender), and (iv) any other Person (other than a natural person) approved by Agent (such approval not to be unreasonably withheld); provided that notwithstanding the foregoing, (y) "Eligible Assignee" shall not include a Credit Party or any Affiliate of a Credit Party and (z) no proposed assignee intending to assume all or any portion of the Revolving Loan Commitment shall be an Eligible Assignee unless such proposed assignee

either already holds a portion of the Revolving Loan Commitment, or has been approved as an Eligible Assignee by Agent.

"**Environmental Laws**" means any and all Laws relating to the environment or the effect of the environment on human health or to emissions, discharges or releases of pollutants, contaminants, Hazardous Materials or wastes into the environment, including ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, Hazardous Materials or wastes or the clean-up or other remediation thereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Plan**" means any "employee benefit plan", as such term is defined in Section 3(3) of ERISA (other than a Multiemployer Plan), which Borrower maintains, sponsors or contributes to, or, in the case of an employee benefit plan which is subject to Section 412 of the Code or Title IV of ERISA, to which a member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"**Event of Default**" has the meaning set forth in Section 8.1.

"**Existing Agent**" means NXT Capital, LLC, in its capacity as agent to the Existing Lenders.

"**Existing Credit Agreement**" means that certain Credit Agreement dated as of December 16, 2011 (as amended, supplemented or modified from time to time) among Borrowers, the Guarantors party thereto, Existing Agent and Existing Lenders.

"**Existing Financing Documents**" means the "Financing Documents" as defined in the Existing Credit Agreement.

"**Existing Lenders**" means the financial institutions party to the Existing Credit Agreement from time to time, and each of its successors and assigns.

"**Existing Obligations**" means the "Obligations" as defined in the Existing Credit Agreement.

"**Extraordinary Receipts**" means any cash received by or paid to or for the account of Borrower not in the Ordinary Course of Business ((and not consisting of proceeds described in any of Section 2.4(b), (c) or (d)) including without limitation amounts received in respect of foreign, United States, state or local tax refunds and pension plan reversions, less any out-of-pocket expenses paid by a Credit Party or Subsidiary in connection therewith, and any taxes paid or payable in connection therewith; provided that Extraordinary Receipts

shall exclude any single or related series of amounts received in an aggregate amount less than $25,000.

"**FATCA**" means Sections 1471 through 1474 of the Code and any regulations or official interpretations thereof (including any Revenue Ruling, Revenue Procedure, Notice or similar guidance issued by the Internal Revenue Service thereunder as a precondition to relief or exemption from taxes under such provisions).

"**Federal Funds Rate**" means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the nearest whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day and (ii) if no such rate is so published on such next preceding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent.

"**Filing Date**" has the meaning set forth in the recitals to this Agreement.

"**Final Order**" has the meaning set forth in the Interim Order.

"**Financing Order**" means, (i) until the entry of the Final Order, the Interim Order, and (ii) after the entry of the Final Order, the Final Order, together with all amendments, modifications and supplements to such Interim Order or Final Order, as applicable, which are acceptable to Agent in its sole and absolute discretion.

"**Financing Documents**" means this Agreement, any Notes, the Security Documents, any fee letter among NXT and any one or more of the Borrower relating to the transactions contemplated hereby, the Subordination Agreement, any subordination or intercreditor agreement (other than the Subordination Agreement) pursuant to which any Debt (other than the Subordinated Debt) and/or any Liens securing such Debt is subordinated to all or any portion of the Obligations and the Liens securing the Obligations, the Financing Order and all other documents, instruments and agreements contemplated herein or thereby and heretofore executed, executed concurrently herewith or executed at any time and from time to time hereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Fiscal Quarter**" means a fiscal quarter of Borrower, ending on January 31, April 30, July 31 or October 31 of each calendar year.

"**Fiscal Year**" means a fiscal year of Borrower, ending on October 31 of each calendar year.

"**Foreign Lender**" means any Lender that is not a "United States person" as defined in Code Section 7701(a)(30).

"**Foreign Subsidiary**" means any Subsidiary other than a Domestic Subsidiary.

"**GAAP**" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States accounting profession), which are applicable to the circumstances as of the date of determination.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any corporation or other Person owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing, whether domestic or foreign.

"**Guarantee**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), provided that the term Guarantee shall not include endorsements for collection or deposit in the Ordinary Course of Business.  The term "Guarantee" used as a verb has a corresponding meaning.

"**Hazardous Materials**" means (i) any "hazardous substance" as defined in CERCLA, (ii) any "hazardous waste" as defined in RCRA, (iii) asbestos, (iv) polychlorinated biphenyls, (v) petroleum, its derivatives, by-products and other hydrocarbons, (vi) toxic mold and (vii) any other pollutant, toxic, radioactive, caustic or otherwise hazardous substance regulated under Environmental Laws.

"**Hazardous Materials Contamination**" means contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other elements on or or of the relevant property by Hazardous Materials, or any derivatives thereof, or on or or of any other property as a result of Hazardous Materials, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**Indemnitees**" has the meaning set forth in Section 9.2.

"**Intellectual Property**" means, with respect to any Person, all patents, trademarks, service marks, logos and other business identifiers, trade names, trade styles, trade dress, copyrights, proprietary know-how, processes, computer software and all registrations, applications and licenses therefor, used in or necessary for the conduct of business by such Person.

"**Interest Period**" means, as to any LIBOR Loan, the period commencing on the date such Loan is borrowed or continued as, or converted into, a LIBOR Loan and ending on the date one (1) month thereafter, as selected by Borrower pursuant to Section 2.5(g); provided, that: (i) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the following Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the preceding Business Day, (ii) any Interest Period that begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period, and (iii) Borrower may not select any Interest Period for a Revolving Loan which would extend beyond the Commitment Expiry Date.

"**Interim Order**" means collectively, the order of the Bankruptcy Court entered in the Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Agent, in its sole discretion, which, among other matters but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other Financing Documents.

"**Inventory**" means "inventory" as defined in Article 9 of the UCC.

"**Investment**" means any investment in any Person, whether by means of acquiring (whether for cash, property, services, Capital Stock or otherwise), making or holding Debt securities, Capital Stock, capital contributions, loans, time deposits, advances, Guarantees or otherwise.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect thereto.

"**Laws**" means any and all Federal, state, local and foreign statutes, laws, judicial decisions, regulations, guidances, guidelines, ordinances, rules, judgments, orders, decrees, codes, injunctions, permits, concessions, grants, franchises, governmental agreements and governmental restrictions, whether now or hereafter in effect.

"**Lender**" means each of (i) each Person party hereto in its capacity as a lender, (ii) each Eligible Assignee that becomes a party hereto pursuant to Section 12.6, (iii) Agent, to the extent of any Revolving Loans made by Agent which have not been settled

among Lenders pursuant to Section 11.13, and (iv) the respective successors of all of the foregoing, and "Lenders" means all of the foregoing.

"**LIBOR**" means, with respect to any LIBOR Loan for any Interest Period, a rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the higher of (i) 1.5% and (ii) the rate of interest which is published as the "London interbank offered rate" posted on the Money Rates page of the Market Data section of The Wall Street Journal for the applicable Interest Period on the second full Business Day next preceding the first day of such Interest Period.  If The Wall Street Journal does not publish the LIBOR or Agent determines in good faith that the rate so published no longer accurately reflects the rate available to Agent in the London Interbank Market or if such rate no longer exists or no longer accurately reflects the rate available to Agent in the London Interbank Market, Agent may select a replacement rate or replacement source, as the case may be.

"**LIBOR Loans**" means any Loans which accrue interest by reference to the LIBOR, in accordance with the terms of this Agreement.

"**LIBOR Margin**" means 8% per annum.

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, including all "liens" as defined by Section 101(37) of the Bankruptcy Code, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

"**Litigation**" means any action, suit or proceeding before any court, mediator, arbitrator or Governmental Authority.

"**Loans**" means the Revolving Loans.

"**Major Casualty Proceeds**" means (i) the aggregate insurance proceeds received in cash  connection with one or more related events under any property insurance policy or business interruption insurance policy or (ii) any award or other compensation received in cash with respect to any eminent domain, condemnation of property or similar proceedings (or any transfer or disposition of property in lieu of condemnation), if the amount of such aggregate insurance proceeds or award or other compensation exceeds $250,000, in each case, less (a) any out-of-pocket fees, costs and expenses reasonably incurred by a Credit Party or any Subsidiary in connection therewith, (b) the amount of any Debt secured by a Lien on the related asset and discharged from the proceeds of such event, and (c) any taxes paid or reasonably estimated by the applicable Credit Party or Subsidiary to be payable by such Person as a consequence of such event (provided, that if the actual amount of taxes actually paid is less than the estimated amount, the difference shall immediately constitute Major Casualty Proceeds).

"**Margin Stock**" has the meaning assigned thereto in Regulation U of the Federal Reserve Board.

"**Material Adverse Effect**" means, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, a material adverse change in, or a material adverse effect upon, any of (i) the condition (financial or otherwise), operations, business or properties of the Borrower, taken as a whole, (ii) the rights and remedies of Agent or Lenders under any Financing Document, or the ability of Borrower to perform any of its obligations under any Financing Document to which it is a party, (iii) the legality, validity or enforceability of any Financing Document, or (iv) the existence, perfection or priority of any security interest granted in any Financing Document, in each case except for the commencement of the Case and the events that customarily and reasonably result from the commencement of the Case.

"**Maximum Lawful Rate**" has the meaning set forth in Section 2.5(h).

"**Milestones**" has the meaning set forth in Section 4.14.

"**Multiemployer Plan**" means a multiemployer plan, that is intended to meet the definition set forth in Section 3(37) or 4001(a)(3) of ERISA, to which a Credit Party or any member of the Controlled Group may have any liability.

"**Net Cash Proceeds**" means, with respect to any transaction or event, an amount equal to the cash proceeds received by Borrower (or any Subsidiary) from or in respect of such transaction or event (including cash proceeds of any non-cash proceeds of such transaction), less (i) out-of-pocket expenses paid to a Person that are reasonably incurred by such Credit Party or Subsidiary in connection therewith the extent included in the Budget and (ii) in the case of an Asset Disposition, the amount of any Debt secured by a Lien on the related asset and discharged from the proceeds of such Asset Disposition and any taxes paid or reasonably estimated by the applicable Credit Party or Subsidiary to be payable by such Person in respect of such Asset Disposition (provided, that if the actual amount of taxes paid is less than the estimated amount, the difference shall immediately constitute Net Cash Proceeds).

"**Notes**" means the Revolving Loan Notes.

"**Notice of Borrowing**" means a notice of a Responsible Officer of Borrower, appropriately completed and substantially in the form of Exhibit E hereto.

"**NXT**" means NXT Capital, LLC, a Delaware limited liability company.

"**Obligations**" means all obligations, liabilities and indebtedness (monetary (including post-petition interest, fees, costs and other charges, whether or not allowed) or otherwise) of Borrower under this Agreement or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"**OFAC**" means the U.S. Department of Treasury Office of Foreign Assets Control.

"**OFAC Lists**" means, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) and/or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

"**Operative Documents**" means the Financing Documents and the Subordinated Debt Documents.

"**Ordinary Course of Business**" means, in respect of any action or omission taken or not taken by any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practices.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of formation or organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and the documents which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

"**Other Statutory Liabilities**" means accrued and unpaid statutory liabilities of the Borrower which may result in claims that have lien priority or priority of payment over all or any portion of the Obligations, are a statutory trust and/or which are legally required to be paid prior to the repayment in full of such Obligations, other than the amount of those liabilities included in the Carveout.

"**Other Taxes**" has the meaning set forth in Section 10.1(b).

"**Participant**" has the meaning set forth in Section 12.6(b).

"**Participant Register**" has the meaning set forth in Section 12.6(b).

"**Payment Account**" means the account specified on the signature pages hereof into which all payments by or on behalf of Borrower to Agent under the Financing Documents shall be made, or such other account as Agent shall from time to time specify by written notice to Borrower.

"**Payment Notification**" means a written notification substantially in the form of Exhibit F hereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"**Pension Plan**" means any ERISA Plan that is subject to Section 412 of the Code or Title IV of ERISA.

"**Permits**" has the meaning set forth in Section 3.1.

"**Permitted Contest**" means a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made; provided that compliance with the obligation that is the subject of such contest is effectively stayed during such challenge.

"**Permitted Liens**" means Liens permitted pursuant to Section 5.2.

"**Permitted Priority Liens**" means (a) the Carveout and (b) all Liens in favor of third parties, which third-party liens, as of the Filing Date, had priority under applicable law over the Liens in favor of the Existing Lenders, solely to the extent that such Liens are valid, perfected and non-avoidable as of the Filing Date and were not subordinated by agreement or applicable law; in each case subject to the terms of the Financing Order and otherwise agreed to by Agent.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**Portfolio Interest Certificate**" has the meaning set forth in Section 10.1(d).

"**Prepetition Senior Liens**" has the meaning set forth in the Financing Order.

"**Pro Rata Share**" means (i)  with respect to a Lender's obligation to make Revolving Loans and such Lender's right to receive the unused line fee described in Section 2.5(b), the Revolving Loan Commitment Percentage of such Lender, (ii) with respect to a Lender's right to receive payments of principal and interest with respect to Revolving Loans, such Lender's Revolving Loan Exposure with respect thereto and (iii) for all other purposes (including without limitation the indemnification obligations arising under Section 11.6) with respect to any Lender, the percentage obtained by dividing (A) the sum of the Revolving Loan Commitment Amount of such Lender (or, in the event the Revolving Loan Commitment shall have been terminated, such Lender's then existing Revolving Loan Outstandings) by (B) the sum of the Revolving Loan Commitment (or, in the event the Revolving Loan Commitment shall have been terminated, the then existing Revolving Loan Outstandings) of all Lenders.

"**Projected Information**" means (i) the projected operating cash receipts for each week, (ii) the projected disbursements for each week (iii) the projected net cash flow for each week, (iv) the projected net sales for each week, (v) the projected aggregate principal

amount of Obligations outstanding for each week and (vi) such other information that Agent may request, in each case with respect to each of Borrower's owned or leased locations.

"**RCRA**" means the Resource Conservation and Recovery Act of 1976.

"**Reinstated Existing Obligations**" means any Existing Obligations constituting an Avoided Payment, to the extent such obligations have been reinstated, in each case, pursuant to, and subject to the requirements and terms of the final and nonappealable order of the Bankruptcy Court.

"**Replacement Lender**" has the meaning set forth in Section 12.6(c).

"**Required Lenders**" means, subject to the provisions of Section 11.13(d), at any time Lenders holding (i) at least sixty-six and two thirds percent (66 2/3%) or more of the sum of the Revolving Loan Commitment or (ii) if the Revolving Loan Commitment has been terminated, at least sixty-six and two thirds percent (66 2/3%) of the then aggregate outstanding principal balance of the Loans, provided that if there are three or fewer Lenders, then subject to the provisions of Section 11.13(d), Required Lenders must include at least two Lenders (Lenders that are Affiliates of one another being considered as one Lender for purposes of this proviso).

"**Required Revolving Lenders**" means, subject to the provisions of Section 11.13(d), at any time Revolving Lenders holding (i) at least sixty-six and two thirds percent (66 2/3%) of the Revolving Loan Commitment or (ii) if the Revolving Loan Commitment has been terminated, at least sixty-six and two thirds percent (66 2/3%) of the then aggregate outstanding principal balance of the Revolving Loans, provided that if there are three or fewer Lenders, then subject to the provisions of Section 11.13(d), Required Revolving Lenders must include at least two Revolving Lenders (Revolving Lenders that are Affiliates of one another being considered as one Revolving Lender for purposes of this proviso).

"**Reserves**" means, as of any date of determination, those reserves that Agent deems necessary or appropriate and subject to Section 2.2(a), to establish and maintain (including reserves with respect to (a) sums that Borrower or its Subsidiaries are required to pay under any Section of the Agreement or any other Financing Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, and (b) amounts owing by Borrower or its Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien), which Lien or trust likely would be pari passu with or have a priority superior to the Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral) with respect to the Revolving Loan Commitments.

"**Responsible Officer**" means any of the Chief Executive Officer, Chief Financial Officer or any other officer of Borrower acceptable to Agent.

"**Restricted Distribution**" means as to any Person (i) any dividend or other distribution (whether in cash, Capital Stock or other property) on any Capital Stock in such Person (except those payable solely in Capital Stock of the same class) or (ii) any payment by such Person on account of the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any Capital Stock in such Person or any claim respecting the purchase or sale of any equity interest in such Person.

"**Revolving Lender**" means each Lender having a Revolving Loan Commitment Amount in excess of zero (or, in the event the Revolving Loan Commitment shall have been terminated at any time, each Lender at such time having Revolving Loan Outstandings in excess of zero).

"**Revolving Loan Commitment**" means, as the context may require, (i) as of any date of determination, the aggregate Revolving Loan Commitment Amounts of all Lenders as of such date, or (ii) the commitment of Lenders to advance Revolving Loans.

"**Revolving Loan Commitment Amount**" means, as to any Lender, the dollar amount, if any, set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Amount" as such amount may be adjusted from time to time by any "Amounts Assigned" (with respect to such Lender's portion of Revolving Loans outstanding and its commitment to make Revolving Loans) pursuant to the terms of any and all effective Assignment Agreements to which such Lender is a party.

"**Revolving Loan Commitment Percentage**" means, as to any Lender, (i) on the Closing Date, the percentage, if any, set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Percentage" and (ii) on any date following the Closing Date, the percentage equal to the Revolving Loan Commitment Amount of such Lender on such date divided by the aggregate Revolving Loan Commitment Amounts of all Lenders on such date.

"**Revolving Loan Exposure**" means, with respect to any Lender on any date of determination, the percentage equal to the amount of such Lender's Revolving Loan Outstandings on such date divided by the aggregate Revolving Loan Outstandings of all Lenders on such date.

"**Revolving Loan Limit**" means, at any time of calculation, the Revolving Loan Commitment plus the amount of all interest, fees, costs and other charges that accrue on or after the Filing Date and are payable in respect of the Existing Obligations and all interest, fees, costs and other charges in respect of this Agreement..

"**Revolving Loan Note**" has the meaning set forth in Section 2.6.

"**Revolving Loan Outstandings**" means at any time of calculation (i) the sum of the then existing aggregate outstanding principal amount of Revolving Loans and (ii) when used with reference to any single Lender, the sum of the then existing outstanding principal amount of Revolving Loans advanced by such Lender.

"**Revolving Loans**" has the meaning set forth in Section 2.2(a).

"**Secured Parties**" means Agent and each Lender to the extent provided within the defined term "Lender".

"**Security Documents**" means any agreement, document or instrument executed concurrently herewith or at any time hereafter pursuant to which one or more Borrower or any other Person either (i) Guarantees payment or performance of all or any portion of the Obligations and/or (ii) provides, as security for all or any portion of the Obligations, a Lien on any of its assets in favor of Agent for its own benefit and the benefit of Lenders and other Secured Parties, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Settlement Date**" has the meaning set forth in Section 11.13(a).

"**Settlement Service**" has the meaning set forth in Section 12.6(a).

"**Solvent**" means, with respect to any Person, that such Person (i) owns and will own assets the fair saleable value of which are (A) greater than the total amount of its liabilities (including Contingent Obligations) and (B) greater than the amount that will be required to pay the probable liabilities of its then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to it, (ii) has capital that is not unreasonably small in relation to its business as presently conducted or after giving effect to any contemplated transaction and (iii) does not intend to incur and does not believe that it will incur debts beyond its ability to pay such debts as they become due.

"**Stated Rate**" has the meaning set forth in Section 2.5(h).

"**Subordinated Debt**" means Debt of any one or more of Borrower owing to Medley Opportunity Fund II L.P. (and its successors and assigns) in an original principal amount of $18,000,000 (together with capitalized interest, fees, costs and other amounts) incurred pursuant to the terms of the Subordinated Debt Documents.

"**Subordinated Debt Documents**" means that certain Secured Subordinated Credit Agreement dated as of December 16, 2011, among Medley Opportunity Fund II L.P., the lenders from time to time party thereto, Borrower and certain Subsidiaries of Borrower and all notes, security documents, fee letters and other documents, instruments and agreements contemplated therein and heretofore executed, executed concurrently herewith or executed at any time and from time to time hereafter.

"**Subordination Agreement**" means that certain Subordination and Intercreditor Agreement dated as of December 16, 2011, among Agent, Medley Opportunity Fund II L.P. and one or more of the Borrower, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof.

"**Subsidiary**" means, with respect to any Person, any other Person of which an aggregate of more than 50% of the outstanding Capital Stock having ordinary voting power to elect a majority of the board of directors (or other applicable governing body) of such other Person is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or a combination thereof, or with respect to which any such Person has the right to vote or designate the vote of more than 50% of such Capital Stock whether by proxy, agreement, operation of Law or otherwise.  Unless the context otherwise requires, each reference to a Subsidiary shall mean a Subsidiary of Borrower.

"**Swap Contract**" means any "swap agreement", as defined in Section 101 of the Bankruptcy Code.

"**Taxes**" has the meaning set forth in Section 10.1.

"**Termination Date**" has the meaning set forth in Section 2.2(d).

"**UCC**" means the Uniform Commercial Code of the State of New York or of any other state the Laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**United States**" means the United States of America.

"**Variance Report**" means a weekly variance report prepared by the Senior Financial Officer and to be provided by Borrower to Agent reflecting actual cash receipts and disbursements for (i) each one week period and (ii) the period from the commencement of the Case to the date of such variance report; each such variance report to be provided to the Agent within one Business Day after the end of the period covered by such variance report, and reflecting the amount and the percentage variance of actual receipts and disbursements (on a line item basis) from those receipts and disbursements reflected in the Budget for such periods.

"**Wall Street Journal**" means The Wall Street Journal online edition (http://online.wsj.com)

"**Wholly-Owned Subsidiary**" means, with respect to any Person, any Subsidiary of such Person of which all of the Capital Stock (other than, in the case of a Foreign Subsidiary, directors' qualifying shares, to the extent legally required) are directly or indirectly owned and controlled by such Person or one or more Wholly-Owned Subsidiaries of such Person.

**Annex B**

**Commitment Annex**
**(as of the Closing Date)**

| Lender | Revolving Loan Commitment Amount | Revolving Loan Commitment Percentage |
|---|---|---|
| NXT | $3,500,000 | 100% |
| | | |
| TOTALS | $3,500,000 | 100% |

**Annex C**

**Closing Checklist**

# EXHIBIT A

## ASSIGNMENT AGREEMENT

This Assignment Agreement (this "**Assignment Agreement**") is entered into as of _____ by and between the Assignor named on the signature page hereto ("**Assignor**") and the Assignee named on the signature page hereto ("**Assignee**").  Reference is made to the Debtor-in-Possession Credit Agreement dated as of July 31, 2015 (as amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**") among Coyne International Enterprises Corp. ("**Borrower**"), the financial institutions party thereto from time to time, as Lenders, and NXT Capital, LLC, as Agent.  Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Credit Agreement.

Assignor and Assignee hereby agree as follows:

1.      Assignor hereby sells and assigns to Assignee, and Assignee hereby purchases and assumes from Assignor, the interests set forth on the schedule attached hereto (the "**Schedule**"), in and to Assignor's rights and obligations under the Credit Agreement as of the effective date set forth on the Schedule (the "**Effective Date**").  Such purchase and sale is made without recourse, representation or warranty except as expressly set forth herein.  On the Effective Date, Assignee shall pay to Assignor an amount [**equal to the aggregate amounts assigned pursuant to the Schedule (exclusive of unfunded portions of the Revolving Loan Commitment) and Assignor shall pay to Assignee a closing fee in respect of the transactions contemplated hereby in the amount specified on the Schedule**].

2.      Assignor (i) represents, as of the Effective Date, that it is the legal and beneficial owner of the interests assigned hereunder free and clear of any adverse claim, (ii) makes no other representation or warranty and assumes no responsibility with respect to any statement, warranties or representations made in or in connection with the Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any other Financing Document or any other instrument or document furnished pursuant thereto, and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or any other Person or the performance or observance by Borrower of its Obligations under the Credit Agreement or any other Financing Document or any other instrument or document furnished pursuant thereto.

3.      Assignee (i) confirms that it has received a copy of the Credit Agreement and the other Financing Documents, together with copies of the most recent financial statements delivered pursuant thereto and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement, (ii) agrees that it will, independently and without reliance upon Agent, Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not

taking action under the Credit Agreement, (iii) appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Financing Documents as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto, (iv) agrees that it will perform all obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender, (v) represents that on the date of this Assignment Agreement it is not presently aware of any facts that would cause it to make a claim under any of Sections 10.2 or 10.3 of the Credit Agreement, (vi) represents and warrants that Assignee is not a Foreign Lender or, if it is a Foreign Lender, (A) that it has delivered to Agent and Borrower's Representative the documentation required to be delivered to Agent by Section 13 below and (B) that if it is claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", (w) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (x) it is not a 10-percent shareholder of Borrower within the meaning of Section 881(c)(3)(B) or Section 871(h)(3)(B) of the Code, (y) it is not a controlled foreign corporation related to Borrower within the meaning of Section 881(c)(3)(C) of the Code and (z) it is not a conduit entity participating in a conduit financing arrangement (as defined in Section 1.881-3 of the Treasury Regulations), (vii) represents and warrants that it is (or, upon receipt of the required consents hereto by Agent and Borrower will become) an Eligible Assignee and that it is compliant with all its obligations under FATCA such that no taxes are required to be withheld from payments made to it under the Financing Documents as the result of FATCA, and (viii) represents and warrants that it has experience and expertise in the making or the purchasing of loans such as the Loans, and that it has acquired the interests described herein for its own account and without any present intention of selling all or any portion of such interests.

4.    Each of Assignor and Assignee represents and warrants to the other party hereto that it has full power and authority to enter into this Assignment Agreement and to perform its obligations hereunder in accordance with the provisions hereof, that this Assignment Agreement has been duly authorized, executed and delivered by such party and that this Assignment Agreement constitutes a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity.

5.    Upon the effectiveness of this Assignment Agreement pursuant to Section 13 below, (i) Agent shall register Assignee as a Lender, pursuant to the terms of the Credit Agreement, (ii) Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment Agreement, have the rights and obligations of a Lender thereunder, (iii) Assignor shall, to the extent provided in this Assignment Agreement, relinquish its rights and be released from its obligations under the Credit Agreement and (iv) Agent shall thereafter make all payments in respect of the interest assigned hereby (including payments of principal, interest, fees and other amounts) to Assignor, solely to the extent of amounts accrued prior to the Effective Date, and otherwise to Assignee.

6.    Each of Assignor and Assignee hereby agrees from time to time, upon request of the other such party hereto, to take such additional actions and to execute and deliver such additional documents and instruments as such other party may reasonably request to effect the transactions contemplated by, and to carry out the intent of, this Assignment Agreement.

7.    Neither this Assignment Agreement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Assignment Agreement) against whom enforcement of such change, waiver, discharge or termination is sought.

8.    For the purposes hereof and for purposes of the Credit Agreement, the notice address of Assignee shall be as set forth on the Schedule.  Any notice or other communication herein required or permitted to be given shall be in writing and delivered in accordance with the notice provisions of the Credit Agreement.

9.    In case any provision in or obligation under this Assignment Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.    THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

11.    This Assignment Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and its successors and assigns.

12.    This Assignment Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures hereto were upon the same agreement.

13.    This Assignment Agreement shall become effective as of the Effective Date upon the satisfaction of each of the following conditions:  (i) the execution of a counterpart hereof by each of Assignor and Assignee, (ii) the execution of a counterpart hereof by Agent and Borrower as evidence of its consent hereto to the extent required pursuant to Section 12.6(a) of the Credit Agreement, (iii) the receipt by Agent of the processing fee referred to in Section 12.6(a) of the Credit Agreement if and to the extent required thereby, (iv) in the event Assignee is a Foreign Lender, the receipt by Agent of United States Internal Revenue Service Forms W-8ECI, W-8BEN or W-8IMY (as applicable), and if applicable the Portfolio Interest Certificate and such other forms, certificates or documents, including those prescribed by the United States Internal Revenue Service, properly completed and executed by Assignee, certifying as to Assignee's

entitlement to exemption from withholding or deduction of Taxes, (v) if Assignee is not a Foreign Lender and not an exempt recipient within the meaning of Treasury Regulation Section 1.6049-4(c), a duly completed and true and accurate Internal Revenue Service Form W-9, and (vi) the receipt by Agent of originals or telecopies of the counterparts described above.

The parties hereto have caused this Assignment Agreement to be executed and delivered as of the date first written above.

ASSIGNOR:

_____

By: _____
Title: _____

ASSIGNEE:

_____

By: _____
Title: _____

Consented to:

NXT Capital, LLC, as Agent

By: _____
Title: _____

## Schedule to Assignment Agreement

Assignor:          _____

Assignee:          _____

Effective Date:  _____


Debtor-in-Possession Credit Agreement dated as of July 31, 2015 among Coyne International Enterprises Corp., as Borrower, the financial institutions party thereto from time to time, as Lenders, and NXT Capital, LLC, as Agent

Interests Assigned:

| Commitment/Loan | Revolving Loan Commitment Amount |
|---|---|
| Amounts Assigned | $_____ |

Closing Fee:          $_____


Assignee Information:

Address for Notices:                    Address for Payments:

_____
_____      Bank:          _____
Attention:    _____          ABA #:        _____
Telephone:  _____          Account #:  _____
Facsimile:    _____          Reference:    _____

**EXHIBIT E**

**NOTICE OF BORROWING**

**COYNE INTERNATIONAL ENTERPRISES CORP.**

**Date: _____, _____**

This certificate is given by _____, a Responsible Officer of Coyne International Enterprises Corp., a New York corporation (the "**Borrower** "), pursuant to Section 2.2(c)/2.5(g) of that certain Debtor-in-Possession Credit Agreement dated as of July 31, 2015 among the Borrower, the Lenders from time to time party thereto and NXT Capital, LLC, as Agent for the Lenders (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

The undersigned Responsible Officer hereby gives notice to Agent of Borrower's request to:  [**complete as appropriate**]

      (a)    on [____**date**____] borrow $[_____] of Revolving Loans for use by Borrower, which Revolving Loans shall be [**Base Rate Loans/LIBOR Loans having an Interest Period of _____ month(s)**], and which should be deposited in Borrower's Account;

      (b)    on [____**date**____] convert $[_____]of the aggregate outstanding principal amount of the [_____] Loan, bearing interest at the [_____] Rate, into a(n) [_____] Loan [**and, in the case of a LIBOR Loan, having an Interest Period of [_____] month(s)**];

      (c)    on [____**date**____] continue $[_____]of the aggregate outstanding principal amount of the [_____] Loan, bearing interest at the LIBOR, as a LIBOR Loan having an Interest Period of [_____] month(s).

The undersigned Responsible Officer, on behalf of Borrower and not individually, hereby certifies that except as set forth on Exhibit A hereto, both before and after giving effect to the request above (i) the condition precedent set forth in Section 7.2(b) has been satisfied, (ii) each of the representations and warranties contained in the Credit Agreement and the other Financing Documents is true and correct in all material respects (without duplication of any materiality provision contained therein) as of the date hereof, except to the extent such representation or warranty relates to a specific date, in which case such representation or warranty is true and correct in all material respects as of such earlier date, and (iii) no Default or Event of Default has occurred and is continuing on the date hereof.

IN WITNESS WHEREOF, the undersigned officer has executed and delivered this certificate this _____ day of _____, _____.

**COYNE INTERNATIONAL ENTERPRISES CORP.**

By _____

Name _____

Title _____

## EXHIBIT F

## PAYMENT NOTIFICATION

## COYNE INTERNATIONAL ENTERPRISES CORP.

**Date:  _____, _____**

Reference is hereby made to the Debtor-in-Possession Credit Agreement dated as of July __, 2015 among Coyne International Enterprises Corp., a New York corporation ("**Borrower**"), NXT Capital, LLC, as Agent and the financial institutions party thereto.  Capitalized terms used here have the meanings ascribed thereto in the Credit Agreement.

Please be advised that funds in the amount of $_____ will be wire transferred to Agent on _____, 20__.

Such funds shall constitute [**an optional**] [**a mandatory**] prepayment of the Loans, with such prepayments to be applied in the manner specified in Section 2.4(f).

[**Such mandatory prepayment is being made pursuant to Section 2.4 of the Credit Agreement.**]

**Fax to NXT Operations 312-450-8100 no later than noon Chicago time.**

**Funds must be received no later than noon Chicago time for same day application.**

         IN WITNESS WHEREOF, the undersigned officer has executed and delivered this notice this ____ day of _____, ____.

                    **COYNE INTERNATIONAL ENTERPRISES CORP.**

                    By _____
                    Name _____
                    Title _____

**EXHIBIT G-2**

**REVOLVING LOAN NOTE**

$**[Prepetition Debt - $10mm + incremental DIP commitment]**          Chicago, Illinois
                                                                                                              July 31, 2015

                    FOR VALUE RECEIVED, the undersigned, Coyne International Enterprises
Corp., a New York corporation ("Borrower") and unconditionally promises to pay to
_____ ("Lender") at the office of Agent at 191 North Wacker Drive,
Suite 1200, Chicago, Illinois 60606, or at such other place as Agent may from time to time
designate in writing, in lawful money of the United States of America and in immediately
available funds, the principal sum of _____ Dollars
($_____), or, if less, the aggregate unpaid principal amount of all Revolving
Loans made or deemed made by Lender to Borrower under the terms of that certain Debtor-
in-Possession Credit Agreement dated as of July 31, 2015 among Borrower, various financial
institutions as are, or may from time to time become, parties thereto as lenders (including
without limitation Lender) and NXT Capital, LLC, as Agent (as amended, restated,
supplemented or otherwise modified from time to time, the "Credit Agreement").  This
Revolving Loan Note (this "Note") is issued in accordance with the provisions of the Credit
Agreement and is entitled to the benefits and security of the Credit Agreement and the other
Financing Documents, and reference is hereby made to the Credit Agreement for a statement
of the terms and conditions under which the Revolving Loans evidenced hereby may be
made and are required to be repaid.  All capitalized terms used herein (which are not
otherwise specifically defined herein) shall be used in this Note as defined in the Credit
Agreement.

                    The outstanding principal balance of the Loans evidenced by this Note shall be
payable in full on the Commitment Expiry Date, or on such earlier date as provided for in the
Credit Agreement.

                    Borrower promises to pay interest from the date hereof until payment in full
hereof in cash on the unpaid principal balance of the Revolving Loans evidenced hereby at
the per annum rate or rates, on the dates and in the manner set forth in the Credit Agreement.

                    Upon the occurrence and during the continuance of an Event of Default, and as
provided in the Credit Agreement, the Revolving Loans evidenced by this Note may be
declared, and immediately shall become, due and payable without demand, notice or legal
process of any kind; *provided*, that upon the occurrence of an Event of Default pursuant to
the provisions of Section 8.1(f) or Section 8.1(g) of the Credit Agreement, the Revolving
Loans evidenced by this Note shall automatically be due and payable, without demand,
notice or acceleration of any kind whatsoever.

                    Payments received in respect of the Revolving Loans shall be applied as
provided in the Credit Agreement.

G2-1

Presentment, demand, protest and notice of presentment, demand, nonpayment and protest are each hereby waived by Borrower.

**THIS NOTE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.** Whenever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but in case any provision of or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. Whenever in this Note reference is made to Agent, Lender or Borrower, such reference shall be deemed to include, as applicable, a reference to its successors and assigns. The provisions of this Note shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

[**Signature Page Follows**]

In addition to and without limitation of any of the foregoing, this Note shall be deemed to be a Financing Document and shall otherwise be subject to all of general terms and conditions contained in Article 12 of the Credit Agreement, *mutatis mutandis*.

**COYNE INTERNATIONAL ENTERPRISES CORP.**

By _____

Its _____

Signature Page to Revolving Loan Note

## **Schedule 4.14**

<u>Milestones</u>

1. On or before the Filing Date (or such later date as Agent shall agree in its discretion), Borrower shall have entered into one or more asset purchase agreements for the sale of substantially all of the Collateral to one or more purchasers (collectively, the "<u>Asset Purchase Agreements</u>"), which shall each be in form and substance acceptable to Agent.

2. On or before the Filing Date (or such later date as Agent shall agree in its discretion), Borrower shall have filed one or more motions to sell substantially all of its assets pursuant to the Asset Purchase Agreements and establish sale procedures in connection therewith, along with a form of order approving such sale(s) (the "<u>Sale Orders</u>") and appropriate supporting declarations, in each case, in form and substance acceptable to Agent.

3. On or before the 45th day after the Filing Date or such later date as Agent shall agree, Borrower shall have commenced the auction if any other qualified bid is submitted prior to the bid deadline (the "<u>Auction Deadline</u>").

4. On or before the 47th day after the Filing Date, 2015 (subject to the Bankruptcy Court's availability) or such later date as Agent shall agree, the Bankruptcy Court shall have entered the Sale Orders, which shall be in form and substance acceptable to Agent.

5. On or before the 15th day after entry of the applicable Sale Order (or such later date as Lenders shall agree), the Closing Date under each Asset Purchase Agreement shall have occurred.