Syracuse, New York

HERRICK, FEINSTEIN LLP
Robert L. Rattet
Andrew C. Gold
Stephen B. Selbst
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
rrattet@herrick.com
agold@herrick.com
sselbst@herrick.com

*Proposed Attorneys for the Debtor and Debtor in
Possession*

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| COYNE INTERNATIONAL ENTERPRISES CORP., | Case No. _____ |
| Debtor. | |

--------------------------------------------------------x

## DECLARATION OF MARK SAMSON
## <u>IN SUPPORT OF FIRST DAY MOTIONS</u>

Mark Samson hereby declares under penalty of perjury that the following is true and

correct:

1.      I am the President and Chief Executive Officer ("CEO") of Coyne International

Enterprises Corp., the above-captioned debtor and debtor-in-possession ("Coyne" or the

"Debtor"), a position I have held since April 1, 2015.  From May 28, 2014 until becoming the

permanent CEO, I served as Interim Chief Executive Officer of the Debtor while being

employed by Getzler Henrich Associates LLC ("GHA"), a turnaround management firm with

which I have been associated since 1999. When I assumed the position of full-time CEO of

Coyne, I resigned from GHA.

2.     As CEO, I am responsible for oversight of all aspects of the Debtor's operations. My experience at the Debtor since May 2014 has allowed me to become familiar with the Debtor's business, facilities, employees and customers.  My tenure at Coyne, together with my previous experience at GHA and my pre-petition dealings with Coyne's professionals and Coyne's creditors, have also helped me understand the challenges Coyne faces in reorganizing and selling its assets for the benefit of all creditors.

3.     To minimize the effects of filing for bankruptcy protection on the Debtor's business and employees, the Debtor has requested various types of "first day" relief by motions that are typically heard on the first day of a chapter 11 case, as well as motions that are heard subsequently (collectively, the "First Day Motions"). Each First Day Motion seeks relief intended to allow the Debtor to perform and meet those obligations necessary to fulfill its duties as a debtor-in-possession in its chapter 11 case. As set forth below, I am generally familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtor to operate in bankruptcy with minimum disruption or loss of productivity or value and best serves the interests of the Debtor's creditors, customers, employees, and other stakeholders.

4.     I submit this declaration in support of the Debtor's chapter 11 petition and the relief requested in the First Day Motions, and to provide general information to the Court regarding the Debtor's intended strategy in this chapter 11 case. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by my colleagues and the Debtor's employees, and from my review of relevant documents, or otherwise upon my opinion based upon my experience, my discussions with the Debtor's advisors and my knowledge of the Debtor's business and financial condition.

I.    **CASE OVERVIEW**

5.    Coyne intends to make a fast trip through chapter 11 for the purpose of effecting sales of substantially all of its plants and operations. As described below, Coyne's business and assets have been thoroughly and professionally marketed during the past year in a process run by SSG Capital Advisors LLC ("SSG"), a leading investment banking firm that specializes in middle-market distressed transactions. During the sale process that SSG led, it contacted a comprehensive list of potential industry and financial buyers and advised them of this opportunity. Indeed, it is not an exaggeration to say that the entire commercial laundry industry in the United States has been aware of these pending sales for the past year.

6.     Although the sale process was slowed by the discovery of previously unknown environmental conditions at some of Coyne's facilities, Coyne and SSG have nonetheless emerged with bidders for all of Coyne's facilities and/or customer routes.  The existing stalking horse bidders are: (a) Clean Uniforms and More!, which has agreed to purchase Coyne's customer routes (but not its real estate or equipment) in New Bedford, Massachusetts for $4 million; (b) Prudential Overall Supply, which has agreed to purchase Coyne's facility in Richmond, Virginia, and its customer routes and equipment at its facility in Greenville, South, Carolina for $7.0 million, and (c) Coyne Acquisition LLC ("NXT Newco"), an entity newly formed by NXT Capital LLC ("NXT"), the agent under Coyne's prepetition senior secured debt facility, which will purchase (the "NXT Newco Bid") all of Coyne's remaining assets, consisting of its customer routes, equipment and facilities in Bristol, Tennessee, Buffalo, New York, Cleveland, Ohio, London, Kentucky, Syracuse, New York, and York, Pennsylvania (collectively, the "Core Assets") for $22,500,000, subject to adjustment.

7.     If the NXT Newco bid is determined to be the best and highest bid, NXT will transfer NXT Newco to an entity to be owned by Coyne's existing senior management team ("Management Newco"), consisting of myself, Alexander Pobedinsky, Coyne's Vice President and General Counsel, and Jennifer Collins, Coyne's Chief Financial Officer.

8.     All of the stalking horse bids are subject to higher and better bids under auction rules to be approved by the Bankruptcy Court. Given the length of time that these assets have been on the market, however, and given the industry's knowledge of their availability, Coyne intends to seek approval for a short marketing period so as to reduce the length of time prior to consummating such sales. Coyne's goal is to be able to close all of its planned asset sales within 75 days of the Petition Date.

4

9.      Coyne regards its planned sales as the best possible result for its key stakeholders under difficult circumstances. For customers, the prompt sale of Coyne's routes and facilities will ensure a seamless transition to the buyers with no interruption of the high-quality service on which they rely. For vendors and other creditors, the sale means the continuing existence of a steady customer, one that will be, in each case, better capitalized and more able to fulfill its obligations than prepetition Coyne. For Coyne's loyal and hard-working employees, the stalking horse transactions mean that seven of Coyne's nine pre-petition facilities will remain open, and approximately 525 jobs will be preserved, representing 85% of the workforce, all for the benefit of those employees and the families who depend on them. The continuing operation of Coyne's seven pre-petition facilities will extend the existence of a loyal corporate citizen, one who contributes to the communities in which it operates. Finally, for union employees, the transition from poorly funded multi-employer pension plans to defined contribution 401k plans will provide an enhanced level of retirement security.

## II.      THE DEBTOR'S BUSINESS, CAPITAL STRUCTURE, AND CIRCUMSTANCES LEADING TO THE CHAPTER 11 FILING

### A.      Description of the Debtor's Business

10.     All of the Debtor's operations are conducted through a single corporation, namely Coyne International Enterprises Corp., which is organized under the laws of the State of New York and has its headquarters at 140 Cortland Avenue, Syracuse, New York.

11.     Coyne is a leading commercial laundry service company in the United States and sells, rents and launders a wide variety of workplace uniforms, career apparel, protective garments, shop towels, reusable absorbent socks and pads, floor mats, treated dust mops and wet mops. Coyne also provides linens, mats, towels and restroom hygiene products, including restroom towels, sanitizers, deodorants, and soaps.

5

12.     Founded by J. Stanley Coyne, Coyne has been family owned and operated since 1929. Coyne serves customers in 24 states through nine commercial laundry plants and 16 service centers. Coyne's plants are located at Bristol, Tennessee; Buffalo, New York; Cleveland, Ohio; Greenville, South Carolina; London, Kentucky; New Bedford, Massachusetts; Richmond, Virginia; Syracuse, New York; and York, Pennsylvania.

13.     Coyne has approximately 9,100 customers, approximately 81% of which are parties to three or five-year contracts, which are typical in its industry. Coyne has a strong share in the market for heavily soiled commercial garments, which it is able to launder efficiently using proprietary cleaning techniques.

14.     Coyne has approximately 620 employees, of which approximately 230 are represented by labor unions. Coyne is a party to 16 collective bargaining agreements. Pursuant to those collective bargaining agreements, Coyne makes contributions to nine multi-employer pension plans. Coyne also provides a 401(k) plan for its non-union employees and for a small number of union employees.

15.     For fiscal year 2014 (which ends on October 31) and fiscal year 2013, Coyne had revenues of $66.2 million and $77.4 million, and experienced net losses of $7.1 million and $1.5 million, respectively.  In 2013, for example, Coyne lost three key customers -- AK Steel, Mylan NV, and General Mills -- which accounted for approximately $6.6 million in annual revenue.  In addition, many of Coyne's existing customers have reduced their workforces, lowering the volume of garments Coyne launders for them, and some former customers terminated the outsourcing of uniform laundering.

16.     Coyne is privately-owned and has no publicly-traded debt or equity securities. Coyne has four classes of capital stock outstanding: Class A (Non-voting) Preferred Stock,

Class B (Non-voting) Preferred Stock (together with the Class A Preferred Stock (Non-voting), the "Preferred Stock"), Class A (Voting) Common Stock and Class B (Non-voting) Common Stock (together with the Class A (Voting) Common Stock, the "Common Stock"). The table below shows the ownership of the Common Stock and the Preferred Stock:

| | **Common Stock** | | | | **Preferred Stock** | | | |
| | Class A (Voting) | | Class B (Non-voting) | | Class A (Non-voting) | | Class B (Non-voting) | |
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Thomas M. Coyne | | | 63,305 | 100% | 19,745 | 100% | 2,272 | 100% |
| Thomas M. Coyne Trust | 1,903 | 100% | | | | | | |
| Totals | 1,903 | 100% | 63,305 | 100% | 19,745 | 100% | 2,272 | 100% |

### B.   Obligations for Borrowed Money

17.   Pursuant to that certain Credit Agreement dated as of December 16, 2011 (the "Prepetition Senior Credit Agreement," and together with the related loan documents, the "Prepetition Senior Documents"), by and among the Debtor, NXT Capital, LLC ("NXT"), for itself and as agent (the "Senior Agent"), and the additional lenders party thereto (together with NXT, the "Senior Lenders"), the Senior Lenders made revolving and term loans to the Debtor in the original aggregate principal amount of $32,000,000.  Coyne estimates that as of July 31, 2015 (the "Petition Date"), the aggregate amount owed to the Senior Lenders for principal, interest, fees and other amounts due under the Prepetition Senior Credit Agreement is not less than $30,000,000.

18.   Pursuant to that certain Guarantee and Collateral Agreement dated as of December 16, 2011, the debt under the Prepetition Senior Credit Agreement is secured by security interests (the "Prepetition Senior Liens") granted by the Debtor and certain guarantors to NXT, for its benefit and the benefit of the Senior Lenders, in substantially all of the assets of

7

the Debtor (the "Prepetition Collateral"). In addition, Thomas M. Coyne, Jr. and the Thomas M. Coyne, Jr. Trust (the "Trust") pledged to NXT all of the issued and outstanding shares of the Common Stock and the Preferred Stock.

19.     Pursuant to that certain Secured Subordinated Credit Agreement dated as of December 16, 2011 (the "Prepetition Junior Credit Agreement," and together with the related loan documents, the "Prepetition Junior Documents"), among the Debtor, Medley Opportunity Fund II LP ("Medley"), as lender and as agent to the additional lenders thereunder (the "Junior Lenders"), the Junior Lenders agreed to make a term loan to the Debtor in the original principal amount of $18,000,000.  Coyne estimates that, as of the Petition Date, the aggregate amount owed to the Junior Lenders for principal, interest, fees and other amounts due under the Prepetition Junior Credit Agreement aggregates approximately $20,000,000.   Coyne's obligations under the Prepetition Junior Credit Agreement are secured by second priority liens and security interests in the same collateral that secures Coyne's obligations under the Prepetition Senior Credit Agreement.

20.     The relative rights and priorities of Prepetition Senior Agent, the Prepetition Senior Lenders, Prepetition Junior Agent, and the Prepetition Junior Lenders are governed by that certain Subordination and Intercreditor Agreement dated as of December 16, 2011 (as amended, supplemented or otherwise modified from time to time, the "Subordination Agreement").  Pursuant to the Subordination Agreement, the payment of the amounts due and owing in respect of the Prepetition Junior Documents (the "Prepetition Junior Debt"), is subordinate to the payment in full of the Prepetition Senior Debt.

### C.     Events Leading to Chapter 11

21.     For the fiscal year ended October 31, 2013, Coyne was in breach of multiple provisions contained in the Prepetition Senior Credit Agreement. On December 6, 2013, Coyne and the Senior Agent entered into that certain Forbearance Agreement (the "Forbearance Agreement") that, *inter alia*, required Coyne to seek to obtain commitments to refinance the debt held by Prepetition Senior Lenders and to explore a sale of Coyne's business. In connection with that process, Coyne retained SSG to act as its investment banker.

22.     At the direction of Thomas Coyne, who then served as President and Chief Executive Officer of the Debtor, SSG first sought to find lenders to refinance the debt owed to the Senior Lenders and the Junior Lenders.  But although SSG conducted a thorough and professional refinancing effort, due to the Company's weakening revenues and cash flow, at the end of March 2014 no new lenders were prepared to refinance Coyne's existing debt without a significant restructuring of its balance sheet.

23.     When the refinancing effort was unsuccessful, the Senior Agent reiterated its request that Coyne direct SSG to immediately commence the process of finding one or more buyers for its business. On or about April 24, 2014 the Senior Agent exercised its rights as a

pledgee of the Common Stock and Preferred Stock and removed Deborah Sydow and Thomas

M. Coyne as directors of Coyne, leaving David McGrain as the sole remaining director. At that

time, Mr. Coyne remained the president and chief executive officer of Coyne.[1]

24.    After Mr. Coyne and Ms. Sydow had been removed, Mr. McGrain determined

that he did not wish to continue to remain as the sole director of Coyne. Coyne then enlisted

William Henrich and Mark Samson of GHA to provide services to Coyne, Mr. Henrich

becoming the sole director of Coyne and Mr. Samson becoming Interim CEO.  Both of their

appointments took effect on May 28, 2014.

### D.    Decision to Pursue Asset Sales

25.    Following his appointment in May 2014, Mr. Henrich directed me and the balance

of Coyne's executive management team to conduct a full review of Coyne's operations and

determine the best strategy for restructuring its business. On June 29, 2014, I reported my

findings to Mr. Henrich at a special meeting of the board of directors of Coyne and

recommended that Coyne seek one or more buyers for its business. Mr. Henrich accepted my

recommendations and directed me to work with SSG to find potential buyers for Coyne's

business.

26.    Following that renewed mandate, SSG launched a thorough and professional

marketing effort, which started in July 2014. As preparatory activities, SSG developed lists of

potential industry and financial buyers; it prepared a confidentiality and non-disclosure

agreement; drafted a confidential offering memorandum (the "CIM") that described the

---

[1] On October 2, 2014 Thomas Coyne was suspended with full pay from serving as President and Chief Executive Officer of Coyne. On April 1, 2015, I became the President and Chief Executive Officer of Coyne. Concurrently with the commencement of this Chapter 11 Case, Coyne has terminated Thomas Coyne from all positions and has moved to reject his employment agreement.

opportunity; and it built an electronic data room containing detailed financial and operating information regarding the Debtor.

27.     Beginning the week of week of July 7, 2014, SSG began the process of notifying potential buyers of the sale opportunity by approaching 105 potential buyers in the following categories:

- Strategic buyers – Uniform rental companies and commercial launderers
- Financial buyers – Both industry-focused and turnaround oriented private equity firms

28.     In connection with its activities, 70 parties signed confidentiality agreements and SSG distributed 57 CIMs. Parties that received the CIM were also granted data room access. SSG conducted follow-up calls and fulfilled diligence requests as necessary and began the process of screening prospective buyer interest for the purpose of arranging site visits and management team meetings.

29.     By September 30, 2014, SSG had received indications of interest from five parties for some or all of Coyne's routes and plants. But several bidders expressed concern over Coyne's potential exposure to environmental claims. In response, Coyne first conducted "Phase I" environmental investigations at each of its nine plants. Because those initial reports identified conditions that merited further investigation, Coyne then conducted  "Phase II" and "Phase III" investigations, the results of which first became available in January 2015.

30.     The environmental investigations, which were conducted by Coyne's environmental consultants, GZA Environmental, identified a number of conditions where Coyne's historical operations had resulted in discharges into the soil, water or air at or adjacent to Coyne's facilities. Prior to commencing the Phase III investigations, Coyne's management team had been aware of environmental compliance issues at its facilities in Cleveland, Ohio,

11

New Bedford, Massachusetts and Greenville, South Carolina. As to all known environmental compliance issues, Coyne's management had been negotiating remediation plans to bring the facilities into compliance with applicable law.

31.     But the Phase III reports identified a number of conditions that were previously unknown to Coyne's management. The most significant issues were presented at Coyne's headquarters facility in Syracuse, New York, where prior dry cleaning operations had resulted in perchloroethylene ("perc") being present in the soil and groundwater beneath Coyne's plant. Upon learning of this condition, Coyne immediately notified the New York Department of Environmental Conservation (the "DEC") and began the process of assessing the extent of the perc contamination of its premises.[2]

32.     The discovery of the previously unknown environmental compliance issues became a factor in Coyne's efforts to sell its assets. Prospective bidders began to reduce their offers, effectively discounting them against the risk of future environmental claims surfacing, while other potential bidders were unable to satisfy themselves about the magnitude of environmental risks and dropped out of the bidding process. Due to the length of time necessary to conduct the various environmental tests, assess their results and determine appropriate responses, the process of investigating and analyzing these conditions significantly slowed Coyne's efforts to identify buyers for its assets, and, as noted above, resulted in some prospective bidders dropping out.

33.     From the initial expressions of interest, SSG, together with the Debtor's other advisors, negotiated letters of intent, and ultimately, definitive purchase agreements with two

---

[2] On June 29, 2015 the New York Department of Environmental Conservation (the "DEC") advised Coyne that its application to enroll its Syracuse facility in the DEC's Brownfields Cleanup Program had been accepted. Under the Brownfields Cleanup Program, Coyne will remediate the contamination at that site, in exchange for which it will receive certain tax credits and protection from third-party claims in respect of the contamination at that site. See N.Y. Environmental Conservation Law, §101 et seq.

third-party buyers, (a) Prudential Overall Supply ("Prudential"), which serves as the stalking-horse bidders for, the Debtor's routes at Greenville, South Carolina, and for the Debtor's routes and facility at Richmond, Virginia, and (b) Clean Uniforms and More! ("Clean"), which serves as the stalking horse bidder for the Debtor's routes at New Bedford, Massachusetts.   The Prudential transaction has a purchase price of $7.0 million and the Clean transaction has a purchase price of $4 million.

34.     Despite marketing the remaining plants and routes for approximately one year, Coyne did not receive acceptable third-party bids for its routes and facilities at Bristol, Tennessee; Buffalo, New York; Cleveland, Ohio; London, Kentucky; Syracuse, New York; and York, Pennsylvania (collectively, the "Core Assets").   Instead, Coyne has accepted the NXT Newco Bid for the Core Assets.

35.     If the NXT Newco Bid is accepted, NXT Newco will be assigned to Management Newco, and Management Newco will assume a substantial portion of the senior secured debt owed to NXT.  Coyne views the NXT Newco Bid for the Core Assets as a positive vote for all stakeholders in this Chapter 11 case because it provides for the continued operation of those six plants, saving approximately 525 jobs and preserving a customer for Coyne's suppliers.

### E.     DIP Loan

36.     NXT has also agreed to make a debtor-in-possession loan (the "DIP Loan") in the amount of $3,500,000 to the Debtor.  The DIP Loan is intended to provide Coyne with adequate liquidity to meet all of its post-petition obligations through the date of closing of the asset sales, including all administrative expenses accrued as of said date. Coyne likewise views the willingness of NXT as DIP Lender to extend debtor-in-possession financing to Coyne as an important statement of its commitment to and confidence in Coyne's reorganization efforts.

13

### III.   UNION NEGOTIATIONS; PENSION PLANS

37.     As of the Petition Date, Coyne was a party to 16 collective bargaining agreements (the "CBAs") with 15 unions, which CBAs covered approximately 230 employees.  With one exception, all of Coyne's CBAs require it to make contributions to multi-employer pension plans (the "MEPPs").   However, many of the MEPPs to which Coyne contributes are substantially underfunded, even though Coyne, as of the Petition Date, was in full compliance with all of its obligations to each of the pension funds to which it contributes.

38.     Illustratively, Coyne was recently advised that the pension fund for Local 1 of the Textile Processors, Service Trades, Health Care, Professional and Technical Employees' Union, which represents the plant workers at Coyne's Cleveland plant, has suspended benefit accruals under that pension plan due its insolvency. Similarly, the Teamsters' Central States Pension Fund, to which Coyne contributes in respect of Teamster employees at its Buffalo, New York plant, recently announced that it was developing a rescue plan to address its deep insolvency:

> "For every $3.46 that the Fund pays out in pension benefits, only $1 is collected from contributing employers, which results in a $2 billion annual shortfall. Clearly, that math will never work." [3]

39.     As a consequence of the collective weakness of the MEPPs to which Coyne contributes, Coyne's actuaries, Harbridge Consulting, estimated that, as of March 2015, Coyne's aggregate potential withdrawal liability if it terminated its obligation to contribute to the MEPPs was approximately $27 million. It is beyond dispute that a continuing liability of that magnitude is unsustainable for Coyne. Worse, as illustrated by disclosures above concerning the extreme financial weakness of the MEPPs to which Coyne contributes, even if Coyne continued to make contributions to those MEPPs, its employees would have no assurance that they would receive their expected retirement benefits. Thus, restructuring

---

[3] Source: http://www.cspensionrescue.com/, accessed July 1, 2015.

Coyne's pension obligations to the MEPPs, and replacing them with more stable payments to defined benefit 401k plans, is a change that will benefit both Coyne and its employees.

40.     In the course of negotiating the Prudential Transaction, the Clean Transaction and the NXT Newco Bid, Coyne learned that its potential withdrawal liability was a significant impediment to attracting and consummating bids for its assets. Prospective purchasers were unwilling to assume Coyne's contingent liability to the MEPPs. Thus, it is a condition of the Prudential Transaction, the Clean Transaction and the NXT Newco Bid that each such sale be free and clear of all liens, claims, charges and encumbrances, including without limitation, Coyne's obligation to make contributions to the MEPPs. Further, the asset purchase agreement with NXT Newco has a closing condition that requires NXT Newco to enter into amendments to the CBAs (the "Union Amendments") that would terminate Coyne's obligation to make contributions to the MEPPs.

41.     When Coyne learned that buyers of its assets would not be willing to assume Coyne's existing obligations to the MEPPs under its CBAs, it promptly contacted its unions to begin a dialogue concerning necessary amendments to the CBAs. To that end, in April 2015 Coyne held a group conference call with representatives of all of its unions and representatives of the International Brotherhood of Teamsters (the "Teamsters").  Coyne advised the union representatives of the status of sale negotiations and granted access to the unions and their professionals to the electronic data room established by SSG so that the unions could become familiar with Coyne's finances and operations, and put the union in a position to negotiate with Coyne over alternatives to the existing MEPPs for employee retirement security.

42.     Later in April 2015 Coyne met with the Teamsters in Washington, D.C. to further discuss Coyne's proposed restructuring and to negotiate alternatives to the existing MEPPs. At

that meeting, the Teamsters' representatives made various information requests to Coyne, which Coyne promptly fulfilled.  As negotiations continued in May and June, Coyne continued to keep its union representatives apprised of the status of Coyne's restructuring efforts.

43.    In June 2015, Coyne developed a formal proposal for the Union Amendments, under which: (a) Coyne would withdraw from and cease to contribute to any of the MEPPs, and any resulting withdrawal liability claims would be treated as general unsecured claims in the Chapter 11 case, (b) in the case of Management Newco, it would establish 401k defined contribution plans  (the "DB Plans") for each of the affected union members at the Core Assets, and (c) Management Newco would make contributions to such DB Plans in an amount equal to the amount that Coyne previously contributed to the applicable MEPPs, which contribution amount would increase by two percent (2%) per year for the duration of the applicable CBA, (d) base minimum salaries would be increased by two percent (2%) per year in the second and third year of each Union Amendment; and (e) for any union employee who was not offered an employment position with the applicable buyer of the facility where he/she worked, such employee would be paid severance in accordance with the terms of the applicable CBA.

44.    In late June 2015, Coyne communicated this proposal to each of the affected unions and began the process of negotiating with such unions in good faith for the purpose of reaching the necessary agreements on the Union Amendments to the CBAs. As a result of extensive good-faith negotiations with its Teamster-affiliated local unions, as of the Petition Date, Coyne had reached an agreement, subject to ratification by the members of the local unions, to permit it to terminate its obligation to contribute to the MEPPs, and to substitute defined contribution pension plans as a retirement benefit for those covered employees, defined contribution pension plans. In exchange for the agreement to allow Coyne to terminate its

16

obligation to participate in the MEPPs, Coyne agreed to certain changes in the terms and conditions of the CBAs with the Teamster-affiliated local unions. Coyne anticipates that it will be filing a motion seeking approval of the Union Amendments with the Teamster-affiliated local unions in the near future.

45.     Coyne has also been conducting parallel negotiations with its other local unions, and has communicated a proposal for amendments of their CBAs that is consistent with the Union Amendments agreed to by the Teamster-affiliated local unions. Coyne has reached agreement with its local unions representing employees at its Cleveland, Ohio and Buffalo, New York plants and is engaged in negotiations with the union representing plant employees in Syracuse, New York. Although those negotiations are not yet final, Coyne is optimistic that it will have concluded those negotiations by the time it files a motion seeking approval of the other Union Amendments.

## IV.   ENVIRONMENTAL CLAIMS

46.     As discussed above, Coyne's operations use or generate as waste byproducts a number of chemicals and other substances, the use or discharge of which is regulated by federal or state environmental laws.  Coyne faces a number of claims that its operations violated applicable law and/or subjected Coyne to liability. The discussion below summarizes known or threatened environmental claims against Coyne and cases where Coyne has voluntarily implemented remediation efforts, and the status of such matters.

### A.    Active Sites

47.     New Bedford, Massachusetts. In August 2014, Coyne and the Environmental Protection Agency (the "EPA") entered into a consent decree to settle alleged violations by Coyne of Clean Air Act ("Act").  In the consent decree, Coyne acknowledged that between

1994 - 2005 it operated industrial laundry equipment at its facility in New Bedford, Massachusetts without obtaining permits authorizing the discharge of volatile organic compounds ("VOCs").  Under the consent decree, Coyne was required to pay a fine of $50,000 and to install equipment necessary to reduce VOC emissions to permissible limits or to cease laundering print and furniture towels at this facility.  Coyne believes its current operations at its New Bedford facility are in compliance in all material respects with applicable environmental laws and regulations.

48.   Cleveland, Ohio.  On January 8, 2014 the Northeast Ohio Regional Sewer District ("NORSD") issued a violation notice to Coyne in respect of its Cleveland, Ohio facility, alleging wastewater discharge permit violations.  Coyne engaged in settlement negotiations with NORSD and implemented a corrective action plan under which its current operations are in compliance with the NORSD regulations.  Coyne has agreed to a consent order with NORSD acknowledging past non-compliance and agreeing to pay a fine of $150,000, payable in 24 installments.

49.   Greenville, South Carolina.  On May 21, 2014 the Spartanburg Sanitary Sewer District ("SSSD") issued a notice to Coyne in respect of its Greenville, South Carolina facility, alleging wastewater discharge permit violations. Coyne believes that it can resolve this matter through negotiations with SSSD and implementation of a corrective action plan.  Coyne has shifted cleaning of so-called "heavy soil" garments to one or more other processors, which allows the facility to be operated in compliance with applicable environmental laws and regulations.

**B.      Former Sites**

50.    <u>Onondaga Lake, New York</u>. In 2009 Honeywell International Inc. ("Honeywell") alleged that Coyne may be liable under the Comprehensive Environmental Response, Compensation, and Liability Act. 42 U.S.C. §103 et seq. ("CERCLA") to contribute to cleanup costs that Honeywell has paid for the Onondaga Lake Superfund site. Honeywell is responsible for performance of all clean-up activities at this site pursuant to consent decrees with the EPA and the DEC. Honeywell seeks contribution from hundreds of Onondaga County industrial sewer users, including Coyne, based on alleged overflow into the lake from the county municipal wastewater treatment site that occurred during the 1970s and 1980s. In September, 2012 Honeywell sent Coyne a settlement proposal seeking $1,400,000. Coyne has made no payment to Honeywell, has denied any liability, and has no evidence that it contributed to the contamination at this site.

51.    <u>Worcester Massachusetts</u>.  Coyne sold a former laundry plant to Armory Street, LLC (ALS") in 2006.  In connection with the sale, Armory indemnified Coyne against all environmental conditions at the property. Coyne believes that ALS operated the facility as a warehouse for several years until it defaulted on its mortgage loan from Millbury Federal Credit Union ("Millbury"), which foreclosed on the property in 2011. Millbury commenced suit in Massachusetts state court against Coyne and ALS in January 2015, seeking a determination that Coyne and ALS are responsible for remediation of the site. Coyne answered the complaint and is defending the action.

52.    <u>Schenectady, New York</u>.  In April 2013 Coyne was notified by the DEC that it was requesting access to Coyne's vacant property in Schenectady, New York in order to investigate a gasoline spill. Based on the proximity to the former Rainbow Car Wash

("Rainbow") tank pit adjacent to the property, Coyne believes that Rainbow was the likely source of the spill.  In January 2015 the DEC delivered a report to Coyne indicating that the Rainbow tank area was the likely source of the gasoline discharges, but that Coyne likely contributed to other contaminations of the soil.

53.     <u>Huntington, West Virginia</u>.  In July 2013 the EPA requested a supplemental response from Coyne regarding a formerly-owned facility in Huntington, West Virginia at which EPA is undertaking response action under CERCLA. Coyne sold the facility to the Wayne County Economic Development Authority (the "EDA") in 2006.  In connection with the sale, the EDA indemnified Coyne against all environmental conditions at the property. EPA has not issued a liability notice letter or demand to Coyne in connection with the Huntington facility.

54.     <u>Belleville, New Jersey and Waterbury, Connecticut</u>.  Coyne is responsible for certain environmental remediation costs at its former Belleville, New Jersey and Waterbury, Connecticut facilities that were sold to G&K Services, Inc. ("G&K") in 2005. Coyne is working with G&K to complete remediation at these sites pursuant to the requirements set forth in its agreement with G&K.  G&K selected the consultants for both sites, with Coyne responsible for oversight of the work and reimbursement of the costs of remediation.

## V.     <u>FIRST DAY MOTIONS</u>

55.     To minimize the adverse effects of the commencement of the chapter 11 case on its business and employees, the Debtor has requested various types of relief in its First Day Motions, all of which are either being filed concurrently with this Declaration, or will be filed shortly after the Petition Date. I believe that the relief requested in each of the First Day

Motions is necessary, appropriate, and is in the best interest of the Debtor's estates, creditors,

and other parties in interest.

56.    The First Day Motions are:

- Motion Pursuant to Sections 105(A) And 363(B) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 For (I) Authorization to Pay Wages, Compensation, and Employee Benefits, and (II) Authorization for Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations

- Application For Entry of an Order Authorizing the Retention and Employment of Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent Effective as of the  Petition Date

- Motion for Entry of an Order Authorizing the Debtor to Redact (I) Certain Supplements to the Debtor's Statements of Financial Affairs and Schedules of Assets and Liabilities, and (II) Contact Information for the Debtor's Customers

- Motion Pursuant to Bankruptcy Rules 1007(C) and 2002(D) for an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs

- Motion for Order Authorizing Maintenance of Prepetition Cash Management System, Bank Accounts and Continued Use of Existing Business Forms, and Granting Related Relief

- Motion for Interim and Final Orders (I) Authorizing, on an Emergency Basis, Payment of Certain Prepetition Claims of Critical Vendors; (II) Authorizing, But Not Directing, After Notice and a Hearing, the Debtor to Pay Certain Obligations Arising in Connection With Goods Received Within the Twenty Day Period Before the Petition Date; and (III) Scheduling a Final Hearing

- Motion for Entry of Interim and Final Orders (I) Authorizing Debtor in Possession to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364; (II) Granting Liens, Security Interests and Superpriority Claims; (III) Authorizing Use of Cash Collateral and Granting Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Scheduling a Final Hearing

57.    I have reviewed each of the First Day Motions (including the exhibits and

schedules attached thereto) listed above, and, to the best of my knowledge, I believe that the

facts set forth in the First Day Motions are true and correct. If I were called upon to testify, I

57.    I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) listed above, and, to the best of my knowledge, I believe that the facts set forth in the First Day Motions are true and correct. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

58.    Furthermore, as a result of my personal knowledge, information supplied to me by other members of the Debtor's management, from my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtor's advisors and knowledge of the Debtor's operations and financial condition, I believe the relief sought in the First Day Motions is necessary for the Debtor to effectuate a smooth transition into chapter 11 bankruptcy, to avoid irreparable harm to its business and estate, and is in the best interests of the Debtor's creditors, estates, and other stakeholders.

59.    Accordingly, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of this case, I believe that the relief sought in the First Day Motions should be granted by the Court in its entirety, together with such other and further relief for the Debtor as this Court deems just and proper, in the most expeditious manner possible.

Dated July 31, 2015

Name:  Mark Samson
Title:   Chief Executive Officer