HERRICK, FEINSTEIN LLP
Robert L. Rattet
Andrew C. Gold
Stephen B. Selbst
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
rrattet@herrick.com
agold@herrick.com
sselbst@herrick.com

PHILLIPS LYTLE LLP
William J. Brown
125 Main Street
Buffalo, New York 14203
(716) 847-7089
wbrown@phillipslytle.com

*Proposed Attorneys for the Debtor*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re                                                    Chapter 11

COYNE INTERNATIONAL ENTERPRISES          Case No.  15-31160-5-mcr
CORP.,

                  Debtor.
---------------------------------------------------------x

**DEBTOR'S MOTION FOR ENTRY OF (I) ORDER APPROVING (a) BIDDING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (b) BID PROTECTIONS TO CERTAIN STALKING HORSE BIDDERS, (c) PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS, AND (d) FORM AND MANNER OF NOTICE OF SALE HEARING; AND (II) ORDER APPROVING (a) SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS OUTSIDE ORDINARY COURSE OF BUSINESS, FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (b) FORM AND CONTENT OF ASSET PURCHASE AGREEMENT, AND (c) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

        Debtor and debtor-in-possession Coyne International Enterprises Corp. ("Coyne" or the

"Debtor"), by and through its undersigned counsel, in support of its motion (the "Motion")

pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of (I) an order approving (a) bidding procedures in connection with the sale of substantially all of the Debtor's assets, (b) bid protections for certain stalking horse bidders, (c) procedures for assumption and assignment of executory contracts, and (d) the form and manner of notice of the hearing to approve the sale (the "Bidding Procedures Order"), and (II) separate orders for the sale of assets to each of the three stalking horse bidders, in the form attached as an exhibit to each respective stalking horse bidder's asset purchase agreement (collectively, the "Sale Orders"), respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## INTRODUCTION AND OVERVIEW OF RELIEF SOUGHT

2.      On July 31, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court, and an order for relief under section 301 of the Bankruptcy Code was entered in this case (the "Chapter 11 Case").

3.      The Debtor has been authorized to remain in possession of its property and to continue in the operation and management of its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No official committee of unsecured creditors has yet been appointed by the Office of the United States Trustee for the Northern District of New York (the "U.S. Trustee") in the Chapter 11 Case.

4.      Annexed hereto as **Exhibit A** is an *Asset Purchase Agreement* (the "Clean APA") for the sale of the Debtor's assets related to the Debtor's business in New Bedford, Massachusetts, as set forth in the Clean APA (the "New Bedford Business") to Clean Rentals, Inc. d/b/a Clean Uniforms and More! ("Clean").

5.      Annexed hereto as **Exhibit B** is an *Asset Purchase Agreement* (the "Prudential APA") for the sale of certain of the Debtor's assets related to the Debtor's businesses in Greenville, South Carolina and Richmond, Virginia, or to associated service centers in Winchester VA, Raleigh NC, Atlanta GA, and Beckley WV, all as set forth in the Prudential APA (the "Greenville/Richmond Business") to Prudential Overall Supply, Inc. ("Prudential"). Such assets include certain customer accounts, contracts, purchase orders, equipment, in-service and both new and used inventory and other supplies, vehicles and other property, all as more fully described in Section 2.1 of the Prudential APA, as well as the Debtor's real estate and facility thereon in Richmond, Virginia.

6.      Annexed hereto as **Exhibit C** is an *Asset Purchase Agreement* (the "Newco APA") between the Debtor and Coyne Acquisition LLC ("Newco") (an entity formed by NXT Capital LLC ("NXT"), the Debtor's prepetition senior secured lender), as the stalking horse bidder, for the sale of Debtor's assets related to the Debtor's businesses in Buffalo, New York (the "Buffalo Business"), Cleveland, Ohio (the "Cleveland Business"), Bristol, Tennessee (the "Bristol Business"), Syracuse, New York (the "Syracuse Business"), York, Pennsylvania (the "York Business") and London, Kentucky (the "London Business"), together with their respective customer contracts and other assets (the "Remaining Businesses"). Clean, Prudential and Newco collectively are referred to herein as the "Stalking Horse Bidders," and the Clean APA, the Prudential APA and the Newco APA collectively are referred to herein as the "APAs."

7.      Pursuant to the APAs with the Stalking Horse Bidders, or a similar agreement with a bidder who later submits a higher and better offer pursuant to the Bidding Procedures described below, the Debtor intends to sell and assign the Assets, free and clear of all liens, claims, interests, and encumbrances, by Court-approved sale (the "Sale").

8.      In order to effectuate the Sale, the Debtor seeks Court approval of the Bidding Procedures Order in the form annexed hereto as **Exhibit D**, granting the following relief:

a.      authorizing and approving the bidding procedures to the extent there is competitive bidding in connection with the Sale, substantially in the form annexed hereto as **Exhibit 1** to **Exhibit D** (the "Bidding Procedures");

b.      authorizing and approving the Breakup Fees (as defined herein) to Clean and Prudential;

c.      authorizing and approving the assumption and assignment of certain executory contracts of the Debtor in accordance with the terms of the applicable APA, and approving the form and manner of the initial notice of the potential assumption and assignment of the Assigned Contracts (defined below), substantially in the form annexed hereto as **Exhibit 2** to **Exhibit D** (the "Assumption and Assignment Notice");

d.      approving the form and manner of the notice of, and hearing to approve, the Sale, substantially in the form annexed hereto as **Exhibit 3** to **Exhibit D** (the "Sale Notice");

e.      approving the form and manner of the notice of sale being provided via publication, substantially in the same form as the Sale Notice;

f.      approving the following proposed dates and deadlines (subject to change as necessary) relating to receipt of competitive bids (if any), and approval of the Sale:

i.      Objections to entry of the Bidding Procedures Order shall be due on August 24, 2015 (the "Bidding Procedures Objection Deadline");

    ii.      The hearing on approval of the Bidding Procedures Order shall take place on August 31, 2015 at 11:00 a.m. (the "<u>Bidding Procedures Hearing</u>");

    iii.     Objections to the Sale and entry of the Sale Orders are due on September 25, 2015 (the "<u>Sale Objection Deadline</u>");

    iv.     Potential bidders that have been informed they are acceptable bidders must submit bids by no later than September 28, 2015 (the "<u>Bid Deadline</u>");

    v.      If qualifying bids are submitted by the Bid Deadline, then the auctions in connection with the Sale shall take place on September 30, 2015, commencing at 10:00 a.m. (EST) at the offices of Debtor's counsel, Herrick, Feinstein LLP, 2 Park Avenue, New York, New York, 10016 (each, an "<u>Auction</u>," and together, the "<u>Auctions</u>");

    vi.     The hearing on approval of the Sale Orders shall take place on October 2, 2015 (the "<u>Sale Hearing</u>").

9.     Upon completion of the Auctions (if any), the Debtor seeks Court approval of the Sale and the Sale Orders, granting the following relief:[1]

    a.     authorizing and approving the Debtor's Sale of the Assets to the Successful Bidder(s), free and clear of all liens, claims, interests, and encumbrances;

    b.     authorizing and approving the Debtor's entry into, and performance under, the APAs (or similar agreement with a Successful Bidder(s) to the extent that it complies with the Bid Procedures);

    c.     authorizing and approving the assumption and assignment of the Assigned Contracts (defined below) pursuant to the applicable APAs;

    d.     determining that the Successful Bidder(s) is (are) a good faith purchaser(s) and assignee(s) pursuant to section 363(m) of the Bankruptcy Code, and

    e.     waiving the fourteen (14) day stays set forth in Bankruptcy Rule 6004(h) and 6006(d).

---

[1] This is a summary of portions of the relief being provided by the Sale Orders. To the extent there are any inconsistencies between this summary and any of the Sale Orders, the terms and the conditions of each of the Sale Orders shall control.

## BACKGROUND

10.     The Debtor is one of the largest privately owned commercial laundry companies in the United States.  It is a leading route-based service provider, selling and renting a variety of work garments, shop towels, floor mats, dust mops, and other accessories in the eastern half of the United States.

11.     Additional information about the Debtor's businesses and the events leading up to the Petition Date can be found in the Affidavit of the Debtor's Chief Executive Officer, Mark Samson (the "Samson Affidavit") filed on the Petition Date, and incorporated herein by reference.

12.     By this Motion, the Debtor seeks authorization to sell the Acquired Assets at an auction pursuant to bidding procedures approved by the Court.

### *Marketing and Sale Process*

13.     Contemporaneously herewith, the Debtor has filed a motion to approve the retention of SSG Advisors, LLC ("SSG") as its exclusive investment banker.  The Debtor requested that SSG assist it in the sale of substantially all of the Assets.  SSG and the Debtor have conducted a rigorous marketing and sale process in connection with the Assets.

14.     SSG launched a thorough and professional marketing effort, which started in July 2014.  As preparatory activities, SSG developed lists of potential industry and financial buyers; it prepared a confidentiality and non-disclosure agreement; drafted a confidential offering memorandum (the "CIM") that described the opportunity; and built an electronic data room containing detailed financial and operating information regarding the Debtor.

15.     Beginning the week of week of July 7, 2014, SSG began the process of notifying potential buyers of the sale opportunity by approaching 105 potential buyers in the following

categories:   Strategic buyers (uniform rental companies and commercial launderers) and financial buyers (both industry-focused and turnaround oriented private equity firms).

16.     In connection with its activities, 70 parties signed confidentiality agreements and SSG distributed 57 CIMs.  Parties that received the CIM were also granted data room access. SSG conducted follow-up calls and fulfilled diligence requests as necessary and began the process of screening prospective buyer interest for the purpose of arranging site visits and management team meetings.

17.     By September 30, 2014, SSG had received encouraging indications of interest from 11 parties for some or all of the Debtor's routes and plants.  But several bidders expressed concern over the Debtor's potential exposure to environmental claims, which is more fully described in the Samson Affidavit.

18.     From the initial expressions of interest, SSG, together with the Debtor's other advisors, negotiated letters of intent, and ultimately, definitive purchase agreements with Clean and Prudential, as described above.  The Prudential transaction has a purchase price of $7 million (subject to reduction under certain circumstances) and the Clean transaction has a purchase price of $4 million, subject to better and higher offers.

19.     Despite marketing the remaining plants and routes for nearly a year, the Debtor did not receive acceptable third-party bids for the Remaining Businesses.  Instead, the Debtor has accepted the Newco APA as the stalking horse bid for the Remaining Businesses.  The Newco bid is also subject to higher and better offers, and does not include a request for a break-up fee.

**OVERVIEW OF PROPOSED SALE**

20.     The material terms of the APAs are summarized as follows:[2]

---

[2] This is a summary of the APAs.  To the extent there are any inconsistencies between this summary and any of the APAs, the terms and the conditions of the APAs shall control.

a.  *Clean APA*

| Subject Matter | APA Section | Description |
|---|---|---|
| Purchase Price | 2.5 | $4 million |
| Purchased Assets | 2.1 | Certain of the Debtor's assets related to the Debtor's business in New Bedford, Massachusetts, and more specifically the Acquired Assets as provided in Section 2.1 of the Clean APA |
| Assumed Liabilities | 2.3 | All liabilities under the Assumed Contracts and the Assumed Permits after the Closing Date, and all Cure Amounts ordered by the Bankruptcy Court. |
| Excluded Assets | 2.2 | Excluded Assets as provided in Section 2.2 of the Clean APA. |
| Excluded Liabilities | 2.4 | All Excluded Liabilities set forth in Section 2.4 of the Clean APA. |
| Closing | 2.9 | Closing to occur on the third business day after occurrence of conditions to closing set forth in Article VII of the Clean APA. |

b.  *Prudential APA*

| Subject Matter | APA Section | Description |
|---|---|---|
| Purchase Price | 2.3 | $7 million (subject to certain reductions in the purchase price if certain events occur, all as described in Section 2.3 of the Prudential APA). |
| Purchased Assets | 2.1 | Various customer contracts, accounts, inventory, equipment, vehicles and other property related to the Debtor's businesses in Greenville, South Carolina and in Richmond, Virginia, or associated service centers in Winchester VA, Raleigh NC, Atlanta GA, and Beckley WV, and including the Debtor's real estate and facility thereon in Richmond, Virginia (the "Richmond Property"), to the extent identified as part of "Acquired Assets" described in Section 2.1 of the Prudential APA. |
| Assumed Liabilities | 2.2 | Only those liabilities specifically defined as "Assumed Liabilities" in Section 2.2 of the Prudential APA, and those specific "Liens" related to the Richmond Property and specifically identified as a "Permitted Lien" |

| | | in Section 2.1(e) of the Prudential APA. |
|---|---|---|
| Excluded Assets | 2.1 | Except for the Richmond Property, any of the Acquired Assets may be rejected by written notice seven business days prior to the commencement of the Auction. |
| Excluded Liabilities | 2.2 | Debtor shall be responsible for Cure Costs. Prudential assumes no liabilities other than "Assumed Liabilities" as defined in the Prudential APA. |
| Closing | 2.6 | Closing to occur on a date mutually-agreed upon by the parties not later than August 31, 2015 (assuming the closing conditions in Article 7 of the Prudential APA have occurred or been waived in the manner required by the Prudential APA), which date may be extended for certain periods of time, all as further described in Section 2.6 of the Prudential APA. |

c. *Newco APA*

| Subject Matter | APA Section | Description |
|---|---|---|
| Purchase Price | 2.5 | $22.5 million |
| Purchased Assets | 2.1 | Certain of the Debtor's assets related to the Debtor's businesses in Buffalo, New York, Cleveland, Ohio, Bristol, Tennessee, Syracuse, New York, York, Pennsylvania and London, Kentucky, together with their respective customer contracts and other assets, and more specifically, the Acquired Assets set forth in Section 2.1 of the Newco APA. |
| Assumed Liabilities | 2.3 | All liabilities under the Assumed Contracts; liabilities for amounts Newco has agreed to pay under the Newco APA, including Cure Amounts; accrued unpaid accounts payable of the Debtor constituting administrative expenses or applied to critical vendors; unpaid expenses for NXT's advisors and attorneys. |
| Excluded Assets | 2.2 | Cash in the Debtor's Designated Account; the Debtor's organizational documents; records related to taxes paid or payable by the Debtor; the Debtor's equity securities; leases and related leased properties and contracts, other than Assumed Contracts; the |

| | | Debtor's bank accounts and lock boxes; tax assets and accounts; bankruptcy claims; confidential personnel and medical records; records the Debtor is required by law to retain; records relating to sale of Excluded Assets; assets being sold to Clean and Prudential; permits other than Assumed Permits; assets maintained pursuant to any Employee Benefit Plan; assets set forth in Annex A to the Newco APA; and any Acquired Assets that are released in order to be sold in connection with another bid for Excluded Assets. |
|---|---|---|
| Excluded Liabilities | 2.4 | The liabilities set forth in Section 2.4 of the Newco APA. |
| Closing | 2.7 | Closing to occur on the third business day after occurrence of conditions to closing set forth in Article 7 of the Newco APA. |

## OVERVIEW OF ASSUMPTION PROCEDURES

21.     The Debtor also seeks approval of the assumption of certain contracts, leases and agreements in accordance with the procedures set forth herein (the "Assumption Procedures").

22.     As soon as practicable following the entry of the Bidding Procedures Order, the Debtor shall serve each counterparty with a notice substantially in the form attached as Exhibit 2 to the Bidding Procedures Order (the "Assumption and Assignment Notice"), by first class mail on all non-debtor counterparties to Executory Contracts or Leases (as defined below).  The Assumption and Assignment Notice will identify each applicable Stalking Horse Bidder, and inform each recipient that the Debtor has agreed to sell its Assets to certain Stalking Horse Bidders pursuant to certain APAs, and that, as part of the Sale, the counterparty's respective Executory Contract or Lease may be either (i) assumed and assigned or (ii) rejected.

23.     No later than one day prior to the Sale Hearing, each Stalking Horse Bidder (or, if such Stalking Horse Bidder is not the Successful Bidder, each other Successful Bidder) may designate, by written notice (a "**Rejection Notice**") to the Debtor, which of the Executory

10

Contracts or Leases are to be treated as rejected contracts (the "**Rejected Contracts**"), and by written notice (an "**Assignment Notice**") to the Debtor, which of the Executory Contracts or Leases are to be treated as assigned contracts (the "**Assigned Contracts**").   Additionally, at any time prior to the Effective Closing Date, the Stalking Horse Bidder or, as applicable, the Successful Bidder, may designate any additional Executory Contract or Lease for exclusion from Assigned Contracts by delivering written notice to the Debtor, and in connection with the Effective Closing Date, such Executory Contract or Lease shall be deemed a Rejected Contract under the Bidding Procedues Order, and the Debtor will be deemed by the Motion to have moved to reject any such Contract as of the Effective Closing Date (and the Effective Closing Date shall constitute the rejection effective date with respect thereto) unless such Executory Contract or Lease had been rejected pursuant to prior order of court.   Notwithstanding anything to the contrary in the Prudential APA, the date by which Prudential may reject, disclaim, and/or refuse to take ownership of any of the Acquired Assets under Section 2.1 of the Prudential APA shall be any date on or before the Effective Closing Date.

24.    The Assumption and Assignment Notice will also include (x) any "cure" amounts required to be paid pursuant to section 365 of the Bankruptcy Code or the applicable APA (the "Cure Amounts") that will apply in the event that the applicable Executory Contract or Lease is to be an Assigned Contract, and (y) any applicable objection deadlines that may be established pursuant to the Bidding Procedures Order.   "Executory Contracts or Leases" shall mean, collectively, all of the Debtor's executory contracts, customer accounts, customer account agreements, permits and leases, and all "Customer Accounts" (as such term is defined in any of the APAs).

25.     Assumption and Assignment Notices in respect of customer contracts shall be redacted in accordance with prior orders of this Court.

26.     No later than one day prior to the Sale Hearing, the Debtor will file and serve on each applicable Executory Contract or Lease counterparty:  (a) notice that its Executory Contract or Lease has, as of that date, been determined to be an Assigned Contract; or (b) notice that its Executory Contract or Lease has, as of that date, been determined to be a Rejected Contract. Service of such notice shall be made via email to all email addresses available to the Debtor for the counterparty in its files, and via first class mail to all addresses available to the Debtor for the counterparty in its files.  Pursuant to Bankruptcy Code section 365 and without further notice: (x) the Debtor will be authorized to assume and assign any and all Assigned Contracts listed in clause (a) above as of the Effective Closing Date for each Stalking Horse Bid or, as applicable, each Successful Bid; and (y) subject to Paragraph 23 above and Paragraph 30 below, all Rejected Contracts listed in Paragraph 26(b) above will be deemed rejected as of the Effective Closing Date for the applicable Stalking Horse Bid or, as applicable, the applicable Successful Bid unless otherwise rejected by the Debtor prior to such date.  "Effective Closing Date" shall mean the date on which all conditions to closing are satisfied (or waived) in the manner required by the applicable APA, including, without limitation, payment in full of the purchase price.

27.     Objections (each a "**Contract Objection**"), if any, to the assumption and assignment of any Executory Contracts or Lease, the adequate assurance of future performance of such Executory Contract or Lease, and the Debtor's proposed Cure Amounts must: (a) be in writing; (b) state with specificity the nature of such objection and alleged cure amount, including applicable and appropriate documentation in support of such alleged cure amount; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Court, on or before

12

September 25, 2015 at 4:00 p.m. prevailing Eastern Time (the "**Cure Objection Deadline**"); and (e) be served, so as to be actually received on or before the Cure Objection Deadline, by (i) counsel for the Debtor; (ii) counsel to each Stalking Horse Bidder; (iii) counsel to the Creditors' Committee; and (iv) the Office of the United States Trustee; *provided*, *however*, that if an Auction results in a Successful Bidder other than a Stalking Horse Bidder, as part of the notice provided by the Debtor pursuant to Paragraph 26, the Debtor will identify such Successful Bidder in a notice and file it with the Court and serve it on each counterparty who was served with the Assumption and Assignment Notice, and the deadline for objecting to the assignment of the Assigned Contracts to such Successful Bidder solely on the basis of adequate assurance of future performance will be at the commencement of the Sale Hearing.

28.     If a counterparty to an Executory Contract or Lease does not timely and properly file a Contract Objection in the manner set forth above, the Debtor's proposed Cure Amount shall be fixed and shall be paid to the counterparty to the executory contract or unexpired lease to the extent such Executory Contract or Lease is assumed and assigned, and the counterparty shall be deemed to consent to the assumption and assignment of the Executory Contract or Lease.  If a counterparty timely and properly files a Contract Objection, then, as set forth in Assumption and Assignment Notice, such counterparty shall have the opportunity to appear before the Court at the Sale Hearing.  In order for the Debtor to assume and assign any of the Executory Contracts or Leases, the proposed Cure Amount determined by the Court (if there is a Contract Objection) or set forth in the Assumption and Assignment Notice (if there is no Contract Objection) must be paid to the counterparty to the Executory Contract or Lease upon the assumption and assignment of such Executory Contract or Lease.

29.     If a Contract Objection is not timely and properly filed and served in accordance with the Bidding Procedures Order, (a) the Debtor's proposed Cure Amount shall be controlling with respect to the Executory Contract or Lease notwithstanding anything to the contrary in any Executory Contract or Lease or any other document, (b) such Executory Contract or Lease may be assigned to the Stalking Horse Bidder or, if applicable, the Successful Bidder, (c) the failure to object shall be deemed consent by the counterparty to the assumption and assignment for the purposes of section 365(c) of the Bankruptcy Code or otherwise, (d) the counterparty to the Executory Contract or Lease shall be forever barred from asserting any other claim arising prior to the assignment, if applicable, against the Debtor, each Stalking Horse Bidder or, if applicable, the Successful Bidder as to such Executory Contract or Lease and (e) with respect to the Executory Contract or Lease, the applicable Stalking Horse Bidder or, if applicable, the applicable Successful Bidder's promise to perform under the Executory Contract or Lease shall be deemed adequate assurance of future performance under the Executory Contract or Lease.

30.     Notwithstanding anything to the contrary herein, at any time prior to the Effective Closing Date, each Stalking Horse Bidder or, as applicable, the Successful Bidder, may, by Assignment Notice to the Debtor, change the designation of any Rejected Contract to be treated as an Assigned Contracts, in which case such Executory Contracts or Leases shall be deemed assumed and assigned as of the Effective Closing Date.   As soon as practicable after the Effective Closing Date of any Sale to the Stalking Horse Bidder or, as applicable, the Successful Bidder, the Debtor shall provide notice of the assumption and assignment of each Assigned Contract which was assumed and assigned in connection therewith to each counterparty to such Assigned Contract.   Any such notices in the case of customer contracts may be redacted in accordance with prior orders of this Court.

14

31.     In the event that any counterparty is not served with the Assumption and
Assignment Notice, and at any time prior to the Effective Closing Date at the request of the
Stalking Horse Bidder or, if applicable, the Successful Bidder, such Bidder may designate the
counterparty's Executory Contract or Lease as either a Rejected Contract or an Assigned
Contract.  If such Executory Contract or Lease is designated as an Assigned Contract, the Debtor
shall promptly move to assign it to the Bidder, and such Bidder shall accept the assignment of
such Assigned Contract effective as of the Closing Date or such later date as the Court may
direct.  If such Executory Contract or Lease is designated as a Rejected Contract, then the Debtor
shall promptly move to reject such Rejected Contract effective as of the Effective Closing Date
unless such Executory Contract or Lease had been rejected pursuant to prior order of court.

## OVERVIEW OF BIDDING PROCEDURES[3]

32.     To participate in the bidding process and to receive non-public information
concerning the Assets, each interested person or entity (each such party, a "Potential Bidder")
(other than the Stalking Horse Bidders) must deliver (unless previously delivered) to SSG, Five
Tower Bridge, Suite 420, 300 Barr Harbor Drive, West Conshohocken, PA 19428 (Attn:
Michael S. Goodman and Michael J. Gorman); counsel to the Debtor, Herrick, Feinstein LLP, 2
Park Avenue, New York, NY 10016 (Attn:  Robert L. Rattet); counsel for NXT (but only with
respect to the New Bedford Business Auction and the Greenville/Richmond Business Auction)
and counsel for the Official Committee of Unsecured Creditors (the "Committee") (collectively,
the "Consulting Parties"), the following materials (the "Potential Bid Package") on or before
September 28, 2015 (prevailing Eastern Time) (the "Bid Deadline"):

---

[3] This is a summary of the Bidding Procedures.  To the extent that anything in this section is inconsistent with the
Bidding Procedures, the Bidding Procedures will control.

- An executed confidentiality agreement in a form and substance reasonably acceptable to SSG and the Debtor;[4] and

- Evidence, including audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement reasonably acceptable to SSG and the Debtor), sufficient to establish the financial wherewithal of the interested party to complete the contemplated transactions and, to the extent the interested party will rely upon the financial wherewithal of an affiliate, bid partner or other sponsor, evidence sufficient to establish the financial wherewithal and intent of the sponsor to provide appropriate financial support.

33.    In order to be deemed a "Qualified Bid" and for a Potential Bidder (other than each Stalking Horse Bidder) to be deemed a "Qualified Bidder", each offer, solicitation or proposal (a "Bid") from a Potential Bidder (other than the Stalking Horse Bidders) (each a "Potential Bid") must be in writing and must:

- state that the Potential Bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the relevant Assets on terms and conditions no less favorable to the Debtor than the terms and conditions contained in the relevant APA (as determined by the Debtor in its reasonable business judgment, in consultation with SSG and its professionals), and provided, that no portion of the purchase price provided for in such purchase and sale agreement shall include assumption of the senior secured indebtedness of the Debtor to NXT without the prior written consent of NXT;[5]

- be accompanied by a clean and duly executed modified APA and a marked modified APA reflecting the Potential Bidder's proposed variations from the relevant APA, which may not be materially more

---

[4] With respect to Potential Bidders for the Greenville/Richmond Business, the confidentiality agreement shall be in a form and substance reasonably acceptable to SSG, the Debtor and Prudential, and otherwise comply with the requirements of the Prudential APA.

[5] With respect to a Qualified Bid for the New Bedford Business, the value of the bid must be in an amount greater than the Stalking Horse Bid for the New Bedford Business plus the Breakup Fee of $100,000 requested by Clean plus the $100,000 bidding increment described below.

With respect to a Qualified Bid for the Greenville/Richmond Business, the value of the bid must be in an amount greater than the Stalking Horse Bid for the Greenville/Richmond Business plus the Breakup Fee of $300,000 requested by Prudential plus the $100,000 bidding increment described below.

With respect to a Qualified Bid for all Assets, the value of the bid must be in an amount greater than the aggregate of all of the Stalking Horse Bids, plus the Breakup Fees of Clean and Prudential, and the $100,000 bidding increment described below.

burdensome to the Debtor or inconsistent with the applicable Stalking Horse APA or order of the Court in the Debtor's chapter 11 case;

- state that the Potential Bidder's offer is irrevocable until the closing of the Sale if such Potential Bidder is determined at the Auction to be (i) the highest and otherwise best bid with respect to each Auction described below (each a "Successful Bidder," and each such bid, a "Successful Bid"), or (ii) the next highest and otherwise best bid with respect to each Auction described below (each an "Alternate Bidder," and each such bid, an "Alternate Bid");

- contain such financial and other information that will allow the Debtor, after consultation with SSG and its professionals, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transactions contemplated by the Sale;

- identify with particularity each and every executory contract as to which assumption and assignment to the Potential Bidder is a condition to closing under the proposed transaction;

- represent that the Potential Bidder will not request or assert entitlement to any transaction or break-up fee, expense reimbursement or similar type of payment;

- fully disclose the identity of any sponsor and each other entity that will be bidding for, purchasing or obtaining possession of some or all of the Assets, or otherwise participating in connection with such Bid, together with the complete terms of any such participation;

- be free from any due diligence, financing or regulatory contingencies of any kind, and be free from the need to obtain shareholder, board of directors or other approval of any kind;

- be accompanied by a deposit at least equal to 10% of the purchase price (the "Good Faith Deposit"), by wire transfer of immediately available funds to an account or accounts designated by the Debtor; and

- be received by the Debtor and SSG on or before the Bid Deadline.

34.    After the Debtor has determined that a Bid satisfies each of the conditions set forth above, the Debtor or SSG shall notify promptly the Potential Bidder who submitted such Qualified Bid that it has been selected as a Qualified Bidder; *provided*, *however*, that the Debtor reserves the right, after consultation with SSG and its professionals, to reject any Potential Bid if

17

the Debtor determines that such Potential Bid is inadequate or insufficient or the Debtor determines that such Potential Bid is not in conformity with the requirements of the Bankruptcy Code or any related rules or is otherwise contrary to the best interests of the Debtor and its estate. Any bid that is not deemed by the Debtor to be a "Qualified Bid" shall not be considered by the Debtor.

***New Bedford Business Auction***

35.     If one or more Qualified Bids for the New Bedford Business is received by the Bid Deadline, then the Debtor shall conduct an Auction for the New Bedford Business (the "New Bedford Business Auction").

36.     Upon the conclusion of the New Bedford Business Auction (if a New Bedford Business Auction is conducted), the Debtor, in the exercise of its reasonable, good-faith business judgment, and after consulting with its advisors and the advisors to the Consulting Parties, shall identify (i) the highest and otherwise best bid(s) (the "New Bedford Business Successful Bid," and such bidder, the "New Bedford Business Successful Bidder"), and (ii) the next highest and otherwise best bid (the "Alternate New Bedford Bid," and such bidder, the "Alternate New Bedford Bidder").

37.     If no Qualified Bid is received for the New Bedford Business, the New Bedford Business Auction will not occur and Clean will be deemed the New Bedford Business Successful Bidder immediately upon the expiration of the Bid Deadline.

38.     Because Clean has required a Breakup Fee in the Clean APA, the Debtor seeks approval to pay to Clean a Breakup Fee in the event that Clean is not the Successful Bidder for the New Bedford Business.

18

*Greenville/Richmond Business Auction*

39.     If one or more Qualified Bids for the Greenville/Richmond Business is received by the Bid Deadline, then the Debtor shall conduct an Auction for the Greenville/Richmond Business (the "Greenville/Richmond Business Auction") at the conclusion of the New Bedford Business Auction.

40.     Upon the conclusion of the Greenville/Richmond Business Auction (if a Greenville/Richmond Business Auction is conducted), the Debtor, in the exercise of its reasonable, good-faith business judgment, and after consulting with its advisors and the Consulting Parties, shall identify (i) the highest and otherwise best bid(s) (the "Greenville/Richmond Business Successful Bid," and such bidder, the "Greenville/Richmond Business Successful Bidder"), and (ii) the next highest and otherwise best bid (the "Alternate Greenville/Richmond Bid," and such bidder, the "Alternate Greenville/Richmond Bidder").

41.     If no Qualified Bid is received for the Greenville/Richmond Business, the Greenville/Richmond Business Auction will not occur and Prudential will be deemed the Greenville/Richmond Business Successful Bidder immediately upon the expiration of the Bid Deadline.

42.     In connection with any bid by NXT (or any transferee of its claims) at any Greenville/Richmond Business Auction, NXT (for itself and as Agent, and for any transferee of its claims) has agreed to waive its right under 11 U.S.C. § 363(k) to "credit bid" or otherwise offset its claims against the purchase price for the Greenville/Richmond Business at any Greenville/Richmond Business Auction.

43.     Medley Opportunity Fund II LP (on its own behalf and on behalf of any party for which it acts as agent, "Medley") and its transferees, as the holder of claims secured by junior

19

liens on the Greenville/Richmond Business, may not "credit bid" or otherwise offset its claims against the purchase price for the Greenville/Richmond Business at any Greenville/Richmond Business Auction, unless its bid otherwise includes cash in an amount sufficient to satisfy in full the debts secured by liens senior to Medley's liens on the Greenville/Richmond Business.

44.     Because Prudential has required a Breakup Fee in the Prudential APA, the Debtor seeks approval to pay to Prudential the Breakup Fee in the event that Prudential is not the Successful Bidder for the Greenville/Richmond Business.

***Remaining Businesses Auction***

45.     If one or more Qualified Bids for some or all of the Remaining Businesses is received by the Bid Deadline, then the Debtor shall conduct an Auction for the Remaining Businesses (the "Remaining Businesses Auction") at the conclusion of the Greenville/Richmond Business Auction.

46.     Qualified Bidders may submit Bids for some or all of the Remaining Businesses. The Debtor will have discretion to compare separate, multiple Bids in the aggregate against the Newco Stalking Horse Bid, including by assigning an orderly net liquidation value to one or more Remaining Businesses that is not part of a competing Bid in determining the overall value of such competing Bid.  The standalone value of each Remaining Business shall be determined by the Debtor in consultation with the Consulting Parties and NXT prior to the Auction, but will not otherwise be disclosed prior to the Remaining Businesses Auction.

47.     If a Qualified Bid, or multiple Qualified Bids for the Remaining Businesses in the aggregate, exceeds the value of the Newco Stalking Horse Bid, such Qualified Bidder(s) and Newco will simultaneously submit a final sealed bid.  The Successful Bidder for the Remaining Businesses will be determined by the Debtor, in consultation with SSG and its professionals,

based on the final sealed bids, and the Debtor, in the exercise of its reasonable, good-faith business judgment, and after consulting with its advisors and the Consulting Parties, shall identify (i) the highest and otherwise best bid(s) (the "Remaining Businesses Successful Bid," and such bidder, the "Remaining Businesses Successful Bidder"), and (ii) the next highest and otherwise best bid for the Remaining Businesses (the "Alternate Remaining Businesses Bid," and such bidder, the "Alternate Remaining Businesses Bidder").[6]

48.    If no Qualified Bid, or multiple Qualified Bids in the aggregate, is received that is higher and better than the Newco Stalking Horse Bid, then Newco will be deemed the Remaining Businesses Successful Bidder.

***All Plants Auction***

49.    If one or more Qualified Bids for all of the Assets is received by the Bid Deadline, then the Debtor shall conduct an auction for all of the Assets (the "All Plants Auction") at the conclusion of the Remaining Businesses Auction.

50.    Upon the conclusion of the All Plants Auction (if an All Plants Auction is conducted), the Debtor, in the exercise of its reasonable, good-faith business judgment, and after consulting with its advisors and the Consulting Parties, shall identify the highest and otherwise best bid (the "All Plants Successful Bid," and such bidder, the "All Plants Successful Bidder").

***Final Auction***

51.    If there is an All Plants Auction at which an All Plants Successful Bid is identified, then upon the conclusion of all other Auctions set forth above, the Debtor, in the exercise of its reasonable, good-faith business judgment, and after consulting with its advisors

---

[6] The value of the Newco Stalking Horse Bid includes Newco's agreement to make payments due under a key employee retention program (the "KEIP"). If Newco is not the Remaining Businesses Successful Bidder, cash in an amount necessary to make payments under the KEIP will be earmarked for such payment from the Remaining Businesses Successful Bid.

and the Consulting Parties, shall determine whether the All Plants Successful Bid is higher and better than the aggregate of the New Bedford Business Successful Bid, the Greenville/Richmond Business Successful Bid, and the Remaining Businesses Successful Bid.

52.     If the All Plants Successful Bid is determined to be higher and better than the aggregate of the New Bedford Business Successful Bid, the Greenville/Richmond Business Successful Bid, and the Remaining Businesses Successful Bid, the Debtor shall conduct a final Auction between the All Plants Auction Successful Bidder, on the one hand, and the Successful Bidder(s) of the New Bedford Business, the Greenville/Richmond Business, and the Remaining Businesses, on the other hand (the "Final Auction").  At such Final Auction, the participating bidders shall simultaneously submit a final sealed bid.  The Successful Bidder(s) for the Assets will be determined by the Debtor, in consultation with SSG and its professionals, based on the final sealed bids, and the Debtor, in the exercise of its reasonable, good-faith business judgment, and after consulting with its advisors and the Consulting Parties, shall identify (i) the highest and otherwise best bid(s) (the "Final Auction Successful Bid," and such bidder, the "Final Auction Successful Bidder"), and (ii) the next highest and otherwise best bid (the "Alternate Final Auction Bid," and such bidder, the "Alternate Final Auction Bidder").

53.     If the Successful Bidder(s) in the Final Auction is the All Plants Successful Bidder, then each of the Successful Bids in the New Bedford Business Auction, the Greenville/Richmond Auction and the Remaining Businesses Auction shall be the respective Alternate Bids, as such applicable APA may be modified at the Auction by such Successful Bidder; *provided, however*, that (x) nothing in these Bidding Procedures shall obligate Prudential to be an Alternate Bidder, and (y) if Clean is the New Bedford Successful Bidder, the terms and conditions of the Clean APA (as may be modified at the Auction) shall govern.  If the Successful

Bidder(s) in the Final Auction is the aggregate of the New Bedford Business Successful Bidder, the Greenville/Richmond Successful Bidder, and the Remaining Businesses Successful Bidder, then the All Plants Successful Bid shall be the Alternate Final Auction Bid.

54.     Finally, the remainder of the Bidding Procedures relating to qualified bids, auction procedures, and other logistical requirements are standard terms that are consistent with and similar to procedures used many other bankruptcy cases.

## BASIS FOR RELIEF REQUESTED

55.     Pursuant to this Motion, the Debtor seeks approval of separate Orders following two separate hearings—the Bidding Procedures Order (which will be considered at the Bidding Procedures Hearing), and the Sale Orders (which will be considered at the Sale Hearing).

## I.     THE BIDDING PROCEDURES ORDER SHOULD BE APPROVED

56.     The Bidding Procedures Order, which includes, *inter alia*, the Bidding Procedures, the Breakup Fee, the Assumption Procedures and the Notice Procedures, should be approved by the Court as a reasonable exercise of the Debtor's business judgment, and necessary and appropriate for the facilitation of an orderly sale process.

### A.     *The Bidding Procedures are Reasonable and Appropriate*

57.     The Bidding Procedures are reasonable, appropriate, tailored to generate the highest and best offers at the Auctions for the Assets, and consistent with other bidding procedures routinely approved by courts in this District.  The Bidding Procedures are designed to facilitate organized, competitive bidding so as to maximize the value of the Assets.  The Bidding Procedures contemplate an open auction process with minimum barriers to entry, and they provide potential bidders with sufficient time to craft their bids and perform due diligence.  Further, the Bidding Procedures comply with section 363(k) of the Bankruptcy Code.

**B.** *Breakup Fee*

58.     As stated above, Clean and Prudential have required a breakup fee in the amount $100,000 and $300,000 respectively (each a "Breakup Fee").   Newco has not requested any breakup fee.  The Breakup Fee is necessary and appropriate in this case.  Clean and Prudential is each entitled to its Breakup Fee if it is not the successful bidder at the relevant auction, whether they or not Clean and Prudential submit a competing bid at such auction.  In the event that Clean and/or Prudential are not the successful bidders because a credit bid is the successful bid at the All Plants Auction, the successful bidder must pay in cash the portion of its successful bid that comprises the Break Up Fees.  The Break Up Fees, if payable, shall be paid from proceeds of the sale(s), shall held in a protected, segregated account as protection and security for the payment of the Break-Up Fee, and shall be released and paid as required by the Clean and Prudential APAs.

59.     "A breakup fee, also known as a 'termination fee,' or a 'cancellation fee,' is a fee paid by the seller of an asset to a previously contracted buyer that loses the opportunity to buy the asset."  Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.), 346 F.3d 31, 33 (2d Cir. 2003).  "The purpose of a breakup fee is to compensate the would-be buyer for its expenses and efforts in negotiating the sale and to provide an added incentive for the seller to carry through on the contract."  Id. at 33.

60.     Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives such as these under the "business judgment rule" standard.  It is well established in this District that courts consider whether (i) the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation, (ii) the fee hampers, rather than encourages, bidding, and (iii) the amount of the fee is unreasonable relative to the proposed

purchase price.  <u>Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)</u>, 147 B.R. 650, 657 (S.D.N.Y. 1992).

61.     Here, the relationship between the Debtor and Clean and Prudential is not tainted by self-dealing or manipulation because they are independent third parties with no prior relationship to the Debtor.  The ability to offer a Breakup Fee to Clean and Prudential serves to enhance the ability of the Debtor to obtain higher and better proposals through the auction process by encouraging and providing a potential financial inducement for third parties to participate.  Finally, the amount of the Breakup Fee is reasonable relative to the proposed purchase price.

### C.     *Assumption and Assignment Procedures*

62.     The assumption and assignment of executory contracts and unexpired leases in accordance with the Assumption Procedures should be approved.  The Assumption Procedures are consistent with the requirements set forth in section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, and they ensure that all of the counterparties to potentially-assumed executory contracts will receive notice and a chance to object.

63.     As part of Assumption Procedures, the Debtor requests that any counterparty that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment thereof, notwithstanding any anti-assignment provision or other restriction.   The provision is necessary in order to ensure an orderly conclusion to the sale process.  <u>See</u>, <u>e.g.</u>, <u>Hargrave v. Tp. of Pemberton (In re Tabone, Inc.)</u>, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that by failing to object, lienholder implicitly consented to sale free of the property free and clear of its lien); <u>BAC Home Loans Servicing LP v. Grassi (In re Grassi)</u>, Nos. EP11-010, 08-21085(JBH), 2011 WL 6096509 at *5 (B.A.P. 1st

Cir. Nov. 21, 2011) ("This Panel, as well [as] other courts in this circuit and nationally, views silence as implied consent sufficient to satisfy the consent requirement for approving a sale under § 363(f)(2).").

### D.    *Notice Procedures*

64.    The Debtor submits that the form and manner of the Sale Notice and the Assumption and Assignment Notice should be approved.

65.    The Debtor has satisfied the requirement of Bankruptcy Rule 2002(a) to provide twenty-one (21) days' notice of the Sale Hearing.  Within three (3) calendar days of entry of the Bidding Procedures Order, the Debtor will serve the Sale Notice on the parties required to be served.   Additionally, the Debtor will publish the Sale Notice in regional and national newspapers, which the Debtor anticipates will be the Syracuse Post Standard and the New York Times.   The Debtor submits that notice of the Motion and related hearing on the Bidding Procedures Order, coupled with service of the Sale Notice as provided for herein and notice of the sale by publication, constitutes good and adequate notice of the Sale and related proceedings pursuant to Fed. R. Bankr. P. 2002.  Accordingly, the Debtor requests that the Court approve the form and manner of the Sale Notice.

66.    As soon as practicable after entry of the Bidding Procedures Order, the Debtor will file and serve the Assumption and Assignment Notice on all non-debtor counterparties to Executory Contracts or Leases in accordance with the Assumption Procedures.  The Assumption and Assignment Notice will provide counterparties with notice of the assumption of their contracts, as well as any cure amount associated with such assumption.  The notice provided by the Assumption and Assignment Notice is in addition to the notice that will be provided by the Sale Notice (which non-debtor counterparties to Executory Contracts or Leases will also

receive).   The Debtor submits that the Assumption and Assignment Notice satisfies any applicable requirement under section 365 of the Bankruptcy Code.   Accordingly, the Debtor requests that the Court approve the form and manner of the Assumption and Assignment Notice.

## II.   THE SALE AND SALE ORDERS SHOULD BE APPROVED

67.   The Sale satisfies all of the requirements of section 363 of the Bankruptcy Code and related case law, and the Sale and the Sale Orders should be approved by the Court as a reasonable exercise of the Debtor's business judgment

### A.   *The Sale is an Exercise of Sound Business Judgment*

68.   Pursuant to section 363(b)(1) of the Bankruptcy Code, the debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   "Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee."   In re MF Global, Inc., 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) (citing Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)).   "Generally, where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."   MF Global, 467 B.R. at 730 (citing In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)).   "If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption falls to parties opposing the transaction."   MF Global, 467 B.R. at 730.   "Once a court determines that a sound business justification exists, the court must determine whether (i) the debtor has provided all

interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith." Id. at 730.

<div align="center">

**(i)      The Sale is for a Sound Business Purpose**

</div>

69.      "The overriding consideration for approval of a section 363 sale is whether a good business reason has been articulated."    In re GSC Group, Inc., 453 B.R. 132, 173 (Bankr. S.D.N.Y. 2011).   In determining whether the debtor has articulated a good business reason for the sale, the Second Circuit has set forth a nonexclusive list of factors to consider, including (i) the proportionate value of the asset to the estate as a whole, (ii) the amount of elapsed time since the filing, (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future, (iv) the effect of the proposed disposition on future plans of reorganization, (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, (vi) which of the alternatives of use, sale or lease the proposal envisions, and (vii) whether the asset is increasing or decreasing in value. Lionel, 722 F.2d at 1071.   Additional factors include whether the estate has the liquidity to survive until confirmation of a plan; whether the sale opportunity will still exist as of the time of plan confirmation, and if not, how likely it is that there will be a satisfactory alternative sale opportunity, or a standalone plan alternative that is equally desirable (or better) for creditors; and whether there is a material risk that by deferring the sale, "the patient will die on the operating table." Boston Generating, 440 B.R. 302, 322 (Bankr. S.D.N.Y. 2010) (citing In re Gen. Motors Corp., 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009)).

70.      In this regard, the debtor's decision-making is reviewed through the lens of the business judgment rule, which is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interests of the company."  Id. at 174; see also In re Boston Generating,

LLC, 440 B.R. at 330 ("The business judgment rules entails (1) a business decision,

(2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and

commentators, no abuse of discretion of waste of corporate assets.").

71.     Here, the Debtor has a sound business reason for selling the Assets.  Without an

available refinancing alternative, and after a thorough review of its business and operations, the

Debtor, in consultation with its professionals, has determined that the best way to maximize

value for its creditors is to sell substantially all of its assets.  The Debtor has made the decision to

sell the Assets after consultation with its advisors, including counsel and SSG.    All parties

involved agree that the Sale will maximize value to creditors.    Further, SSG conducted a

thorough and extensive marketing process for the Assets.  Accordingly, the Debtor has shown a

sound business purpose for the Sale that should be upheld by the Court after applying the

business judgment rule.

### (ii)     The Debtor Has Provided All Interested Parties
### With Adequate and Reasonable Notice of the Sale

72.     The Debtor and SSG have implemented procedures to ensure that adequate and

reasonable notice of the Sale will be provided to all interested parties.  As set forth above, the

Sale Notice (a) will be served in a manner that provides twenty-one (21) days' notice of the Sale

Hearing, (b) informs all interested parties of the Sale Objection Deadline, and (c) shall include

all other pertinent information to parties interested in or affected by the Sale in accordance with

Bankruptcy Rules 2002 and 6004.  Additionally, the notice of the Sale in the form attached

hereto as Exhibit 3 to the Bidding Procedures Order, which the Debtor anticipates will be

published in the Syracuse Post Standard and the New York Times will provide further assurances

that notice of the Sale has been fully and appropriately given.

### (iii)    The Sale Price is Fair and Reasonable

73.    The price that the Debtor receives for the Assets will be fair and reasonable because the sale process was fair and reasonable.    "[T]he true test of value is the sale process itself."  In re Chrysler LLC, 405 B.R. 84, 95 (Bankr. S.D.N.Y. 2009), aff'd, 576 F.3d 108 (2d Cir. 2009).  The purchase price will be fair because of the process that preceded it.

74.    The Debtor and SSG will have spent over a year soliciting more than 100 potential bidders for the Assets.  Moreover, through the Auctions, the Debtor will be further exposing the Assets to the entire universe of potential purchasers, and as shown above, SSG will have thoroughly marketed the Assets and the Sale.

### (iv)    The Purchaser is Proceeding in Good Faith

75.    The Stalking Horse Bidders, or other Successful Bidder(s), are good faith purchaser and good faith assignees pursuant to section 363(m) of the Bankruptcy Code.  "A good faith purchaser is one who purchases the assets for value, in good faith and without notice of adverse claims."  GSC, 453 B.R. at 180 (citing Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 385 (2d Cir. 1997)).  "A purchaser's good faith is shown by the integrity of his conduct during the course of the sale proceedings.  Id. at 180 (internal quotations omitted).  "The absence of good faith is shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  Id. at 180 (internal quotations omitted).

76.    Here, the Stalking Horse Bidders and/or Successful Bidder(s) will not have not engaged in any fraud or collusion, and will not attempt to take grossly unfair advantage of the other bidders.  As shown above, the Sale process in this case will be open and transparent for all

parties involved, and the Stalking Horse Bidders and/or Successful Bidder(s) are presumed to have acted in good faith.

**B.**    ***The Sale Should be Approved Free and Clear of All Liens, Claims, Interests, and Encumbrances Pursuant to Section 363(f) of the Bankruptcy Code***

77.    Pursuant to section 363(f) of the Bankruptcy Code, the debtor may sell estate property free and clear of any interests in that property if one of the following conditions is met: "(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f).

78.    In this case, the Assets are subject to the liens of the Debtor's secured lenders, NXT and Medley.  NXT has consented to the Sale.  NXT and Medley are parties to a Subordination and Intercreditor Agreement dated as of December 16, 2011, pursuant to which, among other things, Medley agree "that [it] will not object to or oppose a sale or other disposition of any property securing all or any part of the [NXT debt] free and clear of security interests, liens or other claims of [Medley] under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code if [NXT has] consented to such sale or disposition." Subordination and Intercreditor Agreement at § 2.2(d).  Accordingly, Medley is deemed to consent to the Sale.  In addition, all lienholders will receive notice of the Sale and their respective liens shall attach to the proceeds of such sale.

**C.**    ***The Debtor Should be Permitted to Assume and Assign the Executory Contracts***

79.    Section 365 of the Bankruptcy Code permits a trustee or chapter 11 debtor-in-possession, with court approval, to assume or reject any executory contract or unexpired lease of

the debtor.  "Assumption is in effect a decision to continue performance.  It requires the debtor to cure most defaults and continues the parties' rights to future performance under the contract or lease."  COR Route 5 Company, LLC v. Penn Traffic Company (In re Penn Traffic Company), 524 F.3d 373, 378 (2d Cir. 2008).   Further, section 365(f) permits the debtor to assign an assumed contract or lease subject to certain requirements set forth in section 365(f)(2).

### (i)    Assumption and Assignment of the Assigned Contracts is a Sound Exercise of the Debtor's Business Judgment

80.    In the Second Circuit, a motion to assume an executory contract is a summary proceeding, where courts efficiently review a "debtor's decision to adhere to a particular contract in the course of the swift administration of the bankruptcy estate."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).   In conducting such a review, bankruptcy courts give deference to the debtor's business judgment. In re MF Global Holdings Ltd., 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012) ("Courts generally will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract or unexpired lease would benefit the debtor's estate.").

81.    In the instant case, the Assigned Contracts are executory contracts that will be assumed by the Debtor in connection with the Sale.  These will be contracts that the Successful Bidder(s) has (have) decided are advantageous to the Debtor's business, and therefore, assuming the Assigned Contracts is a sound exercise of the Debtor's business judgment.

### (ii)    Defaults will be Cured

82.    Upon finding that a debtor has properly exercised its business judgment in deciding to assume a contract, the court must then determine whether the debtor has satisfied the requirements of section 365(b) of the Bankruptcy Code.  That section provides that the debtor cannot assume an executory contract until it cures, or provides adequate assurance that it will

cure, any default; compensates parties for pecuniary loss arising from the default; and provides adequate assurance of future performance thereunder.  11 U.S.C. § 365(b)(1).

83.     Here, the cure requirements will be satisfied because the vast majority of the contracts to be assumed and assigned are customer accounts, pursuant to which the Debtor does not have amounts owing to the contract counterparty.  For those contracts that require cure payments, the Debtor has taken these costs into account as part of the determination of the purchase price for the relevant Assets and, to the extent necessary, will arrange for them to be paid.  Moreover, the Debtor does not anticipate that cure costs will be material in relation to the purchase prices.

### (iii)     Adequate Assurance of Future Performance

84.     Finally, the Debtor submits that at the time of the Sale, "adequate assurance of future performance" will have been provided to all of the counterparties under the Assigned Contracts as required by sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  The Debtor, in consultation with its professionals, has determined that the Stalking Horse Bidders have the financial wherewithal to perform under the Assigned Contracts.  Further, as required by the Bidding Procedures, the Debtor will evaluate the financial wherewithal of potential bidders prior to designating such party a Qualified Bidder (as defined in the Bidding Procedures).  Moreover, the Debtor will provide all contract and lease counterparties with notice of the proposed assumption and assignment, and the counterparties will have adequate time and opportunity to object to the assumption, the proposed cure amount, and whether the Debtor has shown adequate assurance of future performance.

## NOTICE

85.     The Debtor has provided notice of this Motion to: (a) the Office of the United States Trustee, (b) the creditors listed on the Debtor's list of creditors holding the 20 largest unsecured claims, (c) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the assets offered for sale, (d) parties to executory contracts proposed to be assumed and assigned, (e) the Internal Revenue Service, (f) all parties required to be provided notice under the APAs, and (g) all parties that have filed notices of appearance in the Debtor's bankruptcy case.

## NO PRIOR REQUEST

86.     No previous motion for the relief requested herein has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief sought herein.

Dated: New York, New York
       August 7, 2015

<div style="margin-left: 40%;">

HERRICK, FEINSTEIN LLP
*Attorneys for the Debtor and Debtor in Possession*

By: */s/ Robert L. Rattet*
      Robert L. Rattet
      Andrew C. Gold
      Stephen B. Selbst
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
rrattet@herrick.com
agold@herrick.com
sselbst@herrick.com

</div>