**Hearing Date, Time and Location:
October 15, 2015 at 2:00 p.m.
Syracuse, New York**

HERRICK, FEINSTEIN LLP
Robert L. Rattet
Stephen B. Selbst
2 Park Avenue
New York, New York 10016
(212) 592-1400
rrattet@herrick.com
sselbst@herrick.com
hhuynh@herrick.com

and

PHILLIPS LYTLE LLP
William J. Brown
125 Main Street
Buffalo, New York  14203
(716) 847-7089
wbrown@phillipslytle.com

*Attorneys for the Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| COYNE INTERNATIONAL ENTERPRISES CORP., | Case No. 15-31160 |
| Debtor. | |

----------------------------------------------------------x

## NOTICE OF MOTION FOR THE
## APPROVAL OF KEY EMPLOYEE INCENTIVE PLAN

PLEASE TAKE NOTICE that a hearing (the "Hearing") on the Debtor's motion (the "Motion") seeking approval of a Key Employee Incentive Plan has been scheduled for ***October 15, 2015 at 2:00 p.m. before the Honorable Margaret Cangilos-Ruiz, United States Bankruptcy Judge, James Hanley Federal Building, 100 South Clinton Street, Syracuse, NY 13261.***

HF 10107455v.4

PLEASE TAKE FURTHER NOTICE that objections, if any, to the relief requested in the Motion must be filed with the Court on before **October 8, 2015,** and provided to counsel for the Debtor, Herrick, Feinstein, 2 Park Avenue, New York, New York, 10016 (Attn.: Stephen B. Selbst), in accordance with the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Northern District of New York.

PLEASE TAKE FURTHER NOTICE that the Motion and other documents in the Debtor's chapter 11 case may be viewed on the Bankruptcy Court's website www.nynb.uscourts.gov for those with a PACER password, and online at the Debtor's chapter 11 website, www.omnimgt.com/coyne.

Dated:   September 24, 2015
         New York, New York

                                HERRICK, FEINSTEIN LLP

                                By:   */s/ Robert Rattet*
                                    Robert L. Rattet
                                    Stephen B. Selbst
                                    Hanh V. Huynh
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
rrattet@herrick.com
sselbst@herrick.com
hhuynh@herrick.com
*Attorneys for the Debtor and Debtor-in-Possession*

2

HERRICK, FEINSTEIN LLP
Robert L. Rattet
Stephen B. Selbst
2 Park Avenue
New York, New York 10016
(212) 592-1400
rrattet@herrick.com
sselbst@herrick.com
hhuynh@herrick.com

and

PHILLIPS LYTLE LLP
William J. Brown
125 Main Street
Buffalo, New York 14203
(716) 847-7089
wbrown@phillipslytle.com

*Attorneys for the Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                                   Chapter 11

COYNE INTERNATIONAL ENTERPRISES          Case No. 15-31160
CORP.,

         Debtor.
-----------------------------------------------------------x

**MOTION FOR THE APPROVAL OF**
**<u>KEY EMPLOYEE INCENTIVE PLAN</u>**

Coyne International Enterprises Corp., as debtor and debtor-in-possession ("<u>Coyne</u>" or the "<u>Debtor</u>"), hereby moves this Court (the "<u>Motion</u>") for entry of an order (i) approving the Debtor's key employee incentive program (the "<u>KEIP</u>"), (ii) authorizing the Debtor to pay incentive bonuses to certain key employees as provided in the KEIP, and (iii) granting related relief. In support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157. This is a core proceeding pursuant to 28 U.S.C. §157(b).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested are sections 105, 363((b) and 503(c)(3) of the title 11 of the United States Code, 11 U.S.C. § 101 et. seq. (the "Bankruptcy Code").

## BACKGROUND

3. On July 31, 2015 (the "Petition Date"), the Debtor commenced a voluntary case (the "Chapter 11 Case") under chapter 11 of the Bankruptcy Code with the United States District Court for the Northern District of New York (the "Court"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is continuing to manage its affairs as a debtor in possession. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Case.

4. On August 11, 2015, Lee Woodard was appointed as Examiner in this Chapter 11 Case.

5. On August 12, 2015, the United States Trustee for the Northern District of New York appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee").

6. Information regarding the Debtor's history and business operations, capital structure and secured indebtedness, and the events leading up to the commencement of the Chapter 11 Case is set forth in the *Declaration of Mark Samson in Support of the Debtor's Chapter 11 Petition* [Docket 7], which was filed on the Petition Date.

7. Coyne has previously advised this Court that intends to sell all of its assets in one or more sales pursuant to Section 363 of the Bankruptcy Code.[1] Coyne is a party to two purchase agreements with third-party buyers: (a) Prudential Overall Supply, Inc. ("Prudential"), which serves as the stalking-horse bidder for the Debtor's routes at Greenville, South Carolina, and the Debtor's routes and facility at Richmond, Virginia (the "Prudential Transaction"); and (b) Clean Rentals, Inc. d/b/a Clean Uniforms and More! ("Clean"), which serves as the stalking horse bidder for the Debtor's routes at New Bedford, Massachusetts (the "Clean Transaction"). As set forth in the sale and bid procedures motion (the "Sale Motion") [Docket 59] filed by the Debtor, each such sale is subject to higher and better offers on terms customary for a sale pursuant to section 363 of the Bankruptcy Code.

8. Coyne is also party to an asset purchase agreement with Coyne Acquisition LLC ("Newco") (an entity formed by NXT Capital LLC ("NXT"), the Debtor's prepetition senior secured lender) (the "NXT Purchase Agreement"), pursuant to which Newco or a designee of NXT (the "NXT Designee") will acquire (the "NXT Transaction") the Coyne routes and facilities at Bristol, Tennessee; Buffalo, New York; Cleveland, Ohio; London, Kentucky; Syracuse, New York; and York, Pennsylvania and the related service centers (the "Six Plant Assets"). Under the NXT Transaction, a newly formed entity owned by Coyne's senior management team ("CTS Acquisition") would acquire the Six Plant Assets from the NXT Designee and assume a portion of Coyne's indebtedness owed to NXT. The NXT Transaction is also subject to higher and better offers and is part of the Sale Motion. The Prudential

---

[1] Debtor's Motion For Entry of (I) Order Approving (A) Bidding Procedures in Connection With Sale of the Debtor's Businesses, (B) Bid Protections to Stalking Horse Bidders, (C) Procedures for Assumption and Assignment of Executory Contracts, and (D) Form and Manner of Notice of Sale Hearing; and (II) Order Approving (A) Sale of the Debtor's Businesses Outside Ordinary Course of Business, Free And Clear of All Liens, Claims, Interests, and Encumbrances, (B) Form and Content of Asset Purchase Agreement, and (C) Assumption and Assignment of Certain Executory Contracts.

5

Transaction, the Clean Transaction, the NXT Transaction and the offer of any party whose bid is accepted as a "higher and better bid" are referred to collectively as the "Sale Transactions."

9. On September 11, 2015, the Court entered an order [Docket No. 235] approving the proposed bidding procedures in the Sale Motion.

## THE KEY EMPLOYEE INCENTIVE PLAN

**A.  Participating Employees**

10. William Henrich, who is the sole director of the Debtor (the "Independent Director"), in conjunction with SSG and Cohn Reznick LLC, its financial advisor ("CR" and together with SSG, the "Advisors"), determined that the Debtor's three most senior officers, Mark Samson, its CEO, Alexander Pobedinsky, its Vice President and General Counsel, and Jennifer Collins-Clemons, its Chief Financial Officer (collectively, the "Key Employees") are essential to the successful consummation of the Sale Transactions. In addition to maintaining their regular responsibilities related to the Debtor's operations, during the past year the Key Employees assumed added responsibilities in connection with the Debtor's restructuring and the marketing of the Debtor's assets, which additional responsibilities will continue to require intensive labors throughout the Chapter 11. Accordingly, the Independent Director determined that it was appropriate for the Debtor to adopt a key employee incentive plan.

**B.  Development of the KEIP**

11. The proposed KEIP is a performance-based incentive plan that provides increasing levels of incentive payments (each a "Payment" and collectively, the "Payments") to the Key Employees based upon metrics, which include achieving sales targets ("AWR Targets"), and asset sales proceeds ("Sale Proceeds", and together with the AWR Targets, the "Targets") from consummation of the Sale Transactions. The aggregate amount of the Payments increases as the Debtor's achievement of the Targets increases, thus aligning the incentives of the Key

6

Employees with the interests of the Debtor's creditors and estate. The maximum aggregate Payments proposed to be paid to all Key Employees is $500,000. In addition, each Key Employee must remain employed with Debtor until the all of the Sale Transactions are closed, including through any transition services agreement.

12. Notably, the Payments to the Key Employees under the KEIP will only be made if the Debtors accept a higher and better bid for any portion of the Six Plant Assets that are the subject of the NXT Transaction. *If NXT's bid for those assets is accepted, no Key Employee will receive any Payment under the KEIP; rather, the Key Employees will receive equity ownership positions in CTS Acquisition.[2]* This structure keeps the incentives of the Key Employees aligned with their fiduciary duty to maximize the value of estate assets.

13. The Debtor believes that achieving the Targets will be difficult and will require significant efforts from the Key Employees. In no sense is achievement of any of the Targets assured. Given the amount of work expected from the Key Employees, the Debtor believes that the proposed payments under the KEIP are necessary to incentivize and reward the Key Employees for their efforts during the sale process and to ensure the maximum value for Coyne's assets are achieved.

14. In developing the proposed KEIP, the Independent Director, Debtor's counsel, and the Advisors reviewed the Debtor's critical objectives and the benefits of implementing an employee incentive plan. The Advisors consulted with the Independent Director and Debtor's counsel regarding the Independent Director's objectives for the Debtor's sale process. The Advisors also discussed the Debtor's existing compensation programs with the Independent

---

[2] In the event that a higher and better bid(s) is accepted for a portion of the Six Plant Assets that leaves remaining assets subject to the NXT bid insufficient, as an economical matter, to support all of the Key Employees, then any Key Employee that elects to receive equity in CTS Acquisition will not receive Payments. Any Key Employee that elects not to receive equity in CTS Acquisition will be entitled to receive Payments under the KEIP.

7

Director. These discussions enabled the Independent Director, with the assistance of the Advisors, to design and evaluate the KEIP with appropriate incentives. The Debtor narrowly tailored its KEIP program by limiting the Key Employees to the three most senior members of the Debtor's management.

15. The Advisors worked to ensure that the KEIP is competitive within the industry and that the incentives set for the Key Employees participating in the KEIP are appropriate. The Advisors reviewed incentive-based programs that have been approved for other similarly situated companies in recent years after the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The Advisors focused on cases with anticipated or actual proceeds of less than $75 million and a bankruptcy filing date within the past six years. The Advisors based the proposed KEIP payments upon market comparisons of other similarly situated companies and developed the KEIP to be comparable to key employee incentive plans similar in design and scope that have been recently approved by bankruptcy courts. Below is a chart that lists the incentive plans that The Advisors focused on in developing the Debtor's KEIP, and which summarizes how key aspects of those plans compare with the Debtor's KEIP.

| Company Name | Filing Date | Estimated/Actual Sale Proceeds and/or Recoveries | KEIP Max Award (Aggregate) | Total # of Employees Covered | Average Award/Eligible Employee |
|---|---|---|---|---|---|
| Movie Gallery, Inc. | 2/1/2010 | $74,200,000 | $2,860,000 | 5 | $572,000 |
| Magic Brands, LLC | 4/1/2010 | 63,500,000 | 1,659,375 | 11 | 150,852 |
| RIH Acquisitions NJ LLC (Atlantic Club Casino Hotel) | 11/6/2013 | 60,000,000 | 2,100,000 | 7 | 300,000 |
| Claim Jumper | 9/10/2010 | 55,300,000 | 450,000 | 15 | 30,000 |
| Point Blank Solutions, Inc. | 4/1/2010 | 36,600,000 | 381,450 | 20 | 19,073 |
| Evergreen Solar, Inc. | 8/15/2011 | 34,000,000 | 2,000,000 | 7 | 285,714 |
| LHI Liquidation Co. Inc. (Loehmann's Holdings Inc.) | 12/15/2013 | 13,855,130 | 137,500 | 1 | 137,500 |
| Metro Affiliates (Atlantic | 11/4/2013 | 12,000,000 | 605,000 | 2 | 302,500 |

8

| | | | | | |
|---|---|---|---|---|---|
| Express) | | | | | |
| Coyne International Enterprises Corp. | 7/31/15 | 33,500,000 | 500,000 | 3 | 166,667 |

## C.    Terms of the KEIP

16.    For the Key Employees, the maximum Payment payable under the KEIP is as follows: (a) for Mark Samson, $150,000, which is equivalent to regular salary that he currently receives from the Debtor over a period of approximately 4 months, (b) for Alexander Pobedinsky, $175,000, which is equivalent to regular salary that he currently receives from the Debtor over a period of approximately 10 months, and (c) for Jennifer Collins-Clemons, $175,000, which is equivalent to regular salary that she currently receives from the Debtor over a period of approximately 10 months.  The KEIP for the Senior Officers provides for the following potential Payments:

| Sale Proceeds Targets | | AWR Targets | |
|---|---|---|---|
| Sale Proceeds ($ millions) | Aggregate KEIP Payments | Percentage of AWR Target Met | Aggregate KEIP Payments |
| 34.5 | $67,000 | 80 | $33,000 |
| 36.5 | $134,000 | 85 | $66,000 |
| 38.5 | $201,000 | 90 | $99,000 |
| 40.5 | $268,000 | 95 | $132,000 |
| 42.5 | $335,000 | 100 | $165,000 |

17.    As shown above, the Payments to the Key Employee are designed to reward superior performance, the attainment of which is challenging and by no means assured. For that reason, the Payments based on meeting AWR Targets are tiered, with the Key Employees required to achieve no less than 80% of AWR Targets to receive any Payment, and full Payment being earned only if the Debtor meets 100% of its AWR Targets.  The AWR test requires that

the Debtor's AWR in the period from the Petition Date to the approval date of the Sale Transactions be equal to or greater than the specified percentage of the Debtor's AWR for the four weeks prior to the Petition Date. Maintaining stable AWR on a post-petition basis benefits the Debtor by assuring that it can satisfy the closing conditions under its existing asset purchase agreements with its stalking horse buyers and will help elicit higher and better offers.

18. The first tier of Payments for Sale Proceeds Target requires that the Debtor receive $34.5 million, an amount $1 million higher than the existing stalking horse bids. But receipt of even the existing stalking horse bids of an aggregate of $33.5 million is not assured because each of the asset purchase transactions contains numerous closing conditions that must be satisfied. To receive Payments based on Sale Proceeds beyond the first tier, the Debtor will need to receive Sales Proceeds that exceed the existing stalking horse bids in each case by an additional $2 million. Thus to receive Payments in the fifth tier, Sale Proceeds would have to exceed $42.5 million. These Sales Proceeds Targets again align the incentives of the Key Employees with the interests of the Debtor and its creditors and estate.

## RELIEF REQUESTED

19. By this Motion, the Debtor respectfully requests the entry of an order pursuant to sections 363(b)(1), 503(c), and 105(a) of the Bankruptcy Code authorizing the Debtor to adopt and implement the KEIP and make payments of amounts thereunder consistent with the terms of this Motion.

## BASIS FOR RELIEF REQUESTED

### A. The KEIP is a Valid Exercise of the Debtor's Business Judgment under Section 363(b)(1)

20. The Debtor's implementation of the KEIP is a sound exercise of its business judgment and should be approved. Section 363(b)(1) of the Bankruptcy Code provides that a

debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use of estate property under section 363(b)(1), the Second Circuit requires a debtor to show that the use of the property outside of the ordinary course of business was based on the debtor's sound business judgment. See Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

21.     The business judgment rule generally shields decisions made by a debtor's management from judicial second guessing. See Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986). When a debtor demonstrates that it is exercising sound business judgment, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief that the decision was in the debtor's best interest. See Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y.). Therefore, when a debtor's actions satisfy the business judgment rule, a debtor's request for relief should be approved under section 363(b)(1) of the Bankruptcy Code.

22.     The implementation of the KEIP is a proper exercise of the Debtor's business judgment because it incentivizes the Key Employees to maximize the value of the businesses subject to the Sale Transactions, to maximize the proceeds to be received, and to undertake the additional responsibilities to operate the Debtor's businesses throughout the Chapter 11 Case. In addition to their ordinary course activities in connection with the Debtor's operations, the Key Employees are now tasked with increased responsibilities in connection with the Sale

11

Transactions. Moreover, maintaining the level of the Debtor's business performance over the next few months will drive the ultimate outcome of the Sale Transactions. It is therefore crucial that the Key Employees are properly incentivized in a manner that maximizes creditor recoveries. The skills, knowledge and experience that the Key Employees possess are essential to facilitating the Transactions and maximizing the value of the Debtor's estate for the benefit of all creditors.[3] At the same time, the Debtor recognizes that implementation of the KEIP will help retain both non-insider and insider employees through a defined period of time. However, that is not the primary motivating factor behind the KEIP; rather, the KEIP has been designed to motivate Key Employees as needed — and for the duration needed — to maximize cash flow and asset sale proceeds. Cf. Borders, 453 B.R. at 471 (stating that, in the context of section 503(c), "[a]lthough a purported KEIP may contain some retentive effect, that does not mean that the plan, overall, is retentive rather than incentivizing in nature") (citations omitted).

23. In light of the foregoing, the Debtor submits that implementing the KEIP is a valid exercise of its business judgment and is in the best interests of their estates, creditors and stakeholders.

---

[3] Similar incentive programs have been approved in other chapter 11 cases filed in this Circuit and others as a valid exercise of a debtor's business judgment and a highly efficient means of maximizing value for a debtor's estate. See, e.g. In re Dana Corp., 358 B.R. 567, 584-85 (Bankr. S.D.N.Y. 2006); In re Sbarro, Inc., No. 11-11527 (SCC) (Bankr. S.D.N.Y. Sept. 8, 2011) (ECF No. 512) (approving key employee incentive plan based on financial performance); In re Word World, LLC, No. 11-10543 (SHL) (Bankr. S.D.N.Y. Apr. 13, 2011) (approving key employee incentive bonus) (ECF No. 118); In re the Great Atlantic & Pacific Tea Co., No. 10-24549 (RDD) (Bankr. S.D.N.Y. May 2, 2011) (ECF No. 1479) (approving key employee incentive plan based on financial performance); In re Terrestar Networks Inc., No. 10-15446 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2011) (ECF No. 444) (approving incentive plan based on financial performance or alternatively the successful completion of a sale); In re Tronox Inc., No. 09-10156 (ALG) (ECF No. 492) (approving incentive plan based on EBITDA and sale-based targets) (Bankr. S.D.N.Y. June 9, 2009). The Debtor believe the proposed KEIP fits within these frameworks.

**B.     The KEIP Is Not Prohibited By Section 503(c)**

24.    Section 503(c) of the Bankruptcy Code sets forth the criteria for courts to use in approving certain types of payments to insiders and other transfers or obligations that are outside the ordinary course of business.  See 11 U.S.C. § 503(c).

> 1.    **Regardless of "Insider" Status, the KEIP Is An Incentive Plan and Is Not Prohibited By Sections 503(c)(1) or by Section 503 (c)(2)**

25.    The requirements set forth in section 503(c)(1) apply only to retention plans and do not apply to incentive plans that provide compensation to employees who contribute to preserving value and achieving financial objectives.  See 11 U.S.C. § 503(c)(1); In re Global Homes Prods., LLC, 369 B.R. 778, 787 (Bankr. D. Del. 2007).  Under the KEIP, the Debtor will not make any payments to any Key Employee solely because such Key Employee remains employed by the Debtor.  The Key Employees will only receive Payments if the sales and asset sale proceed targets are achieved.  The KEIP is incentive based, not retentive based.

26.    Similarly, section 503(c)(2) sets forth restrictions applicable only to severance plans, which do not apply to incentive plans.  See 11 U.S.C. §§ 503(c)(2); In re Dana Corp. (Dana II), 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) (explaining sections 503(c)(1) and (c)(2) did not apply to the incentive plan).  Therefore, section 503(c)(2) does not apply to the KEIP because payments to Key Employees thereunder are not triggered by the termination of employment, but rather are linked to the Targets.  It is clear that the payments incentivize and reward achievement of the Targets and do not provide payment for retention or severance and therefore are not governed by sections 503(c)(1) or (c)(2) of the Bankruptcy Code.

> 2.    **The KEIP Is Not Prohibited By Section 503(c)(3)**

27.    The Debtor's implementation of the KEIP is not prohibited under section 503(c)(3) of the Bankruptcy Code.  Section 503(c)(3) prohibits "transfers or obligations that are

outside the ordinary course of business and not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). The implementation of the KEIP is quite justified by the "facts and circumstances" of the case.

        a.    **The KEIP Satisfies the Business Judgment Standard**

28. Courts apply the business judgment standard to determine whether anrrt55t incentive plan should be authorized under Bankruptcy Code section 503(c)(3). See In re Dana Corp., 358 B.R. at 571 (providing that management incentive programs should be evaluated under the business judgment standard); see also In re Nobex Corp., No. 05-20050 (CSS), Jan. 12, 2006 Hearing Tr. at 86-87 (Bankr. D. Del. 2006) (finding that the standard under section 503(c)(3) is the business judgment standard). As set forth above, the Debtor has demonstrated sound business judgment for the implementation of the KEIP.

        b.    **The KEIP Is Justified by the Facts and Circumstances**

29. The KEIP is fully justified by the facts and circumstances of this Chapter 11 Case. Courts have examined six factors to consider in determining whether an incentive plan is appropriate under Bankruptcy Code section 503(c)(3):

- whether the plan is calculated to achieve the desired performance;

- whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities and earning potential;

- whether the scope of the plan is fair and reasonable or discriminates unfairly among employees;

- whether the plan is consistent with industry standards;

- whether a debtor performed due diligence in investigating the need for the plan, the employees that need to be incentivized, and what types of plans are generally applicable in a particular industry; and

- whether a debtor received independent counsel in performance due diligence and in creating and authorizing the incentive compensation.

14

See Global Home Prods., 369 B.R. at 786 (citing Dana II, 358 B.R. at 576-77); see also Borders, 453 B.R. at 474-477. Courts balance these factors, which are considered based on the totality of the facts and circumstances related to the incentive plan. See Global Home Prods., 369 B.R. at 786; Dana II, 358 B.R. at 577.

30. Under the first factor, the KEIP is properly calculated to achieve the desired performance because compensation is linked with achievement of the Targets, which will maximize the value of the Debtor's assets. Absent realization of the Targets, none of the Key Employees will receive payment under the KEIP. Payments under the KEIP are tailored to motivate the Key Employees to successfully drive the operational initiatives necessary to attaining the targeted earning levels.

31. Under the second factor, the cost of the KEIP is reasonable in the context of the Debtor's assets, liabilities and earning potential. Assuming the Debtor meets its Targets, the aggregate KEIP payments are $500,000 which is a modest sum relative to the Targets the Debtor is seeking to achieve. Additionally, support of the relief requested by this Motion from the Debtor's prepetition first lien lender is a good indication of the KEIP's reasonableness.

32. With respect to the third factor, the scope of the KEIP is fair and reasonable because it only includes the employees who make significant contributions to the Debtor's financial achievement and who have the most significant ability to improve the Debtor's earning performance. Key Employees participating in the KEIP have been chosen based on their significant past contributions to the Debtor's financial and operational activities, their expertise and knowledge of the industry and the Debtor's businesses, and ability to assist in the Transactions.

33.     In connection with the other factors and as discussed in further detail above, the Debtor and its independent advisors have conducted extensive due diligence in determining the need for and the scope of the KEIP. The overall cost of the KEIP is reasonable, particularly in relation to the Debtor's needs to meet these financial targets in order to maximize recovery for the Debtor's creditors.

**C.     Payment of the KEIP Described Herein Is Essential to Preserve the Value of the Debtor's Businesses through <u>Continued Operations</u>**

34.     Finally, section 105(a) of the Bankruptcy Code empowers a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. The purpose of section 105(a) is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction." 2 <u>Collier on Bankruptcy</u>, 11105.01 (15th rev. ed. 1997); <u>see also</u> <u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (equitable powers derive from section 105); <u>Management Technology Corp. v. Pardo</u>, 56 B.R. 337, 339 (Bankr. D.N.J. 1985) (same).

35.     As discussed above, the KEIP properly incentivizes the Key Employees to undertake the additional responsibilities to operate the Debtor's business throughout this Chapter 11 Case and in connection with the Transactions. It is critical that the Key Employees are properly incentivized to achieve the Debtor's financial objections by maintaining uninterrupted operation of the Debtor's businesses during its Chapter 11 Case. In light of the foregoing, the Debtor respectfully submits that the relief requested herein is an appropriate exercise of the Debtor's business judgment and in the best interests of the Debtor, its creditors and its estate.

**NOTICE**

36.     Notice of this Motion has been provided by electronic transmission, facsimile, or first class mail to: (1) the United States Trustee, (2) the Examiner, (3) the Committee, (4) NXT

Capital LLC, and (5) all other parties who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtor submits that no further notice is required or needed under the circumstances.

## **NO PRIOR RELIEF**

37. No previous motion for the relief sought herein has been made to this or any other Court.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court approve the KEIP, authorize the Debtor pay incentive bonuses under the KEIP, and grant the Debtor such other and further relief to the Debtor as may be just and appropriate under the circumstances.

Dated:    September 24, 2015
         New York, New York

>                    HERRICK, FEINSTEIN LLP
>
>                    By:    */s/ Robert Rattet*
>                           Robert L. Rattet
>                           Stephen B. Selbst
>                           Hanh V. Huynh
>                    2 Park Avenue
>                    New York, New York 10016
>                    (212) 592-1400
>                    (212) 592-1500 (fax)
>                    rrattet@herrick.com
>                    sselbst@herrick.com
>                    hhuynh@herrick.com
>                    *Attorneys for the Debtor and Debtor-in-Possession*