| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>NORTHERN DISTRICT OF NEW YORK | Hearing Date:  October 29, 2015, 11:00 a.m.<br>Hearing Location:  Syracuse, New York |
| In re:                                                         )<br>                                                                    )<br>COYNE INTERNATIONAL ENTERPRISES  )<br>CORP.,                                                      )<br>                                                                    )<br>                                               Debtor.    ) | Chapter 11<br>Case No. 15-31160-5-MCR<br><br>**Related Docket Nos. 252** |

# OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION FOR APPROVAL OF KEY EMPLOYEE INCENTIVE PLAN

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 case of the debtor and debtor-in-possession (the "Debtor") hereby objects (the "Objection") to the Debtor's Motion for Approval of Key Employee Incentive Plan (Docket Nos. 252 and 253)[1] (the "KEIP Motion").[2]  In support of the Objection, the Committee respectfully represents and alleges as follows:

## PRELIMINARY STATEMENT

The Committee objects to the KEIP Motion on the basis that it is impermissible under Bankruptcy Code Section 503(c)(1) and, moreover, it is simply not necessary.  The Debtor proposes that three of its insiders, each of whom already has a fiduciary duty to maximize value, should receive the KEIP Payments for reaching certain Targets (as defined in the KEIP Motion) related to AWR and the proposed Sales.  The Targets here, if they are to be achieved, will have already been achieved through the auction process prior to this Court hearing the KEIP Motion. The KEIP is merely a retention plan requiring that the Key Employees continue to perform their jobs and comply with their already-present fiduciary duty to maximize value.  This is the type of retention plan that is impermissible under the Bankruptcy Code.  Finally, payments to any insider is wholly premature when the Debtor has yet to propose a path forward in this case after the

---

[1] It appears that the KEIP Motion was filed twice.
[2] Capitalized terms not otherwise defined herein will have the meaning ascribed to them in the KEIP Motion.

{33664/30153/AAV/01108816.DOC}        WCSR 35084577v8

Sales and any potential recovery for unsecured creditors. For all these reasons, set forth more fully below, the Court should deny the KEIP Motion.

## BACKGROUND

**A.     The Debtor's Chapter 11 Case**

1.     On July 31, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the Northern District of New York.

2.     The Debtor continues to operate its businesses as a debtor-in-possession pursuant to sections 1107 and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

3.     On August 12, 2015 (the "Formation Date"), the United States Trustee for the Northern District of New York (the "U.S. Trustee"), pursuant to Bankruptcy Code section 1102(a)(1), appointed the Committee. The members of the Committee are: (i) NYS Teamsters Conference and (ii) Central States, Southeast and Southwest Areas Pension Fund. The Committee has selected Womble Carlyle Sandridge & Rice, LLP, as counsel, and Menter, Rudin & Trivelpiece, PC, as conflicts and local counsel, in this chapter 11 case.

**B.     The Proposed Sales**

4.     On August 7, 2015, the Debtor filed the Debtor's Motion for Entry of (I) Order Approving (a) Bidding Procedures in Connection with Sale of Substantially All of the Debtor's Assets, (b) Bid Protections to Certain Stalking Horse Bidders, (c) Procedures for Assumption and Assignment of Executory Contracts, and (d) Form and Manner of Notice of Sale Hearing; and (II) Order Approving (a) Sale of Substantially All of the Debtor's Assets Outside Ordinary Course of Business, Free and Clear of All Liens, Claims, Interests, and Encumbrances, (b) Form and Content of Asset Purchase Agreement, and (c) Assumption and Assignment of Certain

Executory Contracts (Docket No. 59) (the "Sale Motion"). The Sale Motion contemplates three sales: (i) the sale of the Debtor's assets related to its New Bedford, Massachusetts business (the "Clean Sale") to Clean Rentals, Inc. d/b/a Clean Uniforms and More! (the "Clean Stalking Horse Bidder") for $4 million; (ii) the sale of the Debtor's assets related to its Greenville, South Carolina and Richmond, Virginia businesses (the "Prudential Sale") to Prudential Overall Supply, Inc. (the "Prudential Stalking Horse Bidder") for $7 million; and (iii) the sale of the remaining assets of the Debtor's businesses (the "Remaining Assets Sale" and, together with the Clean Sale and the Prudential Sale, collectively, the "Sales") to Coyne Acquisition LLC (the "NXT Stalking Horse Bidder" and, together with the Clean Stalking Horse Bidder and the Prudential Stalking Horse Bidder, collectively, the "Stalking Horse Bidders"), an entity formed by the Debtor's DIP and prepetition senior lender, NXT Capital, LLC ("NXT") for $22.5 million.

5. The Bidding Procedures associated with the Sale Motion were approved on September 11, 2015 (Docket No. 235) (the "Bidding Procedures Order"). Pursuant to the Bidding Procedures Order, the auction of the Debtor's assets will be held on October 27, 2015 (the "Auction"), and the sale hearing is scheduled for October 29, 2015, at 11:00 a.m. (the "Sale Hearing") before this Court.

6. The Debtor has indicated that if the NXT Stalking Horse Bidder is the successful bidder, the Remaining Assets – which constitute the bulk of the Debtor's assets – will be transferred to an entity (CTS Acquisition, Inc., hereinafter referred to as "CTS") owned and operated by the Debtor's existing management team, i.e., the same individuals proposed to benefit from the KEIP, Mark Samson, Alexander Pobedinsky, and Jennifer Collins. See Declaration of Mark Samson in Support of First Day Motions, at ¶ 7 (Docket No. 10) (the "First Day Declaration").

**C.     The KEIP**

7.      Through the KEIP, the Debtor has proposed to make incentive based payments (the "Payments") to key employees that it has deemed critical to the Sales process.  These key employees are Mark Samson, the Debtor's President and Chief Executive Officer; Alexander Pobedinsky, the Debtor's Vice President and General Counsel; and Jennifer Collins, the Debtor's Chief Financial Officer (collectively, the "Key Employees").  The proposed KEIP offers the Payments to the Key Employees on increasing levels based upon certain metrics, including achieving sales targets (the "AWR Targets") and asset sale proceeds targets (the "Sale Proceeds Targets" and, together with the AWR Targets, collectively, the "Targets").

8.      The Payments increase as the Target increases, with the maximum amount of the Payments being $500,000.  Additionally, the Key Employees must remain employed by the Debtor throughout the sale process, and no Payment is received if the NXT Stalking Horse Bidder is the successful bidder for the Debtor's assets.[3]  The Debtor asserts that achievement of the Targets will be difficult and will require significant effort on behalf of the Key Employees.

---

[3]  Given the potential that Medley Opportunity Fund II, LLP ("Medley") could acquire and credit bid the NXT debt, the Committee would request that the Payments not be earned in the event that a transaction is consummated with Medley.

**OBJECTION**

A.  **The Court Should Reject the KEIP Because it is Nothing More than a Disguised (and Impermissible) Retention Plan.**

9.  In 2005, Congress revised the Bankruptcy Code "to eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process." In re Global Home Prods., LLC, 369 B.R. 778, 784 (Bankr. D. Del. 2007) (internal quotation omitted). In order to achieve this result, Congress revised Bankruptcy Code section 503(c)(1) to state specifically that payments shall not be made to an insider "for the purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1).

10.  As a preliminary matter, it is beyond dispute that each of the Key Employees is an insider as such term is defined by the Bankruptcy Code, because the Bankruptcy Code's definition of an "insider" includes both directors and officers of a corporation. See 11 U.S.C. § 101(31). In fact, each of the Key Employees is an insider to a greater extent because they hold a controlling equity interest in an entity that may be acquiring the majority of the Debtor's assets if the NXT Stalking Horse Bidder is the winning bidder. In particular, if the NXT Stalking Horse Bidder is the winning bidder, the Remaining Assets – which constitute the bulk of the Debtor's assets – will be transferred to CTS which is primarily owned and operated by the Key Employees. Essentially, the Key Employees are bidders in the proposed Sales.

11.  With respect to whether the plan at issue is a retention plan or an incentive plan, the burden is on the Debtor to show that the proposed KEIP is not a disguised retention plan. See In re Hawker Beechcraft, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) (stating that "[t]he proponent of the KEIP bears the burden of proving that the plan is not a retention plan governed by § 503(c)(1)."); see also In re Residential Capital, LLC, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) (stating that "[i]n order to show that the more permissive section 503(c)(3) applies, the Debtors must establish by a preponderance of the evidence that the KEIP is primarily

incentivizing and not primarily retentive. If the Debtors fail to meet their burden of proof, the KEIP cannot be approved."). Courts have found that a "plan that does not require affirmative action beyond that contemplated prepetition is not incentive, but is retentive and cannot be approved under the more lenient standards for incentive plans" under Bankruptcy Code section 503(c)(3). GT Advanced Technologies Inc. v. Harrington, No. 15-CV-069-LM, 2015 WL 4459502, at *4 (D.N.H. July 21, 2015) (quoting In re Residential Capital, LLC, 478 B.R. at 171-73).

12. Simply labeling a program as an incentive plan, without requiring that the recipients do anything other than perform their job well, does not remove it from the scope of section 503(c)(1). As here, the KEIP is actually simply rewarding the Key Employees for coming to work and doing their jobs well. Each of the Key Employees is doing the jobs he or she was already doing as of the Petition Date. For example, the Debtor's AWR is currently on or about the 100% target, and has been at that level since the Petition Date.[4] Thus, to earn the largest Payment (an AWR Target of 100%) the Key Employees simply need to maintain the AWR as it is currently trending, which is largely based on contractual levels. Accordingly, the AWR could fall up to 20% and the Key Employees would still receive a Payment. Under these circumstances, the retention plan should be denied. See In re Hawker Beechcraft, 479 B.R. at 315 (holding that the goals at the higher end of the KEIP met the standard but the lower end goals did not, as key employees could earn some form of bonus just by remaining with the debtor).

13. Rather, under section 503(c)(1), a retention plan for insiders is allowable only if certain conditions are met, such as the insider has a bona fide job offer from another company for the same or greater compensation and the insider's services are essential to the Debtor's survival.

---

[4] The Debtor should specify exactly the dollar amount of the AWR threshold.

{33664/30153/AAV/01108816.DOC} WCSR 35084577v8          6

11 U.S.C. § 503(c)(1). The Debtor presented no evidence that these conditions were met in this case.

14. Accordingly, because the KEIP is not an incentive plan, but a retention plan to insiders, which is precisely what Congress sought to eradicate with Bankruptcy Code section 503(c)(1), the Committee requests that the Court deny the KEIP Motion.

**B.    Even if the KEIP is an Incentive Plan, It Fails to Pass Muster under Bankruptcy Code Section 503(c)(3).**

15. In order to avoid this prohibition on retention plans for insiders, the Debtor asserts that the KEIP is an incentive plan allowable pursuant to Bankruptcy Code section 503(c)(3). See KEIP Motion ¶¶ 25-27. Bankruptcy Code section 503(c)(3) imposes a general prohibition on transfers or obligations outside the ordinary course of business (including transfers or obligations in favor of insiders) that are "not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). The Debtor argues that the KEIP is appropriately justified under the facts and circumstances here as (i) it is calculated to achieve the desired performance; (ii) the cost and scope of the KEIP is reasonable; (iii) it is consistent with industry standards; and (iv) the Debtor's independent counsel has performed extensive due diligence in creating and authorizing the KEIP. See KEIP Motion ¶¶ 29-33.

16. Even if the Debtor could provide evidence to this Court that the KEIP was properly incentivizing and not simply aimed at maintaining the employment of the Key Employees, here it is not proper under the facts and circumstances of this case because it is simply not necessary. The KEIP Motion is scheduled to be heard concurrently with approval of the Sales at the Sale Hearing. By the time the KEIP Motion is approved, the Key Employees will have already performed any of the allegedly critical steps necessary for the Debtor to obtain approval of the Sales, as they were required to do in order to comply with their already-existing fiduciary duties. The Debtor maintains that the Key Employees are "critical . . . to achieve the

Debtor's financial objections [sic] by maintaining uninterrupted operation of the Debtors' businesses." KEIP Motion ¶ 35. Indeed the Debtor has conceded that the Key Employees, as insiders, already have a fiduciary duty to maximize value (unlike other non-fiduciaries who need to be incentivized). See KEIP Motion ¶ 12 (acknowledging that the Key Employees have a "fiduciary duty to maximize the value of estate assets").

17. Equally as importantly, upon information and belief, the Key Employees each have already received incentive to do their job well in the form of substantial prepetition raises to their salaries. Namely, each of the Key Employees received raises – some more than 50% of their salary – just before the bankruptcy was filed to remain with the Debtor through the bankruptcy process. Thus, the Debtor's suggestion that the KEIP is appropriate and necessary to compensate the Key Employees for "assumed added responsibilities in connection with the Debtor's restructuring and the marketing of the Debtor's assets" is a farce. See KEIP Motion ¶ 10.

18. The Key Employees should not need to be further incentivized to continue to work through the Sales process. At least one court agreed in a similar case, finding that insiders should not be paid incentives simply for doing their job. In GT Advanced Technologies, nine of the debtor's insiders sought bonuses on varying levels of performance – threshold, target and stretch – on several different metrics. The court was troubled by these insider bonuses, stating that "[i]nsiders [sought] bonus compensation for doing a job they [were] already obligated to do – to right the ship. . . ." Case No. 14-11916-HJB, 2015 WL 5737181, at *6 (Bankr. D.N.H. Sept. 30, 2015); see also Transcript of Hearing, In re Molycorp, Inc., Case No. 15-11357 (CSS) (Bankr. D. Del.), at 57-58 (holding that the KEIP was actually a retention plan because, among other things, the milestones were based on simply confirming a plan or selling the assets by a non-accelerated date certain), attached hereto as Exhibit A. The situation is the same here.

Achieving the Targets is part of the Key Employees' job and they should not need further incentives to complete those jobs after having already received substantial raises.

19.  Even more than the other Key Employees, Mr. Samson, as a restructuring professional, should not require a Payment to assist with the restructuring as that is why he was hired originally. As set forth in his declaration in support of the Debtor's First Day Motions, Mr. Samson was interim CEO to the Debtor's from May 28, 2014 through April 1, 2015. See First Day Declaration ¶ 1. During the period in which Mr. Samson was interim CEO he was also employed by Getzler Henrich Associates LLC ("GHA"), a restructuring advisory firm. See id. On April 1, 2015, Mr. Samson was made the Debtor's permanent CEO. As such, Mr. Samson should not require a KEIP Payment to remain with the Debtor through the sale process when that is precisely why he was hired by the Debtor just months prior to the Petition Date.

20.  Nor is a payment to Mr. Samson necessary, as he is not directly involved in the bidding process due to CTS's unavoidable conflict as a bidder. Specifically, Mr. Samson, previously testified that he would not be part of the decisions regarding bids selected during the auctions. See Dep. of Mark Samson, Aug. 25, 2015, 73:5-19 (excerpts of transcript are attached hereto as Exhibit B).[5] The fact that the Key Employees cannot be an integral part of the bidding process, because they have a controlling interest in one of the bidders, further negates the need to incentivize their efforts related to the Sales.

**C. The Court Should Deny the KEIP Motion Because the Debtor has Failed to Establish That the KEIP Provides a Benefit to the Debtor's Creditors.**

21.  The Debtor asserts that the KEIP should be approved as it is a valid exercise of the Debtor's business judgment. See KEIP Motion ¶¶ 20-23. However, the Debtor fails to establish that the KEIP provides an actual benefit to the estate. Bankruptcy Code section

---

[5] While the KEIP Motion sets forth that the Key Employees will not receive the Payments if the NXT Stalking Horse Bidder is the successful bidder, that does not resolve the fact that they still have a controlling interest in a bidder and cannot be unbiased through the Sales process.

503(b)(1)(A)(i) provides, in pertinent part, that after notice and a hearing, the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case shall be allowed as an administrative expense. See 11 U.S.C. § 503(b)(1)(A)(i). In order to keep administrative expenses to a minimum and to maximize value for an estate, section 503(b) is narrowly construed. See generally In re N.P. Min. Co., Inc., 963 F.2d 1449, 1454 (11th Cir. 1992). In order to qualify for administrative expense priority treatment, the expense must arise from a transaction that accorded the estate with an actual benefit. See In re Insilco Techs., Inc., 309 B.R. 111, 114 (Bankr. D. Del. 2004) (citing Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999)). See also In re Dana Corp., 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (the test under Bankruptcy Code section 503(c)(3) appears to be "no more stringent a test" than the one applied under Bankruptcy Code section 503(b)(1)(A)).

22. At this juncture in the case, the Debtor has proposed nothing more than the Sales. It has not provided this Court with any clear path forward after the Sales. There has been no chapter 11 plan or even a wind-down budget agreed upon. Equally as importantly, at this time, the Sales as proposed will offer no recovery for unsecured creditors and no operating expenses for the estate. (It is disingenuous for the Debtor to say that "support of the relief requested...from the Debtor's prepetition first lien lender is a good indication of the KEIP's reasonableness" because that lender stands to be close to, if not fully, repaid. Thus, the cost of the KEIP will likely be borne by the Debtor's other creditors.) The Stalking Horse Bids combined equal just over $33 million. If no other bidders come forward or the sale price is only slightly increased through the auction, creditors other than the Debtor's secured lenders may receive nothing. In this scenario, approval of potentially up to half a million dollars in payments to the Key Employees as incentive payments is improper.

## RESERVATION OF RIGHTS

23.     The Committee and its members reserve their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, and to raise additional objections prior to or during the hearing on the KEIP Motion.

WHEREFORE, for all of the foregoing reasons, the Committee respectfully requests that this Court enter an order (a) sustaining this Objection, (b) denying the KEIP Motion, and (c) granting the Committee such additional relief as is just and proper.

Dated:   October 22, 2015
         Syracuse, New York

**MENTER, RUDIN & TRIVELPIECE, P.C.**

  /s/Jeffrey A. Dove
Jeffrey A. Dove (Bar Roll No. 101532)
308 Maltbie Street, Suite 200
Syracuse, NY 13204-1439
Telephone:   (315) 474-7541
Facsimile:   (315) 474-4040
E-mail:      jdove@menterlaw.com

*Local and Conflicts Counsel to the Official Committee of Unsecured Creditors*

-and-

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**
Matthew P. Ward (Del. Bar No. 4471)
Ericka F. Johnson (Del. Bar No. 5024)
Morgan L. Patterson (Del. Bar No. 5388)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone:   (302) 252-4320
Facsimile:   (302) 252-4330
E-mail:      maward@wcsr.com
E-mail:      erjohnson@wcsr.com
E-mail:      mpatterson@wcsr.com

*Counsel to the Official Committee of Unsecured Creditors*